



# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

FILED

03 MAR 14 PM 4:09

**TEAM TIRES PLUS, LTD., a**
**Minnesota corporation,**

      **Plaintiff,**

vs.

      CASE NO.: CIV-01-1124 ~~WWE~~/RLP
        JP

**TIRES PLUS INC., a**
**New Mexico corporation,**

      **Defendant.**

---

## DEFENDANT TIRES PLUS INC.'S DAUBERT MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND REPORTS OF PLAINTIFF'S DAMAGES EXPERT STEVEN S. OSCHER AND SUPPORTING MEMORANDUM

Pursuant to the Federal Rules of Evidence and the holdings of Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Defendant Tires Plus Inc.("Defendant") moves the Court to enter an order excluding the testimony and report of Plaintiff's expert Steven S. Oscher on the grounds that (1) Mr. Oscher's opinions are based upon unjustified assumptions, and (2) the prejudice which will be suffered by Defendant should Mr. Oscher be allowed to testify substantially outweighs any probative value.[1]

## I. Statement of Undisputed Facts ("SOF").

1.     In August of 2002, Plaintiff had served upon Defendant a report from Steven S. Oscher ("Oscher Report"), the relevant portions of which are attached as Ex. 37.  On page three

---

[1] Defendant has filed a Second Motion for Summary Judgment Against Plaintiff's Damages Claims. Should that motion be granted, Defendant's current motion would not need to be decided as any need for expert testimony relating to damages would not be required.



of that report, Mr. Oscher states that, based on Plaintiff's belief that it has been economically damaged as a result of Defendant's use of the mark TIRES PLUS, he was "engaged by counsel for the plaintiff to calculate the economic loss" resulting from that damage.

2.   The Oscher Report sets forth three elements of damages, (1) Defendant's Profits, (2) Plaintiff's Economic Damages, and (3) Corrective advertising. Id. at 4.

3.   According to Defendant's financial information, it has suffered losses of $1,222,762 over a sixteen-year period. (Expert Witness Report of Bruce F. Malott ("Malott Expert Report") at 3, attached to Pl.'s Mot. Exclude Test. and Report of Expert Witness Bruce F. Malott.)

4.   Instead of using Defendant's actual profits numbers, Mr. Oscher relied on a published study as a "benchmark for [Defendant's] specific financial information." Oscher Report at 4.

5.   From this published study, Mr. Oscher determined that, nationwide, an average tire dealer had an operating profit of 3.3%, which, when multiplied by Defendant's net sales, amounted to profits of $560,000 from 1994 to 2001. Id.

6.   In calculating Plaintiff's economic damages, Mr. Oscher included the following: 1) an initial franchise fee; 2) royalty fees; 3) maintenance/license fees; and 4) inventory markup damages. Id.

7.   Plaintiff has no plans to enter the New Mexico market (Hyduke Dep. at 93, attached to Def.'s First Mot. Partial Summ. J. Strike Count II Pl.'s Compl. as Ex. 7.)

8.   Plaintiff has not encountered any actual confusion. (Pl.'s Mot. Summ. J. at 18.)

9.  As of 1994, eight years after Defendant began using the mark, Plaintiff's closest company or franchise store was in Des Moines, Iowa.  (Gullett Dep. at 137, *ll*. 21-24, attached to Def.'s First Partial Motion Summ. J. Strike Count II Pl.'s Compl. as Ex. 9.)

10. The initial franchise fee and royalty fees were calculated assuming Defendant would have purchased a franchise from Plaintiff in 1994.  Oscher Dep. at 101, *ll*.11-22 the relevant portions attached as Ex. 38.

11. The inventory markup damages were calculated by assuming Defendant would have bought 62.8% of its tires from Plaintiff.  Id. at 92, *l*. 24 – 93, *l*. 3.

12. Franchisees of Plaintiff are not required to purchase tires from Plaintiff.  Id. at 81, *l*. 21-82, *l*. 1.

13. Mr. Oscher has not stated any amount of money that would be needed to conduct corrective advertising, and has stated that he has no opinion about what such an amount would be.  Oscher Report at 4; Oscher Dep. at 118, *l*. 18-21.

14. On November 18, 2002, Plaintiff had served on Defendant a rebuttal report prepared by Mr. Oscher to evaluate the conclusions of Defendant's expert Bruce Malott's report ("Oscher Rebuttal"), the relevant portions attached as Exhibit 39.

## II. Standards

The testimony and reports of Mr. Oscher do not satisfy the standards set out in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Under Daubert, the Supreme Court established a framework that courts were to use to

3

analyze the admissibility of scientific expert testimony under Fed. R. Evid. 702. The principal purpose of the <u>Daubert</u> framework is to determine whether the proffered evidence is reliable. <u>See United States v. Call</u>, 129 F.3d 1402, 1404 (10th Cir. 1997). Under <u>Daubert</u>, courts are to consider five factors: (1) whether the technique used can and has been tested; (2) whether the technique has been subjected to peer review; (3) the known or potential error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has gained general acceptance in the scientific community. <u>aubert</u>, 509 U.S. at 593-95. This list is not exhaustive. <u>Id.</u> at 594.

In <u>Kumho</u>, the Supreme Court reaffirmed the <u>Daubert</u> principles and held that the <u>Daubert</u> framework was to apply to all expert testimony. Specifically, the Court held that "<u>Daubert</u>'s general holding - setting forth the trial judge's general 'gate keeping' obligation- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." 526 U.S. at 141.

Under Rule 702, the trial court must act as a gatekeeper and determine at the outset, pursuant to Rule 104(a),

> whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

<u>Daubert</u>, 509 U.S. at 592-93 (footnote omitted). In addition "[u]nder Daubert, 'any step that renders the analysis unreliable . . . renders that expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies this methodology.'" <u>Mitchell v. Gencorp, Inc.</u>, 165 F. 3d 778, 782 (10th Cir. 1999) (citing <u>In re Paoli</u>

R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

### III. Mr. Oscher's Opinions  Are Unreliable As Being Based On Unfounded Assumptions

Courts have repeatedly excluded expert testimony related to damages when the proffered opinions are based on unjustified assumptions.  See First Savings Bank, F.S.B. v. U.S. Bancorp, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000) (citing  Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415-16 (7th Cir. 1992) (expert should have separated injury due to unlawful conduct from that due to new entry in market); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 911 (2d Cir. 1962) (economist's damage evidence properly excluded where no basis for assumption established); Cochrane v. Schneider Nat'l. Carriers, Inc., 980 F. Supp. 374 (D. Kan. 1997) (excluding expert estimates of loss based on unjustified assumptions); In re Aluminum Phosphide Antitrust Litigation, 893 F.Supp. 1497, 1507 (D.Kan.1995) (proposed expert opinions based on unjustified assumptions would not assist the trier of fact and were therefore inadmissible under rule 702 & and cases cited therein); S. Pac. Communications Co. v. Am. Tel. & Tel. Co., 556 F. Supp. 825, 1075-76 (D.D.C. 1982) (damage model based on unreasonable and speculative assumptions not sufficient to support just and reasonable approximation of damages) aff'd, 740 F. 2d 980 (D.C. Cir. 1984)).  In the present case, not only are Mr. Oscher's opinions based on unjustified and arbitrary assumptions, but these opinions are clearly contradictory to any actual data produced thus far. In particular, Mr. Oscher disregarded Defendant's financial information when calculating Defendant's profits. SOF No. 4. Additionally, Mr. Oscher assumed that Defendant would have accepted a franchise from Plaintiff in 1994 when calculating Plaintiff's "economic losses." Id. No. 10.  Finally, with regard to

inventory markup, Mr. Oscher arbitrarily assumed that not only would Defendant have accepted a franchise from Plaintiff in 1994, but would have also purchased 62.8% of its tires from Plaintiff. Id. No. 11. These opinions must be excluded under the standards for expert economic testimony that is well accepted within the courts of the Tenth Circuit.

### A. Defendant's Profits

Assuming that Defendant's profits are a proper measure of damages in this case, the amount of Defendant's profits calculated by Mr. Oscher are so speculative and contrary to actual data available to Plaintiff, that any opinion derived from such numbers must be excluded.

Defendant's business is not a profitable business, suffering losses amounting to well over $1,000,000 in the past sixteen years. SOF No. 3. Therefore, the question of whether or not Plaintiff is entitled to recover Defendant's profits is moot as Defendant has none. Nevertheless, Mr. Oscher has asserted that Plaintiff is entitled to $560,000 for what he refers to as "Defendant's Profits." Oscher Report at 4. Instead of relying on Defendant's financial data, or at the least, undertaking an analysis of Defendant's financial data, Mr. Oscher summarily ignored any actual figures. Instead of undertaking any analysis of this data, Mr. Oscher derived what he stated to be an "appropriate operating profit percentage" of 3.3% from a published study referred to as RMA Annual Statement Studies. Oscher Report at 4. These annual studies are published by Risk Management Associates (RMA) and contain financial information submitted to cooperating banks by companies grouped by industry "Standard Industrial Classification." Addendum to Expert Witness Report of Bruce F. Malott, CPA ("Malott Addendum") at 4, the relevant portions attached as Ex. 41.

This 3.3% profit number has absolutely no relationship to Defendant's tire stores and was

derived by Mr. Oscher without any reference to Defendant's own financial data. Were Mr. Oscher's derivation of a profit percentage based on a review of Defendant's financial data, all of which have been made available to Plaintiff, any objections as to Mr. Oscher's opinions could quite possibly be a question of weight and not admissibility. However, Mr. Oscher did not and has not availed himself of this data even though he admitted that Defendant's financial data would be the best evidence of Defendant's profit if a jury were to find the data to be properly recorded. Oscher Dep. at 44, l. 11 – 45, l. 8. Mr. Oscher even went so far as to say that specific financial information would always be the primary source for determining profits. Id. at 37 ll. 4-8. Even after being supplied a multitude of various financial documents relating specifically to Defendant's business, along with the personal tax returns of Don Leonard, owner of Defendant, Mr. Oscher remains unwilling to address these numbers, even though he admitted that he could not testify one way or the other whether or not Defendant's financial information was inaccurate. Second Oscher Dep. at 106, ll. 18-22, the relevant portions are attached as Ex. 40.

Mr. Oscher must not be allowed to substitute nationwide, generalized data bases for actual financial data, not one number of which has ever been shown to be related to Defendant's business. Furthermore, the database utilized by Mr. Oscher was never intended to be used in the context that Mr. Oscher used it. The court need look no farther than Mr. Oscher's own statements in order to judge the propriety of substituting this generalized data in lieu of analyzing Defendant's actual financial data.

> Q. Are you aware of any concerns that RMA itself has expressed about the use of its data?
> A. Well, they make a statement that it is not to be used because they're not giving any reliance to it.
> The fact that RMA has put out these published studies, it is commonly used in terms of just doing what I'm doing and setting a benchmark. Nobody is saying that this is the way it actually is. It's just trying to give the user of

7

information the ability to see what the industry may or may not be doing.

    Q.  Right. It's just a general guideline. if you will?

    A.  Oh, absolutely.

    Q.  It certainly is not meant to be a specific accounting of what Don Leonard made or did not make in his business?

    A.  No, it couldn't be that. It's just to give me. as a provider of what I think is reasonable information. a benchmark, and that's how I've used it.

. . .

    Q.  Would it be fair to state that you can't take the RMA data and conclude that, because another -- an individual business is different, had different profit or loss, that they're necessarily not reporting their profit and loss accurately?

    A.  I don't know that I understand what you just asked me.

    Q.  You're not saying that you can use the RMA data and compare it to an individual business, such as Mr. Leonard's, and come to the conclusion that the reports of Mr. Leonard are inaccurate?
In other words, RMA might give you a conclusion that there's, across the board, a three-percent profit. That doesn't mean, if Mr. Leonard reports a loss, that his reports are not accurate?

    A.  Your last statement is a true statement.  Your other question, the answer to it is:  I don't know.

Oscher Dep. at 39 *l.* 6 – 41 *l.* 5.

First, this 3.3% number was not used as a "benchmark" as Mr. Oscher states.  A benchmark is something to which actual numbers can be compared.  But, instead of comparing Defendant's financial data with this data, Mr. Oscher simply assumed that Defendant did, in fact, attain this level of profitability.  This assumption is clearly erroneous.

Second, RMA, which publishes the numbers utilized by Mr. Oscher, recognizes that its studies should not be considered the norm in a given industry when it states in the introduction to its studies:

RMA does not recommend the Statement Studies figures be considered as absolute norms for a given industry. Rather the figures should be used only as general guidelines and in addition to the other methods of financial analysis.

RMA, Annual Statement Studies, 2000-2001 at 12, attached as Ex. 42.

8

Mr. Oscher, however, with regard to calculating the amount of Defendant's profits, did not use any other financial analysis, but simply derived a profit percentage from the RMA studies and multiplied Defendant's net sales by that number.

Furthermore, the totality of the conclusions in Mr. Oscher's rebuttal report are that "it remains difficult to conclude that [Defendant] operated unprofitably for fourteen of the prior sixteen years." Oscher Rebuttal at 4. When asked in his second deposition if he could opine on whether Defendants financial information was accurate, he agreed that he could not testify to such an issue. Second Oscher Dep. at 106, *ll.* 18-22. Aside from the statement quoted above, Mr. Oscher does not give any further opinions about Defendant's actual financial data. Because no opinions are given in this rebuttal report, this report and any future opinions based thereon should also be excluded from this case.

The real reason Mr. Oscher utilized a published study to calculate Defendant's profit instead of Defendant's actual data is clear: Plaintiff could not recover any damages in the form of Defendant's actual profits because Defendant has none. Therefore, Plaintiff chose to disregard Defendant's actual data and proceeded to make a second assumption that Defendant must have actually made a profit of 3.3%. Plaintiff and its expert, Mr. Oscher, must not be allowed to invent hypothetical profit percentages for Defendant when the actual figures are readily available. Mr. Oscher's opinions do not even qualify as speculation as they are clearly contradictory to available data. If Mr. Oscher were concerned about some of the figures in that data, he had more than ample opportunity to address these concerns. However, the Court must not allow him to completely ignore this data, make up a hypothetical operating profit percentage, and attempt to proffer the opinion that this percentage is in fact the correct percentage to use when calculating

9

the profit of Defendant. It would difficult be to find a clearer case of an opinion based on unfounded and clearly contradictory assumptions, and therefore, all of Mr. Oscher's opinions concerning Defendant's profits must be excluded.

## B. Plaintiff's Economic Damages

As an additional claim for damages, Plaintiff asserts that it is entitled to "Plaintiff's Economic Loss." Oscher Report at 4. However, these damages are premised on the underlying assumption that in 1994, by virtue of Defendant's adoption of the mark TIRES PLUS, it would have been considered either a conversion franchise or an initial franchise. Further, Plaintiff assumed that, by virtue of this association, Plaintiff would have collected licensing fees, royalty fees, maintenance fees, and inventory mark up revenue. SOF No. 6. This underlying assumption defies the facts of this case as admitted by Plaintiff. In 1994, Plaintiff did not have any stores outside of the Midwest. Id. No. 9. Thus, to say that, as of 1994, Plaintiff was suffering losses due to Defendant's use of the mark TIRES PLUS is nothing short of ridiculous.

In order to recover its economic damages, "plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation." Brunswick Corp. v. Spinit Reel Co. 832 F.2d 513, 525 (10th Cir. 1987). In addition, "damages are 'measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement.'" First Savings Bank, F.S.B. v. U.S. Bancorp, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000) (quoting Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993)). Therefore, in order for Mr. Oscher's opinions to be admissible, they must be based on a reliable relationship to the actual damages Plaintiff would have avoided but for the actual confusion caused by Defendant's infringement.

10

The "but for" test suggested by the district court in First Savings Bank, suggests that the proper analysis here would be to ask: but for Defendant's adoption of the mark TIRES PLUS, would Plaintiff have been entitled to the various revenues it now seeks as damages? All of the evidence in this case reveals that Plaintiff was not even offering franchises in New Mexico in 1994. SOF No. 9. Second, it must be assumed that Defendant would be willing to purchase a franchise and had the financial ability to do so. Mr. Oscher himself stated that there was no evidence that Defendant would have accepted a franchise from the years 1994 through 2001, thus explicitly contradicting the very premise of his own opinions. Second Oscher Dep at 90. *ll.* 10-15. Mr. Oscher even admitted that assuming that such a franchise agreement would have been entered into is speculative. Id. at 92, *ll.* 9-13. These assumptions based on a hypothetical situation which could not have possibly occurred must be excluded.

**C. Plaintiff's "Inventory Markup" Damages**

In addition to the unjustified assumptions discussed in Section B above, over half of Plaintiff's alleged economic damages stem from an element Mr. Oscher referred to as "inventory markup." Oscher Report at 4. This element of damages is entirely composed of the income Plaintiff supposedly would have made by selling tires to Defendant. However, as will be shown below, this element of damages is the epitome of speculation. In light of the extreme liberties Mr. Oscher employed in deriving a number for this element of damages, any opinion related to inventory markup must be excluded.

As above, the first assumption necessary in order to arrive at Mr. Oscher's final damage calculation under inventory markup is that, in 1994, Plaintiff would have offered Defendant a franchise. This is ridiculous as Plaintiff was not, and is still not entering the New Mexico

market. SOF Nos. 7 & 9. Second, it has to be assumed that Defendant would have accepted such a franchise from Plaintiff. As Defendant has never sought to be franchisee, this is equally unlikely. As noted above, Mr. Oscher himself agreed that such a presumption was speculative. Second Oscher Dep. at 92, *ll.* 9-13. Third, and most importantly, it must be assumed that Defendant would have bought 62.8% of its tires from Plaintiff. SOF No. 11. This assumption is particularly baseless as Plaintiff does not require any of its franchisees to purchase their tires from it. Id. No. 12. Again, in Mr. Oscher's second deposition, he stated that if Defendant was not a franchise, he would not even have the ability to purchase tires from Plaintiff. Second Oscher Dep. at 93, ll. 2-4. Within this third assumption, Mr. Oscher also made the inherent assumption that Defendant could have purchased tires from Plaintiff at a cost less than it purchases tires from its current suppliers. However, Mr. Oscher has supplied no evidence that this was the case.

These assumptions underlying Mr. Oscher's calculation of inventory markup are so speculative as to render them completely inadmissible in the present case. There is no evidentiary support for these assumptions, and the assumptions defy historical fact. Therefore, Mr. Oscher's opinions as to inventory mark-up should be excluded.

## IV. Any Probative Value Of Mr. Oscher's Testimony Would Be Substantially Outweighed By Prejudicial Effect To Defendant.

Even if Mr. Oscher's opinions are deemed reliable and relevant, they should be excluded under Rule 403 of the Federal Rules of Evidence. "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Courts have excluded such economic data in trademark cases if the probative value of the expert's opinion are "substantially outweighed by the unfair prejudice and the confusion to the jury that would result from the authoritative rendering of such substantial damage estimates by a purported economic expert." First Savings Bank F.S.B. v. U.S. Bancorp. , 117 F. Supp. 1078, 1085-86 (D. Kan. 2000).

In the present case, Plaintiff has never suffered any instances of actual confusion, SOF No. 8 has not done any business in New Mexico, SOF Nos. 7 & 9 and does not seem to have been harmed by Defendant in any recognizable way. Yet Plaintiff's expert has divined that Plaintiff has suffered over $1,000,000 in damages by Defendant's use a similar mark. Whatever probative value Mr. Oscher's exercises in speculation may have to any issue presently, the possibility of prejudice toward Defendant which would occur if Mr. Oscher were allowed to give his speculations a certain ethereal air of authority by virtue by qualifying his opinions as an "expert opinion" would substantially outweigh any such probative value.

## VI. Conclusion

The district court for the District of Kansas, quoting a Seventh Circuit case, stated "[P]eople who want damages have to prove them." First Savings Bank F.S.B. v. U.S. Bancorp. , 117 F. Supp. 1078, 1085 (D. Kan. 2000) (internal quotation marks and citation omitted). Mr. Oscher's opinions are driven by Plaintiff's desire to enhance damages. When the actual data and evidence in this case do not support certain elements of damages, Mr. Oscher has simply supplied his own data. First, Defendant has accumulated losses of over $1,000,000, yet Mr.

Oscher has asserted that it had profits of $560,000. Second, Plaintiff has never entered New Mexico, yet Mr. Oscher has asserted that it is due licensing fees, royalty fees, and inventory markup revenues dating back to 1994. Finally, with regard to inventory markup fees, Mr. Oscher asserts that Defendant, as a franchisee, would have bought 62.8% of its tires from Plaintiff without supplying any evidence that it would have been more economical for Defendant to do so, notwithstanding the fact that franchisees are not required to purchase any tires from Plaintiff. Cumulatively, Mr. Oscher's opinions do not rely on a single shred of evidence. In contrast, the assumptions necessary to arrive at Mr. Oscher's conclusions are clearly contrary to evidence submitted by both parties in this case. Based on the foregoing, Defendant prays that this Court grant its motion and exclude the report and testimony of Mr. Oscher.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _M. Wermager_

Travis R. Collier
DeWitt M. Morgan
Kurt Gilbert
Matthew S. Wermager
Attorneys for Defendant Tires Plus Inc.,
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505) 765-5900
FAX: (505) 768-7395

14

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused to be served a true and correct copy of the foregoing pleading to the following counsel of record on March 14, 2003:

*Via Hand Delivery*
Juan L. Flores, Esq.
Sheehan Sheehan & Stelzner
707 Broadway NE, Suite 300
Albuquerque, NM 87102

*Via Courier*
J. Todd Timmerman
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602

Dated this 14th day of March, 2003.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _____
Matthew S. Wermager

# EXHIBIT 37

### (follows this page)

# Team Tires Plus, Ltd.

## v.

# Tires Plus Inc.

**August 13, 2002**

Prepared by:
Oscher Consulting

## UNDERSTANDING

It is our understanding that Team Tires Plus, Ltd. ("Tires Plus" or "the Plaintiff") has filed a lawsuit against Tires Plus, Inc. ("TPI" or "the Defendant") alleging service mark infringement and unfair competition.

Tires Plus is a company engaged in the business of franchising and operating retail tire stores and automobile service centers nationwide. The service mark in question has been in use by the Plaintiff or its predecessor in interest since 1981. It is believed that subsequent to the adoption and use of the service mark, Tires Plus, by the Plaintiff, the Defendant began using the service mark, Tires Plus, in connection with its retail tire store and automobile service business in Albuquerque, New Mexico.

As a result of the Defendant's improper use of the service mark, Tires Plus believes they have been economically damaged. Oscher Consulting, P.A. and Steven S. Oscher, CPA have been engaged by counsel for the Plaintiff to calculate the economic loss.

## BACKGROUND

Steven S. Oscher is a Certified Public Accountant and the Managing Director of Oscher Consulting, P.A. Prior to forming Oscher Consulting, Mr. Oscher was with an international accounting firm where he served as an Audit and Quality Review partner and Director of their Central Florida Litigation Services Department.

Mr. Oscher is a graduate of the University of South Florida and received his BS in Accounting in 1977. Mr. Oscher is a member of the Association of Certified Fraud Examiners and has been accredited as a Certified Fraud Examiner. He has also been accredited by the American Institute of CPA's in the area of Business Valuation. He has worked on numerous engagements involving issues of economic damages.

A copy of Mr. Oscher's curriculum vitae is attached as Exhibit I. A listing of cases in which Mr. Oscher has provided testimony at trial or deposition in the last four years is attached as Exhibit II. Mr. Oscher is compensated at the rate of $225 per hour.

## INFORMATION CONSIDERED

At this time, we are aware that discovery remains open and additional information may be provided. The documents we have obtained and considered are shown at Exhibit III.

## FINDINGS

The economic damages to be considered in this matter are:

### Defendant's Profits

It is our understanding that TPI was informed during 1994 that it was wrongfully using the service mark, Tires Plus, and a demand was made for them to cease and desist. We have requested financial statements and tax returns for TPI, but have only received redacted financial statements containing annual sales and marketing expense totals. Exhibit IV reflects annual revenue for TPI for 1994 through 2001 (mid-year information has not been provided by the Defendant). Without the Defendant's specific financial information, we have utilized published studies to provide a benchmark for TPI's expected operating profit. These studies indicate 3.3 percent would be an appropriate operating profit percentage. Therefore, for the period 1994 through 2001, the Defendant's calculated operating profit is $ 560,000.

### Plaintiff's Economic Damages

The Plaintiff's economic damages associated with the Defendant's infringement would primarily be earnings from initial franchise fees, royalty fees, maintenance/license fees, inventory markup, and advertising fees. Exhibit V provides the analysis of the damage component giving consideration to two different scenarios. The first assumes TPI would have been a converted franchisee, and the second scenario assumes TPI would be considered an initial franchisee. The Plaintiff's economic loss would range from $565,000 to $850,000.

### Corrective Advertising

We understand an additional damage consideration may be needed for additional expenditures associated with corrective advertising. We are aware that TPI has produced their historical advertising expense for the years 1994 through 2001 as being $180,922. At this time, we have asked for the Plaintiff's projected future costs to correct any false impressions associated with the improper use of the trademark. Such information has not yet been received.

### Other

We are aware that Mr. Gary Fox, a tire store owner in Albuquerque, New Mexico, had expressed an interest in seeking a Tires Plus franchise operation. In the event the Court should find that the Defendant's actions prevented additional franchise opportunities from developing, economic damages similar to that shown on Exhibit V will need to be prepared.

We have prepared our calculations based on the presumption that the damage period commenced upon legal notification of the infringement. If the Court decides the period for calculation of economic damages is earlier than 1994, we will adjust our analysis accordingly.

Page 4

# EXHIBIT 38

**(follows this page)**

```
 1                                                        1
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW MEXICO
              NO. CIV-01 1124 WWE/RLP
 3
 4   TEAM TIRES PLUS, LTD., a
     Minnesota corporation,
 5
               Plaintiff,
 6
       vs.
 7
 8   TIRES PLUS, INC., a
     New Mexico corporation,
 9
               Defendant.
10
11
12
13          DEPOSITION OF STEVEN S. OSCHER
14               September 27th, 2002
                     9:13 a.m.
15        201 Third Street, Northwest, Suite 2200
             Albuquerque, New Mexico  87102
16
17
18          PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19
20
21   TAKEN BY:    MR. TRAVIS R. COLLIER
                  ATTORNEY FOR DEFENDANT
22
23
24   REPORTED BY: MICHELE TRUJILLO, CCR No. 226
                  Kathy Townsend Court Reporters
25                110 Twelfth Street, Northwest
                  Albuquerque, New Mexico  87102
```

```
 1                E X H I B I T S                        1
 2   OSCHER EXHIBIT:                            MARKED
 3   72  Notice to Take Deposition Duces Tecum     8
 4   73. Letter dated 9/16/02 to Mr. Morgan from
 5       Mr. Timmerman                             9
 6   74. Report done by Oscher Consulting         10
 7   75. Two handwritten pages, beginning with
 8       "I, Tire Cost - (y)"                      11
 9   76. Group of documents produced to Mr. Oscher
10       including financial information          31
11   77. Team Tires Plus, Ltd., Economic Damages
12       and Tires Plus, Inc., ("TPI"), Annual
13       Revenue, with red markings               33
14   78. Xerox copy of yellow stickie             48
15   79. Xerox copy of yellow stickie             48
16   80. Copy of Exhibit 75 handwritten pages with
17       new calculations                         86
18
```

```
 1                A P P E A R A N C E S                  2
 2   For the Plaintiff:
 3      SHUMAKER, LOOP & KENDRICK. L.L.P.
        Attorneys at Law
 4      Bank of America Plaza, Suite 2800
        101 East Kennedy Boulevard
 5      Tampa, Florida  33602
        By: MR. C. PHILIP CAMPBELL, JR.
 6
 7   For the Defendant:
 8      RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
        Attorneys at Law
 9      201 Third Street, Northwest, Suite 2200
        Albuquerque, New Mexico  87102
10      By: MR. TRAVIS R. COLLIER
            MR. MATTHEW WERMAGER
11
     Also Present:
12
        Mr. Donald Leonard
13      Mr. Bruce Malott
14
15                I N D E X
16   STEVEN S. OSCHER                        PAGE
17      Direct Examination by Mr. Collier       4
18   CERTIFICATE OF COMPLETION OF DEPOSITION  129
19   SIGNATURE/CORRECTION PAGE                131
20
21
22
23
24
25
```

```
                                                        4
 1                 STEVEN S. OSCHER
 2      after having been first duly sworn under oath,
 3      was questioned and testified as follows:
 4                 DIRECT EXAMINATION
 5   BY MR. COLLIER:
 6      Q.  Good morning, Mr. Oscher.  Is that a correct
 7   pronunciation of your name?
 8      A.  It is, sir.
 9      Q.  As you know, we're here for your deposition
10   this morning.  My name is Travis Collier.  I represent
11   the defendant in this case, and I'm going to try to refer
12   to both parties as just the plaintiff and the defendant,
13   for the ease of use here.
14         I take it you've given many depositions.  Is
15   that correct?
16      A.  Yes, sir.
17      Q.  And you sort of know the lay of the land, if
18   you will?
19      A.  I hope so, yes, sir.
20      Q.  If I should ask you anything you don't
21   understand, please let me know so that we make sure your
22   answers are accurate, all right?
23      A.  Yes, sir.
24      Q.  When were you first engaged in this matter?
25      A.  I'm trying to think.
```

37

```
 1      A.  If I had had complete financial information, it
 2  would certainly have allowed me to consider the
 3  information more completely than I did, yes, sir.
 4      Q.  In fact, that would be your primary source for
 5  determining the defendant's profits, would it not?
 6      A.  The actual financial statements?
 7      Q.  Yes, sir.
 8      A.  That would always be so.
 9      Q.  Did you utilize any published studies besides
10  RMA?
11      A.  No, sir.
12      Q.  I guess, for purposes of the record, would you
13  identify what RMA is?
14      A.  Well, it used to stand for Robert Morris
15  Associates, but I think it's taken on a different -- the
16  acronym stands for something else other than Robert
17  Morris Associates today.
18      Q.  Would you tell me how you determined the
19  defendant's profits?
20      A.  What I tried to do was find where there might
21  have been some published information relative to a tire
22  store operation that also had a service operation, repair
23  operation, associated with it.  I didn't find any
24  published studies on point to that topic.
25          What I wanted to then do was find something
```

39

```
 1  stores for the repair shops.
 2          So the accumulation of data seemed to come from
 3  enough different places that -- using it as a benchmark
 4  was something I had done in other cases and I believed
 5  that it was reasonable and appropriate.
 6      Q.  Are you aware of any concerns that RMA itself
 7  has expressed about the use of its data?
 8      A.  Well, they make a statement that it is not to
 9  be used because they're not giving any reliance to it.
10          The fact that RMA has put out these published
11  studies, it is commonly used in terms of just doing what
12  I'm doing and setting a benchmark.  Nobody is saying that
13  this is the way it actually is.  It's just trying to give
14  the user of information the ability to see what the
15  industry may or may not be doing.
16      Q.  Right.  It's just a general guideline, if you
17  will?
18      A.  Oh, absolutely.
19      Q.  It certainly is not meant to be a specific
20  accounting of what Don Leonard made or did not make in
21  his business?
22      A.  No, it couldn't be that.  It's just to give me,
23  as a provider of what I think is reasonable information,
24  a benchmark, and that's how I've used it.
25      Q.  And you're aware that there are concerns that
```

38

```
 1  that I thought could be close to the issue, and by going
 2  to these published studies, I was able to take a look at
 3  a tire operation, and that's why there's actually two
 4  different studies here, the first being "Retail - Tires &
 5  Tubes," and the other would be "General Automotive Repair
 6  Shops."
 7          What I did was, in taking the profit
 8  information off of this study or these studies and then
 9  adjusting for what I believe -- from the redacted sales
10  information that I received from Mr. Leonard's operation,
11  the defendant's operation, I determined that about 60
12  percent of his sales were tire-related and 40 percent
13  were repair-related, and I put that percentage to the
14  profit percentages from here, and that's how I came up to
15  the 3.3 percent.
16      Q.  Do you have any concerns about relying on that
17  RMA information in trying to make a profit calculation?
18      A.  No, I think that what -- if I could get it back
19  for a second --
20          MR. MALOTT:  I'm sorry.
21          THE WITNESS:  Thanks, Bruce.
22          The studies that they have done here involved,
23  at different points in time, well over 100, over 150
24  different tire stores, retail tire stores, and similarly,
25  for the auto repair shops, it was well over 300, 350
```

40

```
 1  the information may not be accurate because of geographic
 2  considerations, size of business, a whole host of
 3  factors?
 4      A.  Well, on size of business, they actually try to
 5  help you.  You're perhaps correct about geographics, but
 6  the study tends to break down the size of -- and sales
 7  volume of different-size operations, so that, by itself,
 8  is not an issue.
 9      Q.  RMA believes it's an issue, don't they?
10      A.  No.  Otherwise, they wouldn't have -- I don't
11  believe they -- they would not have set out, you know,
12  that we're dealing with stores and sales volumes of
13  different sizes.
14      Q.  Would it be fair to state that you can't take
15  the RMA data and conclude that, because another -- an
16  individual business is different, had different profit or
17  loss, that they're necessarily not reporting their profit
18  and loss accurately?
19      A.  I don't know that I understand what you just
20  asked me.
21      Q.  You're not saying that you can use the RMA data
22  and compare it to an individual business, such as Mr.
23  Leonard's, and come to the conclusion that the reports of
24  Mr. Leonard are inaccurate?
25          In other words, RMA might give you a conclusion
```

41

```
 1    that there's, across the board, a three-percent profit.
 2    That doesn't mean, if Mr. Leonard reports a loss, that
 3    his reports are not accurate?
 4       A.  Your last statement is a true statement.  Your
 5    other question, the answer to it is:  I don't know.
 6            When I start an investigation, one of the first
 7    barometers I look at is as to, "What do I expect?" and
 8    RMA or any industry publications are the first source
 9    that I go to.  If things seem to tie in, then at least it
10    gives me some understanding of the business operation.
11       Q.  But the primary source that you would look at
12    to determine if Mr. Leonard was profitable or not would
13    be his own financial statements?
14       A.  Certainly, his financial statements are the
15    first source of information, the detail of his
16    accounting, yes, sir.
17       Q.  Have you undertaken any review of his financial
18    information in determining his profits?
19       A.  I have not done a study on his information, no,
20    sir.
21       Q.  Have you been given a copy of Mr. Malott's
22    report and attachments?
23       A.  Yes, sir.
24       Q.  When did you receive that?
25       A.  Probably a couple of weeks ago.
```

42

```
 1       Q.  Were you aware that Don Leonard's specific
 2    information was contained as exhibits to Mr. Malott's
 3    report?
 4       A.  It wasn't contained as specific information.
 5    It was certain financial statements and tax returns.
 6       Q.  Right, but the specific information concerning
 7    the expenses for Mr. Leonard's business were set out in
 8    exhibits to Mr. Malott's report, were they not?
 9       A.  Well, Mr. Malott copied, or people in his
10    office copied, information that was picked up off of
11    financial statements or tax returns.  I mean, that's my
12    understanding.
13       Q.  Did you make any effort to try to determine
14    Mr. Leonard's profits and losses using that material?
15       A.  Other than raising questions because things
16    certainly seemed out of order, I didn't do anything more
17    than that at this time, no, sir.
18       Q.  But you would agree with me that that's a
19    better indication of what his profits and losses would be
20    as compared to the RMA information?
21            MR. CAMPBELL:  Objection, vague.
22       A.  I don't know that I -- again, I don't know what
23    I don't know, because I haven't done anything to truly
24    look at the underlying issues that relate to the expenses
25    or the sales that Mr. Leonard reported on his financial
```

43

```
 1    records.
 2       Q.  But that's information that you requested
 3    Mr. Timmerman to give to you at one point, right?
 4       A.  Yes, sir.
 5       Q.  But you haven't looked at that since you've
 6    received it?
 7       A.  No.  I looked at the information that was
 8    contained in Mr. Malott's report.  My comment spoke to
 9    what the underlying information that made up those
10    numbers that were reported, either on the compiled
11    financial statements or on the tax returns, was.
12       Q.  But you haven't used Mr. Leonard's numbers to
13    come up with a profit or loss number?
14       A.  Well, I did use his sales numbers.  It was that
15    redacted information that we initially received.
16       Q.  But you didn't use his expense numbers?
17       A.  I didn't have his expense numbers.
18       Q.  You had them as of two or three weeks ago; is
19    that correct?
20       A.  Two or three -- again, as I'm saying, when I
21    looked at the information, I didn't -- it called into
22    question the reliability of the information, and I didn't
23    see, at that point in time, the need to make any
24    modification of my numbers.
25       Q.  Would you agree with me, if a jury finds that
```

44

```
 1    Mr. Leonard's numbers are reliable, that Mr. Leonard's
 2    operation would not have made a profit over the years
 3    that you've looked at?
 4       A.  I'm hesitating, because I don't know how you're
 5    defining as "profit."  If you could help me with that,
 6    then I'd like to answer your question.
 7       Q.  Well, let me ask you how you define "profit."
 8       A.  I define it as the appropriate business
 9    expenses taken away from appropriate, properly recorded
10    business revenue.
11       Q.  If you were to assume, first of all, that all
12    of Mr. Leonard's income and expenses were appropriately
13    recorded, as given to you in the Malott information,
14    would you agree with me, over the years that you've
15    looked at, that his firm has not had a profit?
16       A.  If they were reasonable and appropriate --
17    again, I -- what's -- I don't know how to answer that
18    question, and I'm not trying to be evasive, but I'm just
19    simply saying that, you know, without going in and -- for
20    example, I understand that there's personal expenses that
21    Mr. Leonard has acknowledged are recorded in there.
22            I don't know whether those are meaningful or
23    not.  I know Mr. Malott testified yesterday that he asked
24    the question and that he was told that they weren't, but
25    I don't know that Mr. Malott or the people in his office
```

STEVEN OSCHER, 9/27/02

45

1  did any further investigation of them. In fact, I don't
2  think they did.
3      So the fact that there's a recording of
4  numbers, I'm not prepared to buy into the fact that they
5  have been properly recorded, but maybe the answer to your
6  question is, if a jury finds that everything has been
7  properly recorded, would I agree that that was the best
8  evidence? Yes, sir, I would.
9      Q.  And if a jury finds that his expenses and
10  income have been properly recorded, would you also agree
11  that he has not had a profit for those years which he
12  examined?
13      A.  No, I can't say that, sir.
14      Q.  Why not?
15      A.  Well, because, yesterday, even Mr. Malott
16  indicated that the "profit" issue is one that -- he is
17  taking out interest. He is taking out rent on top of his
18  salary. That may, if looked at more closely, in fact,
19  constitute a profit to Mr. Leonard personally from the
20  business.
21      Q.  Have you looked at any issues concerning
22  interest or rent to Don Leonard yourself?
23      A.  It has only come up as part of my review in
24  preparation for Mr. Malott's deposition yesterday and his
25  testimony yesterday.

46

1      Q.  So as we sit here today, you do not hold any
2  opinion that any interest or rent paid by the defendant
3  was inappropriate. Is that a fair statement?
4      A.  I don't know what it is. I can't answer that.
5      Q.  And, likewise, you have no opinion, as we sit
6  here today, as to whether or not there have been personal
7  expenses recorded in an amount that would change the
8  bottom line of his business?
9      A.  I don't know the answer to that.
10      Q.  But assuming that interest and rent had been
11  appropriately paid and recorded and the jury were to so
12  find that, then would you agree that the defendant was
13  not profitable in the years that you examined?
14      A.  Well, that would be a jury finding at that
15  point, not my finding.
16      Q.  But if they were to make an initial finding
17  that his expenses were properly recorded, would you agree
18  then that there was no profit to the defendant during the
19  years that you looked at?
20      A.  I don't know that I can make that statement
21  without me looking at it in detail myself. What the jury
22  may or may not do is certainly in their purview.
23      Q.  I'm asking you to assume that they believe
24  everything has been properly recorded. In that case,
25  given that assumption, would you agree that Mr. Leonard's

47

1  business has not been profitable for the years that you
2  examined?
3      MR. CAMPBELL:  Objection, asked and answered.
4      A.  If they say that the expenses are greater than
5  the income, would I agree that that mathematical
6  calculation would show a loss? The answer is yes.
7      Q.  How did you ascertain your 3.5 percent?
8      A.  I don't know whether it was copied. I had --
9  I'm sorry.
10      I think, when this was given, I had some
11  percentages on here. I didn't see it when you handed me
12  that document earlier.
13      Q.  So for the purposes of identifying this, you've
14  brought the same pages of the RMA guide with you here
15  today, but on those are some yellow Post-it notes that
16  have some calculated percentages; is that correct?
17      A.  Yes, sir. Again, that was part of what
18  Mr. Campbell provided you.
19      Q.  This morning?
20      A.  This morning, sir.
21      Now, I think these have been provided to you
22  earlier.
23      Q.  The pages had, but --
24      A.  The pages had, but I didn't see that these
25  little stickies had been copied when they were copied.

48

1      Q.  Correct.
2      A.  And so I --
3      Q.  That's something new; is that correct? The
4  yellow Post-its are new?
5      A.  I don't --
6      Q.  To us.
7      A.  It seems they were from the -- I mean, they've
8  always been on there, so --
9      Q.  Let's do this. Let's take a break and get
10  these copied. Is it just the two of these yellow
11  Post-its?
12      A.  Yes, sir.
13      Q.  All right.
14      A.  I mean, they can probably put them on one, but
15  each one --
16      Q.  All right. Let me get that done.
17      A.  Okay.
18      (Recess taken.)
19      (Oscher Exhibits 78 and 79 marked.)
20      Q.  Let me show you what I've marked as Exhibits 78
21  and 79. Are those copies of the yellow stickies that
22  we've just talked about?
23      A.  They are, sir.
24      Q.  Let's take Exhibit 78 first. Tell me where you
25  got those numbers.

81

```
 1    appears on -- I forget the exhibit number.
 2         Q.  Exhibit 75.
 3         A.  Yes, sir.  It's this number right here, all
 4    right?
 5         Q.  All right.
 6         A.  For the other internal reports, I've taken that
 7    same number across to determine what their profit margin
 8    is on tire sales, and that's where I've derived the 76.7,
 9    the 76.6, 76.8, the 77.1 percent, to come to this
10    four-year average, which is really a three-and-a-half-
11    year, if you will, of 76.8 percent that's used in my
12    report.
13         Q.  Okay.  I understand that.
14         A.  Good.  Do you want to go to the next
15    percentage?
16         Q.  I think so.
17         MR. COLLIER:  Just off the record for a minute.
18         (Off-the-record discussion.)
19         Q.  Let's go to the next one, Roman numeral II on
20    Exhibit 75.
21         A.  Okay.  The second issue was that the
22    franchisees are not required to purchase tires from the
23    franchisor, but that a significant percentage of the
24    tires that have been purchased historically are being
25    purchased from the franchisor by the franchisees, to the
```

82

```
 1    tune of 85 percent.
 2              That was the original comment that was made or
 3    the original information that was given.  What I then
 4    needed to find out was what percentage might that be when
 5    I looked at the information.
 6              So the first assumption or the first thing I
 7    needed to do was to find out the inventory -- well, that
 8    was the objective, to find out the inventory purchased,
 9    and I'm referring now to -- is that Exhibit 75?
10         Q.  Yes.
11         A.  Okay.  Under II-A, what relationship of tire
12    sales to total sales exists within the franchise system.
13              So what I utilized was a -- if I can -- in the
14    third grouping down, you see "Total Tire/Tire Related
15    Sales" of 55 million, 55.8 million.
16         Q.  For "TY Actual," this year actual?
17         A.  Yes, sir.  Right.
18         Q.  It's on Oscher 0024; is that correct?
19         A.  Yes, sir, it's the same document.
20         Q.  Okay.
21         A.  Under '97 on Exhibit 75, there's a cross-out,
22    but do you see the 55.9 as the numerator?
23         Q.  Uh-huh.
24         A.  The denominator -- if you look all the way to
25    the bottom, you see total sales of 83.1 million.
```

83

```
 1         Q.  All right.
 2         A.  That became my denominator.
 3              So for '97, my calculation was that 67.3
 4    percent of their sales volume was based on tires, and
 5    then I did the same calculation for '98, '99 and 2000
 6    for the other documents.
 7         Q.  Now, how does that tell you what percentage of
 8    tires that franchisees will buy?
 9         A.  If you allow me to go through the rest of II,
10    it -- from my standpoint, it had to work in steps, and
11    what I'm doing with, essentially, A, B and C is I'm
12    laying a predicate for my calculation.
13         Q.  So the 67.3 percent represents what, again?
14    The percentage of tire sales to total sales?
15         A.  That's correct, sir.  Okay?
16         Q.  All right.  Now, let me just ask you one thing.
17    I'm sorry, but before I leave that --
18         A.  Yeah.
19         Q.  -- that 55 million includes not only retail new
20    tires, but wholesale tires, used tires?
21         A.  It's everything.
22         Q.  Would you expect used tires to be sold to
23    franchisees?
24         A.  I don't know whether they were retreads, but
25    the answer is, again, for purposes of my calculation, it
```

84

```
 1    was such an insignificant part of the tire sales that any
 2    residual difference I didn't see as making a big
 3    difference to my overall calculation.
 4         Q.  All right.  Go ahead.
 5         A.  The second calculation was total franchisee
 6    sales, and on that number, I needed to go to Oscher Bates
 7    number 39.
 8         Q.  Okay.
 9         A.  I'm going to give you a specific number.
10         Q.  Ask him.
11         A.  Now, see, I don't know whether this is a --
12         MR. COLLIER:  Off the record.
13         (Off-the-record discussion.)
14         Q.  Back on the record.
15         A.  The Bates-numbered document 39, on the far
16    left-hand side is a number that is 26.8 million.
17         Q.  Under what column are you looking?
18         A.  I'm sorry.  Let me help you here.
19         Q.  You're looking on the right-hand column --
20         A.  Yeah.
21         Q.  -- "Year-to-Date," and it says "Last Year
22    Actual."
23         A.  So those are the total sales.
24         Q.  This is Oscher 0039.
25         A.  And I may have transposed that, because, for
```

**69**

1   for 1997, in order to make that determination, I needed
2   to take the information from B, which was franchisee
3   sales, to that percentage which were tire sales.
4        So by multiplying II-B by II-A, it gave me the
5   calculation for '97 for 22.9 and the other calculations.
6   That's just a mathematical calculation there.
7      Q.  All right.  Did you say multiply or divide?
8      A.  I was multiplying -- in II-D, I was multiplying
9   the amount of franchisee sales, because that was total
10  sales, by that amount which were franchise sales -- or,
11  excuse me, which were tire sales.
12      If you remember, in A, we made an allocation
13  for the various stores between tires and other products.
14     Q.  Well, I might be missing something here, but B
15  is all franchisee sales.
16     A.  Right.
17     Q.  C is simply those tire purchases by
18  franchisees.
19     A.  That's right.  We'll get to C in a second, with
20  another calculation.  All I'm trying to do is put numbers
21  in in terms of coming to a percentage, which will
22  eventually be those -- the percentage of tires bought
23  from the franchisor.
24     Q.  But I don't understand why you're multiplying,
25  to tell you the truth.

**90**

1     A.  Okay.  I know that the ratio of tires to total
2  sales, which is what calculation A was about, was -- tire
3  sales were, in '97, 67.3 percent.
4     Q.  Oh, excuse me.
5      I got you now.  So D is B times A?
6     A.  That's right.
7     Q.  So your assumption A was tire sales to total
8  sales of the plaintiff itself?
9     A.  Right.
10    Q.  And you've assumed that that's the same
11  percentage that a franchisee would have?
12    A.  That's correct.
13    Q.  Let me ask you this question.  Going back to
14  calculation Roman numeral II-C, that figure is listed, to
15  include tires, batteries and parts, on Oscher 0038.
16    A.  Which number did you give me?
17    Q.  0038, Oscher.
18    A.  You're giving me a Bates number.
19     Yes, sir.
20    Q.  So Roman numeral II-C is not just tire
21  purchases; is that correct?
22    A.  That's correct.
23    Q.  Do you take care of that later on or something?
24    A.  Well, what I did was -- I didn't have enough
25  information, but when I reviewed the parts sales that

**91**

1   were made by the franchisees, there was probably less
2   than five percent that were being used from the
3   franchisee, and I just picked up the whole number.
4      But when I looked at the individual items, they
5   were not buying a lot of the parts, and when I inquired
6   about that, not unlike the tires, the franchisees had the
7   ability to purchase parts from other locations or from
8   other sources other than Team Tires.
9     Q.  So you discount that as insignificant?
10    A.  Yes, sir, discount it --
11    Q.  So let's go back to Roman numeral II-E.
12    A.  What I then needed to do was, the amounts that
13  had been calculated as far as franchisee tire sales in
14  total, I needed to make a determination as to what the
15  cost of those tires would have been, and I used the
16  percentage from I, the tire cost, and I multiplied that
17  by the franchisee cost in D, and the calculations are
18  17.6 million in '97 and then the other amounts.
19    Q.  So you used the results of D, and you
20  multiplied that against which section?
21    A.  The first -- on the first page, what the tire
22  cost calculation was.
23    Q.  The 76.8 percent?
24    A.  76.7 percent.  Well, I didn't use the four-year
25  average.  I didn't get the four-year average until

**92**

1   afterwards.  I used each individual year as the
2   calculation.  So I multiplied the 22.9 million --
3     Q.  Okay.
4     A.  You're okay?
5     Q.  Right.  Okay.  I see what you're saying you
6   did.
7      So you multiplied the Roman numeral I
8   calculation times Roman numeral II-D?
9     A.  Right.
10    Q.  What is calculation Roman numeral II-F?
11    A.  And then II-F finally allowed me to get to the
12  percentage of tires purchased from the franchisor.  The
13  11.6 million in item C is the amount that we just talked
14  about, and when you divide that by the calculation in
15  II-E, the 17.6, you get 65.9 percent.
16     Then, when you multiply -- I'm sorry.  Then you
17  do the same multiplication, the same calculation, for the
18  other years, as well.
19    Q.  So calculation F is what divided by E?
20    A.  It is C.
21    Q.  C divided by E.
22    A.  What the tire purchases were from the
23  franchisees.
24    Q.  So your conclusion, then, is that franchisees
25  purchased, on average, 62.9 percent of their tires from

93

1  the franchisor?
2      A.  For the period of information we had available,
3  yes, sir.
4      Q.  What's calculation Roman numeral III?
5      A.  Three, if -- and let me give you -- what I took
6  is the margin from tire sales by franchise of the
7  franchisor to the franchisee.
8      Q.  Excuse me.  You mean item Roman numeral III?
9      A.  Yes.
10     Now, we're looking at Bates number 36, but the
11 numbers, as you pointed out earlier, included tires and
12 batteries, and they were making different calculations
13 internally.  What I went to was the '98 report, and I'll
14 give you a Bates number.
15     On Bates number 84, Oscher 84, if you go to the
16 Year-To-Date column or section, the second group of
17 numbers -- the third group of numbers makes reference to
18 total margin tires, and then underneath that is a
19 percentage and it says 12.72.
20     Q.  I'm not seeing that.
21     A.  I know, that's a tough one.
22         Is that it right there?
23     Q.  Okay.
24     A.  Yeah, and then --
25         MR. MALOTT:  This needs to be on the record, so

94

1  we know.
2      Q.  On Oscher 84, under the right-hand
3  "Year-To-Date" column, under "TY Actual," the very last
4  number under that first -- or, actually, the second
5  grouping is entitled "Percentage Sales," including direct
6  "something or another."
7      If you go across, there's a percentage listed
8  as 12.72.  What does that represent to you?
9      A.  That is the margin on sales of tires that were
10 made by the franchisor from the --
11     Q.  So that's what they state that they're marking
12 the tires up to sell to their franchisees?
13     A.  That's what they're saying that they were
14 making.  That's my understanding, yes, sir.
15     Now, if you move over to the two columns to the
16 Last Year Actual, that's where you get the percentage
17 that you see on Exhibit 80, the 11.87 percent, because,
18 unlike the '97 internal financial report, they had set
19 out the information for just tires only, and so it was
20 picked up there.
21     Q.  So what this tells you is that their margin is
22 actually -- or the markup is actually 11.8 percent
23 instead of the eight percent that you were previously
24 told?
25     A.  That's correct, sir.

95

1      Q.  Now, is there another document somewhere within
2  this packet for the margin as to all tire sales?
3      A.  That was the 30 percent that was the margin --
4  total margin that they had on tires, which was the first
5  calculation that we looked at.
6      Q.  Have you done any checking to determine if
7  these records are accurate?
8      A.  The checking that I did was -- and now we go
9  into the Price Waterhouse and Coopers financial
10 statements.
11     The opening information that was given in these
12 reports was anchoring, if you will, the sales, and it's
13 essentially the first page in each of the documents,
14 where they're reporting what their income was and what
15 their total sales were.
16     I went to the audited financial statements and
17 confirmed those balances as they appeared and used that
18 as my benchmark.
19     Q.  Did you double-check on the margin?
20     A.  I didn't do anything with the margins.  Again,
21 those are internally generated financial statements.
22     I wasn't going to go in and re-audit the books.
23 The audited financial statements stand for themselves, at
24 least in this regard, and I was concerned that I was
25 dealing with the total sales which had been set forth in

96

1  these internal documents, which made their way up to the
2  audited financial statements.
3      Q.  So does that complete how you calculated these
4  three percentage figures?
5      A.  Yes, sir, it does.
6          MR. COLLIER:  Okay.  I will ask Matt to get
7  Donnie.
8          MR. CAMPBELL:  I'll get him.
9          (Recess taken.)
10     Q.  Show me, then, where you plugged these
11 percentages into your report.
12     A.  Sure.
13     We were talking, on Exhibit IV -- and this is
14 my Exhibit IV.  I don't know.  Have you marked those?
15     Q.  Your Exhibit IV, which for our record is
16 Exhibit 77.
17     A.  Right.  Thank you.
18     Q.  Exhibit 77 is Exhibits IV and V as you redid
19 them this morning.
20     A.  Yes, sir.
21     Q.  And as I understand you, right now, you're
22 going to redo it one more time?
23     A.  I am.
24     Q.  So let's go to your Exhibit IV contained within
25 our Exhibit 77.  Tell me what you've done.

1  don't know the answer.
2      Q.  From just a business point of view -- well,
3  strike that.
4      Are you aware of any evidence -- besides this
5  notion that a Mr. Gary Fox had made an inquiry, are you
6  aware of any other evidence that the plaintiff was
7  interested in opening any franchises here in New Mexico
8  at any time?
9      A.  Sitting here now, I'm not recalling any, no,
10  sir.
11     Q.  On what basis did you make your assumption that
12  Don Leonard would have opened as a franchise in 1994?
13     A.  I believe that was an assumption that I was
14  asked to consider by the attorneys.
15     Q.  Something Mr. Timmerman asked you to do?
16     A.  Either Mr. Timmerman or Mr. Campbell.
17     Q.  And your assumption is that he would have
18  opened in 1994; is that accurate?
19     A.  Yes, sir.
20     Q.  Is that --
21     A.  That's what my calculations are based on, yes,
22  sir.
23     Q.  Are you aware -- well, strike that.
24     Let me ask this.  If he had opened as a
25  franchisee in 1994, would it be appropriate to assume

102

1  that he would have opened as a franchisee using a 1994
2  franchise agreement as opposed to one that had been
3  modified later, in 2000 or 2001?
4      A.  Yes, sir.
5      Q.  Have you been supplied with a 1994 franchise
6  agreement?
7      A.  No, sir, I don't recall that I have.
8      Q.  The numbers that you've used in your report, as
9  far as I can tell, come from a 2001 or 2002 franchise
10  circular.  Is that accurate?
11     A.  I'm not sure.  I would have told you it was an
12  earlier circular, but I'm not sure.
13     Q.  Do you know whether the numbers you used to
14  calculate damages were the correct numbers that were used
15  in 1994?
16     A.  My understanding is that the percentages were
17  the same percentages back then.  I asked the question.
18     Q.  Who told you that they were the same
19  percentages?
20     A.  I think it was Mr. Slattery.
21     Q.  Did you ask for any documents to support that?
22     A.  I'm sure I did.
23     Q.  Do you have those?
24     A.  I don't.
25     Q.  Do you have them in your office?

103

1      A.  No, sir.
2      Q.  Have you ever seen them?
3      A.  I have not seen them, no, sir.
4      Q.  Can you show me what document, if any, you did
5  use for the one-percent base and the four-percent base
6  numbers?
7      A.  It would have been within the documents that
8  were produced, that are part of the records that were the
9  documents considered.  Whatever I had, I used as a basis.
10     My question was:  Was the one percent and the
11  four percent, as it's set out here as a percentage -- was
12  that the same in '94?  I believe Mr. Slattery answered
13  that it was.
14     Before that, it was his understanding -- and I
15  forget what time period, but it was either the late '80s
16  or '90s, that he had indicated that they had had a
17  three-percent fee as opposed to the four percent that was
18  now being used.
19     Q.  Let me show you what's been previously marked
20  as Defendant's Exhibit 4, and referring to page 77?
21  05775, this is a franchise offering circular indicating a
22  continuing fee amount of four percent of gross receipts.
23  Do you see that on page 05773?
24     A.  Yes, sir.
25     Q.  With a Footnote 2 that indicates, if you're

104

1  converting, that you have an additional one percent, and
2  that's on page 05776.  Is that where you got your initial
3  continuing fees?
4      A.  I think I just said I don't know whether it was
5  this document that I had or if there was another
6  document.
7      I saw this.  You said it was 2002, and if you
8  had asked me without telling me that, I would have said
9  that I thought I had seen an earlier circular that was
10  contained within the documents.  That's all.
11     Q.  Well, can I ask you to please get to Mr.
12  Campbell a copy of the circular that you feel you're
13  basing your conclusions on?
14     A.  Okay.  I mean, that one works as well.  I mean,
15  it's very possible that it could have been.  I'll check
16  to see if I have an earlier circular with that
17  information in it.
18     Q.  Right.  You would agree that it would be
19  appropriate to use the 1994 circular, not the 2002
20  circular?
21     A.  Well, I would agree that it would -- if the
22  information from 1994 is the same as in the 2002 one,
23  it's the percentage that matters, not the circular that
24  matters.
25     Q.  But the percentage comes from the circular?

STEVEN OSCHER, 9/27/02

105

1   A. Well, the percentage is stated in the circular.
2  It comes from the corporate office.
3   Q. For example, let me show you a circular that is
4  dated as being effective in May 2000, two years before
5  2002, and the continuing fees in that circular are only
6  four percent instead of an additional one percent add-on.
7   A. I don't know that I've seen this. I mean, it's
8  2000. I don't have any Bates numbers on here, so I don't
9  know -- to compare it to the documents that I've
10  received.
11      I did not see this. I have not seen this, sir.
12   Q. Does that raise your suspicions, perhaps, that
13  your percentages may not be correct?
14   A. If -- this would certainly suggest that they
15  use, as a base, four percent and then charge four percent
16  over that base for converting stores. That's what it
17  says, yes, sir.
18   Q. So would you agree that what we need to do is
19  find out what franchise agreement was in place in 1994?
20   A. Well, to the extent that it would be any
21  different from this, the answer is that's correct. If it
22  was the same in '94 as here, then we would have our
23  benchmark.
24   Q. And we don't know that, sitting here today, do
25  we?

106

1   A. No, sir, other than what Mr. Slattery told me.
2   Q. Now, is it your understanding, in 1994, that
3  Don Leonard had existing stores?
4   A. Yes, sir.
5   Q. If that was the case, there would be no reason
6  for him to apply as a new franchisee, would there, as
7  compared to a conversion franchisee?
8   A. Again, I don't know the answer to that. I
9  would have expected it to be as a conversion, but since I
10  didn't know what the parameters might be, that's the
11  reason that I used the alternative.
12   Q. Right. But your best judgment would be, if Don
13  had converted to a franchise in 1994, that would be as a
14  conversion business, because he had existing stores?
15   A. That's what I would have thought, yes, sir.
16   Q. Which would mean that your calculations as a
17  conversion franchisee would be the more probable
18  calculation, not as a new franchisee?
19   A. Again, from a straight business standpoint,
20  that's what I would expect, but I don't know all of the
21  nuances.
22   Q. Now, I think I understand this, but why don't
23  you, for the record, just explain the one-percent base
24  calculation.
25   A. My understanding was that the fees that would

be paid would be after establishing what the prior year
base was for, what the base would be for a converting
franchisee's operation.
    In this case, it would be the $1,497,000 base,
so that a percentage would be paid on that of one
percent, and that the increase of four percent -- or the
four percent on increased sales.
 Q. Your base is $1,497,719, and that came from
what document?
 A. It's actually Exhibit IV.
 Q. Exhibit IV, from Don's 1993 total sales?
 A. Yes, sir.
 Q. And I see that you dropped your advertising
expenses from the first calculations in your first report
of August 2002.
 A. Yes, sir.
 Q. Is that because the franchising circular
indicates that all of that is to be expended and it's
not --
 A. Yeah. That was based on my confirmation in
talking with Mr. Slattery that that is, in fact, what
they did do, yes, sir.
 Q. Are you aware that that's, indeed, what the
franchise circular represents that they will do, use all
of the advertising money for actual expenses?

A. It did. When the number was first given to me,
I raised that as a question, and they said -- "they"
being what I discussed with Mr. Zimmerman. I said,
"That's one of the things that I needed to talk to Mr.
Slattery about."
 Q. Now, I note that your deduction amount has
changed from 28 percent to five percent.
 A. Yes, sir.
 Q. Explain to me, first of all, how you calculated
28 percent and then why you have now changed that to five
percent.
 A. When I was first given the information -- and
the discussion with the numbers involved franchise fees
and converting fees for each existing store or a new
store, which was the $15,000 amount per store -- my
comment at that point in time was that it was my
understanding that there were fees that would be involved
as far as earning those revenues and, similarly, as it
related to tire sales and everything else that the
franchisor was doing.
    I've been told that there was a report that
indicated that they had evaluated all of that information
and that the cost associated with the earning of those
revenues from a franchisee's standpoint was at 28
percent. I, again, said, "I would like to see the

117

1  taking a look at a franchise for a day once a quarter
2  would have not been a very expensive flight, and, again,
3  within the five percent, it was discussed and felt that
4  it was covered.
5      Q.  Is Exhibit 77, then, your final calculation as
6  to economic damages for the plaintiff in this case?
7      A.  From the facts as I understand them today, yes,
8  sir.
9      Q.  Would it be fair to say that you don't have any
10  other calculations of royalties or franchise fees or any
11  other fees that you believe may be due to the plaintiff
12  as a result of any alleged trademark violation in this
13  case?
14      A.  I have not done any other calculations, no,
15  sir.
16      Q.  And you're not aware of any other valuation of
17  that that you haven't done in this case?
18      A.  I'm confused by your question.  Are you asking
19  has somebody else other than me made a calculation?
20      Q.  No.  Do you intend to do any other type of
21  valuation besides what you've given us in Exhibit 77?
22      A.  Again, I don't know.  If additional information
23  comes to light and I'm asked by Mr. Campbell to do work,
24  I will.
25      Q.  All right.  And then you'll let us know about

118

1  that if you do?
2      A.  I think Mr. Campbell would.
3      Q.  Right.
4          Let me move on to your report, to the section
5  entitled "Corrective Advertising."
6      A.  Yes, sir.
7      Q.  Have you deleted that from your damages in this
8  case?
9      A.  No, I haven't deleted it.  The advertising
10  component, you asked about before.  It's there.  I don't
11  have any additional information with regards to what it
12  might take to provide corrective advertising.  I only had
13  the information that Mr. Leonard has used, historically,
14  for his stores.
15      Q.  So is it --
16      A.  So I have not done anything more than what is
17  stated on page four.
18      Q.  Is it fair to say that as we sit here today,
19  you don't have an opinion as to what amount might be
20  needed for corrective advertising?
21      A.  That's a correct statement.
22      Q.  And would it be fair to say that you're not
23  aware, as we sit here today, of any false impressions
24  that have been associated with the alleged improper use
25  of a trademark?

119

1      A.  I don't have any direct information, no, sir.
2      Q.  And you've not been given any information from
3  the plaintiffs, as you suggest in your report, about
4  that?
5      A.  I have not received any information from the
6  plaintiffs, no.
7      Q.  You've testified earlier, from a review of
8  Don's financials, as stated in his papers, that he was
9  not profitable; is that correct?
10      A.  His tax returns and his financial statements
11  return a loss, 14 of 15 years.
12          MR. CAMPBELL:  Just so the record is correct,
13  when you say "his," are you referring to the Defendant
14  Team -- excuse me, Tires Plus, Inc.?
15          THE WITNESS:  For the stores and the
16  information that was reported by Mr. Leonard, yes, sir.
17          MR. CAMPBELL:  You used the pronoun "his," and
18  I wanted to make sure --
19          THE WITNESS:  Well, he asked me about Don.  I'm
20  sorry.
21      Q.  You understand that when I've been using "Don
22  Leonard," I've been referring to the defendant in this
23  case, basically?
24      A.  That's what I've assumed, yes, sir.
25      Q.  You've not done any calculations with the

120

1  assumption that Gary Fox had purchased a franchise
2  operation at any point in time?
3      A.  No, sir.
4      Q.  Have we covered all of the, first of all,
5  calculations that you've done in this case?
6      A.  Yes, sir, I believe we have.
7      Q.  Have we covered all of the opinions which
8  you've been asked to give in this matter?
9      A.  Yes, sir, I believe we have.
10      Q.  And between what you've disclosed in your
11  report as those things that you've reviewed, as well as
12  what you've brought with you here today, have we seen all
13  of those documents upon which you've relied or generated
14  in this matter?
15      A.  Yes, sir.  I don't think there's anything else.
16      Q.  Are you aware of whether or not you're going to
17  work on any rebuttal testimony in this matter?
18      A.  That's up to Mr. Campbell.  We haven't
19  discussed it.
20      Q.  As we sit here today, you haven't discussed any
21  additional work on the case?
22      A.  There's been discussions, but I don't think
23  I've been asked to do anything additional.
24      Q.  Has there been discussions of things you are
25  considering to do?

KATHY  TOWNSEND  COURT  REPORTERS  (505)  243-5018
110  TWELFTH  STREET,  NORTHWEST,  ALBUQUERQUE,  NM  87102

# EXHIBIT 39

**(follows this page)**

# Team Tires Plus, Ltd.

## v.

# Tires Plus, Inc.

## November 18, 2002

Prepared by:
Oscher Consulting

## UNDERSTANDING

It is our understanding that Team Tires Plus, Ltd. ("Tires Plus" or "the Plaintiff") has filed a lawsuit against Tires Plus, Inc. ("TPI" or "the Defendant") alleging service mark infringement and unfair competition.

Tires Plus is a company engaged in the business of franchising and operating retail tire stores and automobile service centers nationwide. The service mark in question has been in use by the Plaintiff or its predecessor in interest since 1981. It is believed that subsequent to the adoption and use of the service mark, Tires Plus, by the Plaintiff, the Defendant began using the service mark, Tires Plus, in connection with its retail tire store and automobile service business in Albuquerque, New Mexico.

The Defendant has engaged an accounting expert, Mr. Bruce F. Mallot, CPA, who has provided a report and testified that TPI has realized losses in fourteen of the sixteen years from 1986 to 2001. He concludes that the fourteen years of losses should be aggregated against the two years of profits and the result would be an aggregate loss of $1,122,762. Oscher Consulting, P.A. and Steven S. Oscher, CPA, have been requested by counsel to evaluate Mr. Mallot's conclusions.

## BACKGROUND

Steven S. Oscher is a Certified Public Accountant and the Managing Director of Oscher Consulting, P.A. Prior to forming Oscher Consulting, Mr. Oscher was with an international accounting firm where he served as an Audit and Quality Review partner and Director of their Central Florida Litigation Services Department.

Mr. Oscher is a graduate of the University of South Florida and received his BS in Accounting in 1977. Mr. Oscher is a member of the Association of Certified Fraud Examiners and has been accredited as a Certified Fraud Examiner. He has also been accredited by the American Institute of CPA's in the area of Business Valuation. He has worked on numerous engagements involving issues of economic damages.

A copy of Mr. Oscher's curriculum vitae is attached as Exhibit I. A listing of cases in which Mr. Oscher has provided testimony at trial or deposition in the last four years is attached as Exhibit II. Mr. Oscher is compensated at the rate of $225 per hour.

## INFORMATION CONSIDERED

At this time, we are aware that discovery remains open and additional information may be provided. The documents we have obtained and considered are shown at Exhibit III.

## FINDINGS AND CONCLUSION

Mr. Mallot testified that he received the financial information utilized in his August 14, 2002 expert report, from TPI's outside accounting firm.  His report suggested and his testimony confirmed that he did no independent testing of the financial information to determine whether the financial information presented actually represented the operating results for the business of Tires Plus, Inc.

Mr. Mallot indicated that he relied on conversations with Mr. Leonard as the basis for his conclusions and that, while operating losses in 14 of 16 years did not appear usual, he did nothing independently to specifically analyze and quantify any of his concerns.

At the conclusion of Mr. Mallot's testimony, I suggested of Plaintiff's counsel that additional information should be obtained to properly evaluate the financial information Mr. Mallot utilized in his report.  At the present time, the financial information produced, Tires Plus, Inc.'s general ledger for the years 1997-2001 and Mr. Leonard's personal tax returns for the years 1986-2000, have not provided the detail needed to fully evaluate the Defendant's operations and, as a result, it remains difficult to conclude that Tires Plus, Inc. operated unprofitably for fourteen of the prior sixteen years.

Steven S. Oscher

11/18/02
Date

Page 4

# EXHIBIT 40

## (follows this page)

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW MEXICO
2

3

4    TEAM TIRES PLUS, LTD., a
     Minnesota corporation,
5
              Plaintiff(s),
6
     vs.                     CASE NO.:  CIV-01- 1124 WWE/RLP
7
     TIRES PLUS, INC., a
8    New Mexico corporation,

9             Defendant(s).
     ─────────────────────────────────────────────────────────
10
            TELEPHONIC DEPOSITION OF STEVEN S. OSCHER
11                          VOLUME II
     ─────────────────────────────────────────────────────────
12

13           PURSUANT TO the notice of taking deposition

14   of **STEVEN S. OSCHER**, upon oral examination in the

15   above-styled cause, at the instance of Defendant(s),

16   for the purpose of discovery, for use at trial, or

17   both of the foregoing, or for such other purposes as

18   are permitted under the Florida Rules of Civil

19   Procedure and other applicable law, proceedings

20   therefore were held before Kathy Savich, Registered

21   Professional Reporter and Notary Public in and for

22   the State of Florida at Large, at Shumaker, Loop &

23   Kendrick, 101 East Kennedy Boulevard, Suite 2800,

24   Tampa, Florida, on January 23, 2003, commencing at

25   9:00 a.m. MST.

1    that; that's correct, sir.

2        Q.    And during that time in your life, did you

3    often and commonly prepare financial statements for

4    use in the business world that weren't audited?

5        A.    Yes.

6        Q.    And you're not suggesting that just because

7    financial statements are not audited that they're

8    necessarily untrustworthy?

9        A.    No.

10       Q.    In regard to the new information that you

11   received since your last deposition, did you find

12   any information that led you to believe that Don

13   Leonard would have agreed to a franchise operation

14   here in New Mexico from the years 1994 through 2001?

15       A.    No, sir.

16       Q.    And would you agree that your calculations

17   concerning lost royalties or lost tire sales are

18   based upon the assumption that a franchise agreement

19   would have been entered into?

20           MR. CAMPBELL:  Travis, again, this is

21       Phil Campbell.  I'm going to impose an

22       objection.  You're now seeking to redepose

23       him on his initial reports, findings and

24       conclusions.

25           MR. COLLIER:  Well, his position in this

1    have any evidence that Mr. Leonard would have

2    entered into a franchise agreement?  That was your

3    opinion then; is that correct?

4         A.   I had no evidence, that's correct, sir.

5         Q.   All right.  And based upon all the review

6    that you've done since that time, you still have no

7    evidence to that effect?

8         A.   That's correct, sir.

9         Q.   And as we sit here today then, after you

10   reviewed this new information, is it accurate to

11   state that whether or not Mr. Leonard would have

12   entered into a franchise agreement is speculative?

13        A.   Yes.

14        Q.   I'm sorry, I can't hear you.

15        A.   I said yes.

16        Q.   Your answer is yes; is that correct?

17        A.   That's correct.

18        Q.   I can't hear you, Mr. Oscher.

19        A.   Yes.

20        Q.   Thank you.  And would it also be fair to

21   state that given all the new information that you

22   have seen since the last deposition, there is no

23   information there that would indicate that Don

24   Leonard would have purchased any tires from

25   Plaintiff, Team Tires Plus, in the years 1994

1    through 2001; is that correct?

2        A.    If they weren't a franchise -- if he wasn't

3    a franchisee, I don't know that he'd have the

4    ability to purchase tires from Team Tires.

5        Q.    So whether or not he would have purchased

6    tires from the Plaintiff in the operative time

7    periods is also speculative as we sit here today; is

8    that correct?

9        A.    If the presumption is that he would have

10   been a franchisee, then I don't think it's

11   speculative that he would have bought tires.  So I

12   am not sure the question you're asking me now, given

13   the assumption that I made that he was acting or

14   would have acted as a franchisee.

15       Q.    All right.  But you, yourself, have no

16   information that he would have been a franchisee.

17   We have covered that; is that correct?

18       A.    That's correct, sir.

19       Q.    And therefore, you have no information

20   yourself that he would have purchased tires; is that

21   correct?

22       A.    That's correct, sir.

23       Q.    So that becomes speculative; is that

24   accurate?

25       A.    No, not -- again, not under the initial

1       said that he has not reached any additional

2       opinions or conclusions based upon anything

3       he's been provided other than contained in

4       his rebuttal report.  Let's move on.

5          Q.   My question to him is:  Do you intend, sir,

6   to use any of the documents that we sent to you

7   since your last deposition to put it up in front of

8   the jury and to point out any discrepancies to the

9   jury?

10         A.   I don't know.

11         Q.   You're not prepared to testify on that

12  today; is that your testimony?

13         A.   I am not prepared to answer the question

14  the way it is asked because I don't know what the

15  additional information that I will receive, whether

16  or not, you know, that information that I've looked

17  at so far needs to be further evaluated.

18         Q.   So, as we sit here today then, with the

19  information you've been given, you cannot testify

20  one way or the other whether or not Donnie Leonard's

21  financials are inaccurate?

22         A.   That's correct.

23         Q.   And unless you get any additional

24  information, you won't be able to give that

25  testimony at trial; is that fair also?

# EXHIBIT 41

**(follows this page)**

*Team Tires Plus, Ltd.*

*vs.*

*Tires Plus, Inc.*

U.S.D.C. No. CIV-01-1124 JP/RLP

ADDENDUM TO

EXPERT WITNESS

REPORT OF

BRUCE F. MALOTT, CPA

November 18, 2002

Consequently, Mr. Oscher used RMA *Annual Statement Studies* to determine an expected profit for Defendant.  The *Annual Statement Studies* are published by Risk Management Associates (RMA) and contain financial information submitted to cooperating banks by companies grouped by industry "Standard Industrial Classification."

Although Mr. Oscher was subsequently supplied with additional financial statement information for the Defendant, Mr. Oscher failed to use actual financial statement information as provided by the Defendant in his analysis and provided no substantive reasons or analysis for his failure to use the Defendant's actual financial data.   I have read the Defendant's financial statements, and corporate tax returns for the tax years ended December 31, 1986, through December 31, 2000, Mr. Don Leonard's personal income tax returns for the tax years ended December 31, 1986 through December 31, 2000, and leases and notes payable to shareholders of the Defendant and have discussed them with Mr. Donald Leonard and I am unaware of any reason to doubt their accuracy.

Mr. Oscher has chosen to continue to utilize only the Defendant's reported revenue numbers, extrapolating profits using RMA benchmarks.  This, however, is not the purpose for which RMA publishes its financial statement studies.  RMA states in its Introduction:

> *RMA does not recommend the Statement Studies figures be considered as absolute norms for a given industry.  Rather the figures should be used only as general guidelines and in addition to the other methods of financial analysis.*

Mr. Oscher acknowledges that RMA should be used only as a general guideline in his deposition at page 39, lines 10 through 24.

Mr. Oscher's use of the RMA data to extrapolate a profit over the years 1994 to 2001 to TPI is speculative and contradicted by the facts. As noted in my original report dated August 14, 2002, TPI suffered losses for the years in question. It is important to note that for the years ended December 31, 1996 through 1999, and for the seven months ended July 29, 2000 many of Plaintiff's retail stores also consistently suffered losses. Further, of the Plaintiff's stores suffering losses, many did so to a magnitude greater than the losses suffered by the Defendant for those years.   Mr. Oscher's contention that the Defendant was or would have been profitable *is*

4

THIS REPORT CONTAINS HIGHLY CONFIDENTIAL INFORMATION AND IS BEING DISTRIBUTED TO COUNSEL AND OPPOSING EXPERTS ONLY.

# EXHIBIT 42

**(follows this page)**

12

• RMA recommends that *Statement Studies* data be regarded only as general guidelines and not as absolute industry norms. There are several reasons why the data may not be fully representative of a given industry:

(1) The financial statements used in the *Statement Studies* are not selected by any random or statistically reliable method. RMA member banks voluntarily submit the raw data they have available each year with no limitation on company size.

(2) Many companies have varied product lines; however, the Statement Studies categorize them by their primary product Standard Industrial Classification (SIC) number only.

(3) Some of our industry samples are rather small in relation to the total number of firms in a given industry. A relatively small sample can increase the chances that some of our composites do not fully represent an industry.

(4) There is the chance that an extreme statement can be present in a sample, causing a disproportionate influence on the industry composite. This is particularly true in a relatively small sample.

(5) Companies within the same industry may differ in their method of operations which in turn can directly influence their financial statements. Since they are included in our sample, too, these statements can significantly affect our composite calculations.

(6) Other considerations that can result in variations among different companies engaged in the same general line of business are different labor markets; geographical location; different accounting methods; quality of products handled; sources and methods of financing; and terms of sale.

*For these reasons, RMA does not recommend the Statement Studies figures be considered as absolute norms for a given industry. Rather the figures should be used only as general guidelines and in addition to the other methods of financial analysis. RMA makes no claim as to the representativeness of the figures printed in this book.*