

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

03 APR -2 PM 3: 44

**TEAM TIRES PLUS, LTD., a**
**Minnesota corporation,**

    **Plaintiff,**

vs.                               **CASE NO.: CIV-01 1124 JP/RLP**

**TIRES PLUS INC., a**
**New Mexico corporation,**

    **Defendant.**                       /

## PLAINTIFF'S RESPONSE TO DEFENDANT TIRES PLUS INC.'S *DAUBERT* MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND REPORTS OF PLAINTIFF'S DAMAGES EXPERT STEVEN S. OSCHER

Plaintiff Team Tires Plus, Ltd. ("Plaintiff"), by and through its undersigned attorneys, files this its Response to Defendant Tires Plus Inc.'s ("Defendant's") *Daubert* Motion in Limine to Exclude the Testimony and Reports of Plaintiff's Damages Expert Steven S. Oscher.

**I.    INTRODUCTION.**

Defendant argues that pursuant to *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this Court should exclude the testimony and reports of Plaintiff's damages expert Steven S. Oscher. Defendant contends that Mr. Oscher's opinions are based on unjustified assumptions and are accordingly of no value. As discussed below, Defendant's arguments are based on a fundamental misunderstanding of the remedies sought and burden of proof in this action. Furthermore, any assumptions upon which Mr. Oscher relies in



forming his opinions are rationally related to evidence that has been generated in discovery and will be introduced at trial.

## II.   ARGUMENT.[1]

### A.   MR. OSCHER IS WELL QUALIFIED TO TESTIFY AS A DAMAGES EXPERT IN THIS ACTION.

Defendant fails to recognize and give full credit, by way of omission, to Mr. Oscher's credentials. As indicated by Mr. Oscher's curriculum vitae (attached hereto as Exhibit "1"), he received a degree in accounting from the University of South Florida in 1977 and is a certified public accountant. Mr. Oscher has studied at the graduate level and participates in continuing professional education as both an instructor and a student. Mr. Oscher participates in a number of professional organizations, including the American Institute of CPA's (by which he is accredited in business valuation), the Florida Institute of CPA's (serving on its litigation services sub-committee), the Association of Certified Fraud Examiners (by which he is accredited as a Certified Fraud Examiner), and the National Association of Forensic Economists. Mr. Oscher also sits on the boards of several institutions, including the University of South Florida School of Accountancy, the University of South Florida College of Business, the Florida State Board of Accountancy, and the Accountants Independence Task Force Committee.

On a professional level, Mr. Oscher has worked for several accounting firms in accounting, audit, litigation support, and consulting capacities, and since 1990 has been the Managing Director of Oscher Consulting P.A. As indicated by Mr. Oscher's Rule 26 disclosure (attached hereto as

---

[1] Plaintiff will not, and is not required to, respond to Defendant's self-serving "Statement of Undisputed Facts" on an item by item basis. In the event that Defendant seizes on this to make frivolous claims of admissions of certain facts or concessions of certain legal arguments in its Reply as it has in connection with other motions, suffice it to say that this listing of allegedly "undisputed" facts is materially incomplete, inaccurate, and misleading, and therefore is "disputed." Furthermore, these allegedly "undisputed" facts in no way support the exclusion of Mr Oscher's testimony and reports as requested by Defendant. To the extent that any allegedly "undisputed" fact needs to be controverted in this Response, the same will be done in the body of the Response

Exhibit "2"), he has qualified and served as a damages expert in numerous cases in federal and state court, including cases involving patent and trademark infringement.

Defendant ignores Mr. Oscher's impeccable credentials to serve as a damages expert in this case, likely because they distinguish the case upon which Defendant most heavily relies in its Motion – *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F.Supp.2d 1078 (D. Kan. 2000). While it is true that in *First Sav. Bank* the plaintiff's damages expert was excluded, the Court's holding was based in large part on its finding that the plaintiff's purported damages expert lacked "the requisite skill, experience and knowledge in the field of determining lost profits to financial institutions as to make his opinion rest on a substantial foundation and aid the trier of fact in his search for truth." *Id.* at 1083. In *First Sav. Bank*, the proffered expert (1) did not sign the report upon which his opinion was based, (2) was not a partner with the firm for which he was employed and did not know when or if he would become one, (3) was not a certified public accountant, (4) had not provided his resume for the Court's review, (5) had never before been asked to value harm caused by use of a trade name or trademark, (6) had never testified either by deposition or in trial, (7) had never published any books or articles on valuation, and (8) did not believe that he had ever done a financial analysis of any institution in Kansas before. *Id.* By comparison, Mr. Oscher is imminently qualified to undertake the review and analysis and give the opinions that he offers in this case.

**B.      MR. OSCHER DID NOT IN HIS INITIAL REPORT ATTEMPT TO CALCULATE DEFENDANT'S PROFITS, SINCE IT IS NOT PLAINTIFF'S BURDEN UNDER 15 U.S.C. § 1117 TO PROVE DEFENDANT'S PROFITS, BUT ONLY TO PROVE DEFENDANT'S SALES. AFTER PLAINTIFF MAKES SUCH PROOF OF SALES, IT IS THEN DEFENDANT'S BURDEN UNDER 15 U.S.C. § 1117 TO PROVE ALL ELEMENTS OF COST OR DEDUCTION CLAIMED TO ARRIVE AT AN AMOUNT EQUAL TO ITS PROFITS. IN HIS INITIAL REPORT, MR. OSCHER SOUGHT ONLY TO PROVIDE A BENCHMARK AGAINST WHICH DEFENDANT'S**

## DAMAGES EXPERT'S INITIAL REPORT, AS IT RELATED TO ELEMENTS OF COST OR DEDUCTION CLAIMED, COULD BE EXAMINED.

A large part of Defendant's Motion focuses on Mr. Oscher's opinions as they relate to Defendant's profitability, or alleged lack thereof. *See* Defendant's Motion pp. 6-10. Defendant's claim that Mr. Oscher did not properly calculate its profits is, however, based on a fundamental misunderstanding of the remedies sought and burden of proof in this action.

In an infringement and/or unfair competition case brought under 15 U.S.C. §§ 1114 and/or 1125, the Court may provide a monetary remedy under 15 U.S.C. § 1117, which provides in pertinent part as follows:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover <u>(1) defendant's profits, (2) any damages sustained by the plaintiff</u>, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. <u>In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.</u> Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (emphasis added). The flaw in Defendant's argument is evident from its beginning where Defendant characterizes the award of Defendant's profits sought by Plaintiff as a "measure of damages," thus seeking to apply only a single analysis. *See* Defendant's Motion p. 6. However, as is made clear in 15 U.S.C. § 1117(a), while awards to a plaintiff of a defendant's profits and/or its damages are both monetary remedies for infringement and unfair

4

competition, they are not the same. They involve separate and different analyses, and the Court

has discretion to fashion a monetary remedy for infringement and unfair competition taking into

account either or both, subject to "the principles of equity" and "the circumstances of the case."

*See* 15 U.S.C. § 1117; *see also Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 917

(Fed. Cir. 1984) (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121

(9th Cir. 1968), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968)).

In assessing profits, Plaintiff is required to prove Defendant's sales only; Defendant must

prove all elements of cost or deduction claimed. *See* 15 U.S.C. § 1117; *see also Teaching Co.*

*Ltd. P'ship v. Unapix Entm't, Inc.*, 87 F.Supp.2d 567, 589-593 (E.D. Va. 2000) (discussing the

failure to prove certain elements of cost or deduction by a defendant, who, similar to Defendant,

had produced as evidence of its lack of profits financial statements reflecting sustained losses,

without providing corroborating proof of line items). Therefore, Mr. Oscher was not in his initial

report tasked with opining as to Defendant's actual profits or examining any elements of cost or

deduction that Defendant might claim. *See* initial report of Steven S. Oscher (excerpts of which

are attached to Defendant's Motion as Exhibit "37") p. 3. Nor could he have done so, since at

the time his initial report was prepared and served, the only financial information that had been

provided by Defendant to Plaintiff was Defendant's gross revenue and advertising figures for the

years 1986-2001. *See* Oscher Initial Report p. 4. It was not until Defendant served its own

damages expert's initial report that Defendant for the first time provided its financial statements

and tax returns for the years 1986-2001, and it was not until after the depositions of both

Plaintiff's and Defendant's damages experts that Defendant provided any further financial

information. *See* Oscher Initial Report p. 4; Deposition of Steven S. Oscher (excerpts of which

are attached hereto as Exhibit "3") pp. 36-37, 41-43, 61-62; rebuttal report of Steven S. Oscher

(excerpts of which are attached to Defendant's Motion as Exhibit "39") p. 4. Defendant's claim that Mr. Oscher "summarily ignored" this information in preparing his initial report is highly misleading.

Given that Plaintiff's burden of proof in assessing profits is only to prove Defendant's sales[2] and that Defendant's damages expert had not yet been deposed as to the opinions expressed in his initial report, Mr. Oscher was not asked to undertake any further review of Defendant's newly produced financial information between the time of serving his initial report and his deposition thereon. *See* Oscher Depo. p. 64, 120-121. Such work was in the nature of rebuttal, and rebuttal reports were scheduled to be served at a later date. *See* Stipulated Revised Scheduling Orders, Doc. Nos. 38 and 51. Therefore, Defendant's criticisms of Mr. Oscher's initial report and deposition testimony as having been based only on the limited financial information available at the time the initial report was prepared and served, is misplaced.

What Mr. Oscher did do in his initial report in addressing Defendant's profits was to take Defendant's gross revenue figures and apply to them a profit percentage derived from the publicly available RMA Annual Statement Studies that Defendant discusses.    As Mr. Oscher testified in his deposition, the profit number that he generated obviously could not represent Defendant's actual profits, but was instead intended to serve only as a benchmark against which Defendant's damages expert's opinions on Defendant's profitability, or alleged lack thereof, could be examined. *See* Oscher Depo. p. 38-39, 40-41.[3]    Defendant's attack on Mr. Oscher's

---

[2] This is an arithmetic exercise based on the gross revenue figures provided by Defendant.  There is no disputing that all of Defendant's revenues have been derived under the name TIRES PLUS

[3] Defendant's claim that Mr. Oscher did not use the profit number generated by applying the profit percentage derived from the RMA Annual Studies to Defendant's gross revenue figures as a benchmark is contradicted by the deposition testimony quoted by Defendant at pages 7-8 of its Motion  Mr Oscher was clear in his testimony he was not assuming based on the RMA Annual Statement Studies that Defendant had or had not achieved any particular level of profitability.

methodology based on the allegation that he intended this profit number to be reflective of Defendant's actual profits is also misplaced.

It is not Plaintiff's burden to prove Defendant's profits, but only to prove an entitlement to disgorgement of the same by demonstrating that the equities of the case are such that an award of Defendant's profits under alternative theories of "preventing unjust enrichment and deterring willful infringement" is appropriate. *See Bishop v. Equinox Int'l Corp.*, 154 F.3d 1220, 1222-23 (10th Cir. 1998). If Plaintiff succeeds in its proof of entitlement, then its burden will only be to prove Defendant's sales; Defendant will have the burden to prove all elements of cost or deduction claimed. *See* 15 U.S.C. § 1117; *see also Teaching Co.*, 87 F.Supp.2d at 589. It is therefore only in calculating the total of Defendant's gross sales for the years in question (which Defendant has not claimed that Mr. Oscher did improperly) and offering testimony in rebuttal to Defendant's proof of elements of cost or deduction, including its damages expert's opinions on the same, that Mr. Oscher's opinions as to Defendant's profits will become relevant. Defendant's criticism of Mr. Oscher's initial report and testimony thereon as not having properly calculated Defendant's profits is without merit.

Furthermore, even if the finder of fact, after considering the testimony of Plaintiff's and Defendant's damages experts, finds that Defendant has in fact been unprofitable or that Defendant's assertion of unprofitability is not credible, the Court may still fashion an award of profits based on the equities of the case, on the theory that Plaintiff should not be prejudiced by Defendant's inefficiency. *See, e.g., Hospitality Int'l, Inc. v. Mahtani*, 1998 U.S. Dist. LEXIS 16445, *31-32 (M.D.N.C. 1998) (citing *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 744 (7th Cir. 1985) and *KFC Corp. v. Lilleoren*, 821 F.Supp. 1191, 1192 (W.D. Ky. 1993)). In such a case the benchmark provided by Mr. Oscher would become highly relevant because it

would provide the trier of fact with an applicable and appropriate measure for arriving at an award of Defendant's profits in the absence of sound evidence of elements of cost or deduction by Defendant.

### C.   MR. OSCHER'S OPINIONS AS EXPRESSED IN HIS REBUTTAL REPORT AND DEPOSITION TESTIMONY WILL BE OF GREAT ASSISTANCE TO THE FINDER OF FACT IN ASSESSING THE WEIGHT TO BE GIVEN TO DEFENDANT'S DAMAGES EXPERT'S OPINIONS ON DEFENDANT'S CLAIMED ELEMENTS OF COST OR DEDUCTION.

Defendant claims that "no opinions are given in [Mr. Oscher's] rebuttal report." *See* Defendant's Motion p. 9. This claim is clearly untrue as shown by the "Findings and Conclusions" of Mr. Oscher's rebuttal report. *See* Oscher Rebuttal Report p. 4. The opinions expressed in Mr. Oscher's rebuttal report are twofold: (1) that Defendant's damages expert's analysis of Defendant's financial information is severely lacking and (2) that the financial information produced by Defendant "have not provided the detail needed to fully evaluate Defendant's operations and, as a result, it remains difficult to conclude that [Defendant] operated unprofitably for fourteen of the prior sixteen years." *See id.*

As set out in Plaintiff's motion to exclude the testimony and initial report of Defendant's damages expert from this proceeding, the analysis of Defendant's financial information undertaken by Defendant's damages expert is so lacking that he ought not be permitted to testify at trial. *See* Plaintiff's Motion to Exclude Testimony and Report of Expert Witness Bruce F. Malott, Doc. No. 77. Rather than exclude this expert, the Court has determined to permit him to testify and allow the finder of fact to assess the weight to be given to his testimony. *See* Memorandum Opinion and Order, Doc. No. 115. That being the case, Mr. Oscher's critique of the depth of Defendant's damages expert's analysis, or lack thereof, will be of great assistance to the finder of fact. Mr. Oscher was clear in his rebuttal report that he was of the opinion that Defendant's damages expert's

8

analysis was severely lacking in light of the facts of this case, and Defendant has deposed Mr. Oscher as to this opinion.

The second part of Mr. Oscher's opinion relates to the financial information supplied by Defendant to date. While Defendant characterizes Mr. Oscher's opinion that this financial information does not allow him to reach any conclusion as to Defendant's profitability, or alleged lack thereof, as being "no opinion," Defendant misunderstands the significance of Mr. Oscher's statement. The expressed purpose of Mr. Oscher's rebuttal report was to evaluate the conclusions of Defendant's damages expert, not to calculate for Defendant its own elements of cost or deduction claimed. *See* Oscher Rebuttal Report p. 3. Mr. Oscher's evaluation of the initial report and testimony of Defendant's damages expert is that the information provided, even when supplemented with information subsequently provided by Defendant, is insufficient to reach a sound conclusion as to Defendant's profitability. *See id.* p. 4. Therefore, the opinions expressed by Defendant's damages expert are inherently unreliable and cannot be given significant weight. Again, it is Defendant's burden to prove elements of cost or deduction in assessing profits. The significance of Mr. Oscher's opinion as expressed in his rebuttal report is that Defendant has not met that burden, and Defendant has deposed Mr. Oscher as to this opinion as well.

There are serious doubts as to the veracity of Defendant's position that it has operated unprofitably for 14 of 16 years, incurring losses in excess of $1,200,000.00 during those years, and yet remained in business. Both Plaintiff's and Defendant's damages experts agree that this set of facts is highly unusual, and would prompt questions. *See* Oscher Depo. pp. 57-62; Deposition of Bruce F. Mallott (excerpts of which are attached to Plaintiff's Motion to Exclude Testimony and Report of Expert Witness Bruce F. Malott, Doc. No. 77, as Exhibit "1") pp. 22-24. The parties dispute whether Defendant's damages expert dug deeply to confirm that this is truly what happened,

and Mr. Oscher's testimony to the effect that Defendant's damages expert barely scratched the surface, and so his opinions are therefore highly suspect, will be relevant and of great assistance to the finder of fact.

**D.   MR. OSCHER'S OPINIONS AS TO PLAINTIFF'S DAMAGES ARE RATIONALLY RELATED TO EVIDENCE THAT HAS BEEN GENERATED IN DISCOVERY AND WILL BE INTRODUCED AT TRIAL.**

Defendant challenges Mr. Oscher's opinions as to Plaintiff's damages claim as being based on the assumptions that: (1) Plaintiff would have offered Defendant a franchise, (2) Defendant would have accepted a franchise from Plaintiff pursuant to which it would have paid to Plaintiff franchise royalties, and (3) as a franchisee Defendant would have made a certain percentage of its tire purchases through Plaintiff. Defendant claims that these assumptions are "unjustified and arbitrary," and render Mr. Oscher's opinions speculative and inadmissible. *See* Defendant's Motion pp. 3, 5-6, 10-12. To the contrary, as discussed below, any assumptions made by Mr. Oscher are rationally related to evidence that has been generated in discovery and will be introduced at trial, and his opinions are clearly and directly supportive of Plaintiff's damages claims.

> **1.   Even the antitrust and personal injury cases cited by Defendant in support of its position do not support its arguments. The cases cited by Defendant stand only for the proposition that in Lanham Act cases, where exacting proof of damages is frequently difficult, the Court has considerable discretion to fashion an award of monetary damages, and the infringer will bear the risk of any uncertainty inherent in such calculations.**

Relying primarily on a series of antitrust and personal injury cases, Defendant argues that "[c]ourts have repeatedly excluded expert testimony related to damages when the proffered opinions are based on unjustified assumptions." *See* Defendant's Motion p. 5. However, the holdings in these cases are inapposite. Notably, even in cases that do not involve claims of trademark infringement and unfair competition, courts in the Tenth and other Circuits have held that

"[a]lthough an expert opinion must be based on 'facts which enable [her] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ...absolute certainty is not required.'" *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)); *see also Marquis v. Chrysler Corp.*, 577 F.2d 624, 638 (9th Cir. 1978) (expert testimony based on assumptions and estimates permitted as the same were not "demonstrably false or unreasonable"). Taking this willingness to accept expert testimony on the issue of damages a step further, in Lanham Act cases it has been repeatedly held that "an inability to show actual damages does not alone preclude a recovery under section 1117." *Bandag*, 750 F.2d at 919; *see also Mirage Resports, Inc. v. Stirpe*, 152 F.Supp.2d 1208, 1218 (D. Nev. 2000); *Dorr-Oliver, Inc. v. Fluid-Quip, Inc.*, 834 F.Supp. 1008, 1013 (N.D. Ill. 1993).

The language found in 15 U.S.C. § 1117[4] provides the Court with considerable discretion to award damages based on equitable considerations. *See Mirage*, 152 F.Supp.2d at 1218; *Bandag*, 750 F.2d at 917 (citing *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968)). The Court may award damages even when they are not susceptible to precise calculation. *See Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986). "What is relevant is that...the *fact of damage* has been established with reasonable certainty....[W]here the evidence shows the fact of damage, there can be recovery even though there is no clear standard for measuring the extent of the injury. The rationale for this approach is that '[the] most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'" *See Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219,

---

[4] "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a).

1232-33 (D. Col. 1976) (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). Recognizing that arriving at a monetary award in a trademark case is an imprecise exercise, the Tenth Circuit has in certain cases even instructed the district court to simply "fashion a remedy that 'will satisfy the equities of the case.'" *See Bishop*, 154 F.3d at 1224 (quoting *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125, 131, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947)).

The Lanham Act cases cited by Defendant in support of its position are consistent with the foregoing. For example, in *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525-26 (10th Cir. 1987) (one of the few Lanham Act cases cited by Defendant in its Motion), although the plaintiff had met its burden of proving an entitlement to damages, it had difficulty quantifying the exact amount of its damages attributable to the defendant's infringement. The plaintiff in *Brunswick* argued in support of its claim for damages that it should be assumed to have lost one unit of its sales for each unit of sales made by the defendant. *Id.* at 526. The district court rejected this analysis as being too speculative, finding that "although [the plaintiff] established a legal basis for damages, it failed to establish clear proof of damages." *Id.* at 525. The district court refused to assess damages against the defendant. *Id.* at 526.

The Tenth Circuit Court of Appeal reversed, stating that "[a] defendant whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the damages are somewhat speculative....Evidence of the amount of damages may be circumstantial and inexact." *Id.* at 526 (citations omitted). Although the *Brunswick* court agreed that the plaintiff's assumption upon which its damages calculation was based – a sale lost for each sale by the defendant – was somewhat speculative, it held that "[t]hose items of evidence provide the court a broad basis from which it may arrive at a fair, if not precise, amount with which to compensate [the plaintiff] for

12

wrongful infringement." *Id.* The *Brunswick* court remanded to the district court to determine the amount of damages due to the plaintiff.

> **2.**   **Mr. Oscher's calculation of Plaintiff's economic damages as consisting of lost franchise royalties and tire margin based on historical data regarding Plaintiff's franchise royalty rates and its franchisees' purchases of tires through Plaintiff, provides a rational basis upon which the finder of fact could fashion an award of damages for Plaintiff.**

Defendant relies heavily on the holding in *First Sav. Bank, supra,* to support the strict "but for" analysis in which it would have the Court engage. However, in the context of that case, the Court did not promulgate such an analysis as applicable to all Lanham Act cases, but was instead addressing a proposed opinion by the plaintiff's purported damages expert that was based on an assumption that "improperly attributed all [of the plaintiff's] losses to the defendants' allegedly illegal acts, despite the presence of other factors that could be significant to his analysis." *Id.* at 1084. The Court listed a multitude of other factors that could have contributed to the plaintiff's losses. *Id.* at 1084-85. However, the plaintiff's purported damages expert took none of those other factors into consideration, creating serious questions as to causation of the damages claimed. *Id.* at 1084. This failure on the part of the plaintiff's purported damages expert (who as noted in Section A above could not even qualify as a damages expert) so infected his basic methodology, that it rendered his proposed testimony "inherently unreliable and purely speculative." *Id.* at 1084-85. Further, the Court found that the assumption upon which this proposed testimony was based was so flawed that the testimony "would not assist the jury in determining the amount of actual damages defendant caused plaintiff to suffer." *Id.* at 1085. The Court therefore excluded the expert. *Id.* The holding in *First Sav. Bank* is indicative of how flawed an expert's assumptions must be before the expert's testimony will be entirely excluded.

Unlike in *First Sav. Bank*, Mr. Oscher's qualifications are not, nor can they be, challenged by Defendant. In addition, the facts of this case provide a rational basis for Mr. Oscher's calculation of Plaintiff's damages based on an assumed loss of revenues at the franchise level in the form of unpaid franchise royalties and lost tire margin.[5]  Plaintiff (currently through its subsidiary Tires Plus Franchising Corporation) is in the business of franchising retail tire stores and automobile maintenance centers pursuant to a proprietary marketing plan or system developed and owned by Plaintiff under the mark TIRES PLUS. See Affidavit of John Hyduke (attached to Plaintiff's Motion for Summary Judgment, Doc. No. 72, as Exhibit "A") ¶¶4-9.  So as to guarantee to the consuming public the consistency and high quality of services received from retail outlets that are part of the TIRES PLUS® franchise system, Plaintiff attaches to such outlets, and permits such outlets to use, its mark TIRES PLUS. *See* Hyduke Aff. ¶¶18-20.  The assumption implicit in Mr. Oscher's analysis is that if Defendant desires to take advantage of the significant benefit of using the TIRES PLUS name in connection with its business, a right reserved only for Plaintiff and its affiliates and franchisees, then it should bear the financial burdens that are common to similarly situated parties, specifically Plaintiff's franchisees.

In an attempt to avoid liability for damages, Defendant argues that Tires Plus has not been damaged since it has not to date entered New Mexico and does not have specific plans to enter New Mexico. However, Plaintiff is being, and has been, damaged by Defendant's current infringement and unfair competition. As discussed in the deposition of Plaintiff's corporate representative John Hyduke, Plaintiff generally develops new markets employing a "concentric

---

[5] As used in this Response, the term "tire margin" (also referred to by Defendant as "inventory mark up") is defined as the difference between the price at which Plaintiff can purchase tires from manufacturers and the price at which it sells the same tires to franchisees   Sometimes this is also realized by Plaintiff in the form of incentives received directly from tire manufacturers as a result of Plaintiff's or its franchisees' purchases of tires from such manufacturers.

circle" strategy.  It starts with company stores at the hub of the circle and fills in the concentric circles around the hub with a combination of company-owned and franchised locations.  *See* Deposition of John Hyduke (excerpts of which are attached to Plaintiff's Response to Defendant's Second Motion for Partial Summary Judgment Against Plaintiff's Damages Claims as Exhibit "E") p. 24.  Plaintiff began forming plans to develop the Denver, Colorado market in 1997, with a launch planned for 2000.  As part of Plaintiff's development strategy, additional stores would be developed up and down the "front range."[6]  *See* Deposition of Donald M. Gullett (excerpts of which are attached to Plaintiff's Response to Defendant's Second Motion for Partial Summary Judgment Against Plaintiff's Damages Claims as Exhibit "C") pp. 157-159.  Therefore, as early as 1997, Defendant was doing business in a market area that was scheduled for development by Plaintiff.

In 2000, Plaintiff invited Defendant to resolve the current issues by exploring a license arrangement with Plaintiff whereby it would be "permitted to use the TIRES PLUS® name as an authorized licensee."  Defendant declined.  However, this proposal is indicative of Plaintiff's interest in Albuquerque, New Mexico.  *See* Deposition of Donald E. Leonard (excerpts of which are attached to Plaintiff's Response to Defendant's Second Motion for Partial Summary Judgment Against Plaintiff's Damages Claims as Exhibit "B") pp. 207-211, Exhibit "25"; Hyduke Aff. ¶28.

In 2001, Plaintiff received an inquiry regarding its franchise program from Gary Fox, to which it responded, further evidencing its interest in the Albuquerque, New Mexico market.  While Defendant draws its own inferences from Mr. Fox's actions and testimony, equally strong inferences that Mr. Fox decided against becoming a TIRES PLUS® franchisee because of

---

[6] This was described as extending from Canada to New Mexico  *See* Gullett Depo. pp 159-160

Defendant's (1) current use of the mark TIRES PLUS in Albuquerque, New Mexico, (2) dispute with Plaintiff, and (3) communications to Mr. Fox regarding this action, can also be drawn from the timing and nature of Defendant's communications to Mr. Fox and Mr. Fox's announcement that he was no longer interested in associating with Plaintiff. *See* Deposition of Gary Fox (excerpts of which are attached to Plaintiff's Response to Defendant's Second Motion for Partial Summary Judgment Against Plaintiff's Damages Claims as Exhibit "D") pp. 5-6, 11-21, 22-24, 28-31, 35, 41-42, Exhibit "1."

While Plaintiff does not yet have "specific" plans to enter the Albuquerque, New Mexico market in terms of specifically identified franchisees and locations, the development of "specific" plans is problematic. Defendant has already sued Plaintiff for alleged infringement of Defendant's common law rights in its attempted counterclaim in this action, which obviously has a chilling effect on Plaintiff's desire to heavily invest in the Albuquerque, New Mexico market or contract with potential franchisees until this matter is resolved. Yet Plaintiff continues to develop the front range, approaching New Mexico, and does "plan" to develop the New Mexico market consistent with its intentions expressed in this action. *See* Hyduke Aff. ¶¶28-35. Defendant's unsupported statements to the contrary are misleading.

Defendant has been using the mark TIRES PLUS on an unauthorized, royalty-free basis since 1986, has known this since 1994, and is currently standing in the way of Plaintiff's development plans by its usurpation of the Albuquerque, New Mexico market. *See* Leonard Depo. pp. 195-207, Exhibits "21," "22," "23," and "24"; Gullett Depo. pp. 133, 138-140, 144. Granted Defendant has not received all of the other benefits that Plaintiff's franchisees receive, however, that is by Defendant's choice despite Plaintiff's offer that it become part of the TIRES PLUS® franchise system. Plaintiff has been damaged and continues to be damaged, and while

16

such damages are difficult to quantify, that does not mean that the Court, given the equities of this case, has no power or authority to craft a monetary award. *See Big O*, 408 F.Supp. at 1232-33.

In similar instances, it has been held appropriate to measure the damages awarded for unauthorized trademark usage by reference to a royalty rate under which the trademark was otherwise licensed, or by reference to a royalty rate offered by a party, but rejected by the trademark owner prior to infringement by the party. *See, e.g., Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340 (7th Cir. 1994); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F.Supp. 1025 (N.D. Tex. 1980); *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71 (5th Cir. 1979). This approach is generally permissible so long as the measure of damages comports with the equitable limitations of 15 U.S.C. § 1117 and bears a rational relationship to the rights appropriated. *See Holiday Inns*, 493 F. Supp. at 1028; *Boston Prof'l Hockey*, 597 F.2d at 76.

As discussed above, Plaintiff is engaged in the business of licensing, among other things, the right to use the name and mark TIRES PLUS for retail tire stores and automobile maintenance centers. Therefore, determining a reasonable royalty rate would not only be simple and straightforward, but also appropriate in this case. Mr. Oscher's use of a royalty rate based on an assumed franchisor/franchisee relationship between Plaintiff and Defendant dating back to 1994 to calculate Plaintiff's economic damages is entirely appropriate.

As a further element of Plaintiff's economic damages, Mr. Oscher, based on the assumption that Defendant would have been a franchisee of Plaintiff beginning in 1994 and acted as the average franchisee, calculated Plaintiff's lost tire margin. As Mr. Oscher explained, the percentages that he used to arrive at this figure were derived from Plaintiff's and its franchisees'

historical data. *See* Oscher Depo. pp. 78-98. Whether or not Defendant would have functioned as an average franchisee is open to debate, however, the facts are that the average franchisee does buy a certain percentage of its tires through Plaintiff and that Plaintiff does profit therefrom. Therefore, there is a reasonable basis for the assumption employed by Mr. Oscher in calculating Plaintiff's lost tire margin as an element of Plaintiff's economic damages.

Contrary to Defendant's assertion, there is no speculation as to whether Plaintiff would have offered to make Defendant one of its franchisees. Plaintiff did so. While Defendant rejected these offers and instead continued to use Plaintiff's mark on an unauthorized, royalty-free basis, that does not render a calculation of Plaintiff's damages, based on what Plaintiff would have expected to receive had Defendant actually become a franchisee and properly licensed user of Plaintiff's mark TIRES PLUS, speculative. To the contrary, similar to the holdings *Sands, Taylor & Wood, Holiday Inns*, and *Boston Prof'l Hockey*, it provides a rational basis upon which a calculation of Plaintiff's economic damages can be made. To the extent that any speculation is involved, similar to the defendant in *Brunswick, supra*, Defendant should not be heard to complain as it is Defendant's wrongful conduct that has damaged Plaintiff, and Plaintiff should be compensated for its damages.

### E.   IT WOULD BE HIGHLY PREJUDICIAL TO PLAINTIFF FOR MR. OSCHER'S TESTIMONY TO BE EXCLUDED.

Defendant concludes its Motion arguing that "[e]ven if Mr. Oscher's opinions are deemed reliable and relevant, they should be excluded under Rule 403 of the Federal Rules of Evidence," arguing that it will be prejudiced by such testimony. *See* Defendant's Motion p. 12-13. It is inconceivable that if Mr. Oscher's opinions are deemed "reliable and relevant" they should not be admitted. At trial, Plaintiff will establish an entitlement to (1) Defendant's profits and/or

18

(2) damages sustained by Plaintiff, and will need to rely on the "reliable and relevant" opinions offered by Mr. Oscher to assist the finder of fact in quantifying such profits and/or damages. Defendant argues, without support, that it will be prejudiced if Plaintiff is permitted to so rely on Mr. Oscher's opinions. To the contrary, Plaintiff is the only party that will be prejudiced should Mr. Oscher's opinions be excluded and Defendant's damages expert be permitted to testify free of any threat of rebuttal.

Defendant cites *First Sav. Bank, supra,* in support of its position. However, as discussed above, the purported damages expert in that case was not excluded based solely on the concern of prejudice to the defendant, but instead because (1) he could not qualify as an expert and (2) his opinions were based on a fundamentally flawed assumption and methodology. Absent any legitimate claim of prejudice, Defendant lapses back into its arguments that Mr. Oscher's opinions are based on unjustified assumptions to justify its request for their exclusion, to which arguments Plaintiff has fully responded above. Mr. Oscher's opinions are reliable, relevant, and probative, and Plaintiff should not be hamstrung in the presentation of its case for damages by the exclusion of such opinions. Defendant has been permitted to introduce the opinions of its damages expert to establish its claimed elements of cost or deduction and to rebut Plaintiff's claim for damages. It would be highly prejudicial to Plaintiff if Mr. Oscher's contrary opinions were to be excluded.

## III.   CONCLUSION.

As demonstrated above, Defendant's arguments are based on a fundamental misunderstanding of the remedies sought and burden of proof in this action. Furthermore, any assumptions upon which Mr. Oscher relies in forming his opinions are rationally related to evidence that has been generated in discovery and will be introduced at trial.

WHEREFORE, Plaintiff requests that Defendant's *Daubert* Motion in Limine to Exclude the Testimony and Reports of Plaintiff's Damages Expert Steven S. Oscher be denied.

Respectfully submitted,

Juan A. Flores, Esquire
Sheehan, Sheehan & Stelzner, P.A.
707 Broadway, N.E.
Suite 300
Albuquerque, New Mexico 87103
Telephone No.: (505) 247-0411
Facsimile No.: (505) 842-8890

and

C. Philip Campbell, Jr. Esquire
Florida Bar No.: 0615986
J. Todd Timmerman, Esquire
Florida Bar No.: 0956058
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.: (813) 229-1660

Attorneys for Plaintiff, Team Tires Plus, Ltd.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was sent by Hand Delivery to Travis R. Collier, Esquire and DeWitt M. Morgan, Esquire, Rodey, Dickason, Sloan, Akin & Robb, P.A., 201 Third Street NW, Suite 2200, Albuquerque, New Mexico 87102, on this 2nd day of April, 2003.

Juan L. Flores, Esquire
C. Philip Campbell, Jr. Esquire
J. Todd Timmerman, Esquire

20

# STEVEN S. OSCHER, CPA

**Education:**

- B.S. Accounting 1977
  University of South Florida
- Graduate studies at University of South Florida
  as well as continuing professional education as an
  instructor and student

**Employment:**

| | |
|---|---|
| 1990 – Present | Oscher Consulting, P.A. |
| | Managing Director |
| 1990 – 1991 | Coopers & Lybrand - Consultant |
| 1984 – 1990 | Laventhol & Horwath - Partner |
| | Director, Litigation Support Services |
| | Director, Accounting & Auditing Services |
| 1981 - 1984 | Coopers & Lybrand - Audit Manager |
| 1977 - 1981 | Grant Thornton - Audit Supervisor |

**Professional:**

- American Institute of CPA's
  (Accredited in Business Valuation)
- Florida Institute of CPA's
- Association of Certified Fraud Examiners
  (Accredited as a Certified Fraud Examiner)
- Florida Institute of CPA's Litigation Services Sub-Committee
- University of South Florida School of Accountancy, Board of Directors
- University of South Florida College of Business, Deans Circle Board
  Member
- National Association of Forensic Economists
- Florida State Board of Accountancy, Board Member, past Chairman
  and Vice Chairman
- American Arbitration Association, National Roster of Neutrals member
- Accountants Independence Task Force Committee, Chairman

**Community:**
**(current and past)**

- Florida Bar Grievance Committee
- Tampa Chamber of Commerce
- Leadership Tampa, Chairman
- Committee of 100 Task Force, Vice Chairman
- University of South Florida
  National Alumni Association, President
  College of Business, Advisory Board Chairman
- Hillsborough County Bar Association
- Sun Dome, Inc., Board of Directors
- Unlicensed Practice of Law Committee member
  (Appointed by the Florida Supreme Court)
- FICPA Valuation and Litigation Services Committee member

**Publications:**

- "Preparation of a Case: Inception to Trial"
  *Florida CPA Today*

**Military:**

| | |
|---|---|
| 1966 - 1972 | U.S. Navy - Submarine Service |
| | Clearance: Top Secret |



EXHIBIT

1

# STEVEN S. OSCHER
## OSCHER CONSULTING
### LITIGATION BACKGROUND

Exhibit II

| FIRM | CASE NUMBER | CASE NAME |
|------|-------------|-----------|
| Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A. Tampa, Florida Re: Lost Profits | 92-12768-CA DIV CV-O Jacksonville, Florida Circuit Court | Cargill, Inc. v. Griffin Industries, Inc. |
| Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. Tampa, Florida Re: Patent Infringement/ Economic Damages | 93-1117-CI-15 Tampa, Florida Federal Court | Sensonics v. Acrosonic |
| Maney, Damsker, Harris, P.A. Tampa, Florida Re: Marital Dissolution | 93-13982 Div "K" Tampa, Florida Hillsborough County | McKenzie v. McKenzie |
| Annis, Mitchell, Cockey, Edwards & Roehn, A. Tampa, Florida Re: Employment Agreement/ Economic Damages | 93-4515 Div "C" FNB: 183685 FNB: 774146 Tampa, Florida | Marc S. Ayers v. Belmac Corp., a Florida Corp. & Michael M. Harshbarger |
| Alpert, Barker & Calcutt, P.A. Tampa, Florida Re: Employment Dispute | 94-03705 Tampa, Florida Federal Court | Cindy Morris v. Lawrence W. Crow, Jr. et al. |
| Alpert, Barker & Calcutt, P.A. Tampa, Florida Re: Wrongful Termination | 93-301-CIV-T-17B U.S. District Court | Laura A. Park v. First Union Brokerage |
| Fowler, White, Gillen, Boggs, Villareal & Banker, P.A. Tampa, Florida Re: Economic Damages/ Trust Venture | CA-88-5096 Div "Y" Tampa, Florida Hillsborough County | American Plasticraft et al. v. Newburn et al. |
| Mr. Peter Moll, Esquire Howry & Simon Washington, D.C. Re: Fraud Investigation/ Termination Distributorship | 95-241-CIV-J-16 | Anheuser Busch, Inc. v. A-B Distributors, Inc. |

EXHIBIT

2

1

Exhibit II (cont.)

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Mr. Arnold Levine, Esquire<br>Levine Hirsch Segall & Northcutt, PA<br>Tampa, Florida<br>Re: Asset Valuation | GC-F-95-289<br>Circuit Court, 10th<br>Judicial Circuit<br>Polk County, FL | Ben Wilson Bane v. Consuella<br>Kathleen Bane |
| Mr. David M. Boggs, Esquire<br>MacFarlane, Ausley, Ferguson &<br>McMullen, P.A.<br>Tampa, Florida<br>Re: Fraud Investigation | 94-1176-CIV-T-17C | Anthony Distributors, Inc. v.<br>Miller Brewing Co. |
| Mr. Wil H. Florin Esquire and Mr. Dennis<br>Rogers, Esquire<br>Florin, Roebig, Walker & Huddelstun, P.A.<br>Clearwater, Florida<br>Re: Asset Valuation / Fraud Investigation | Probate No.<br>95-2371 TR<br>Pinellas County, Florida | William Baumgardner et al. v.<br>Joe R. Wolfe, Esquire |
| Lempton Logan<br>Ft. Myers, Florida<br>Re: Lost Profits | 95-245-CIV-FTM-25D | Days Inn Island Beach Resort v.<br>Highlands Insurance Company |
| Chris Rodems<br>Alpert, Barker & Calcutt, P.A.<br>Tampa, Florida<br>Re: Employment Damages | 95-2904<br>Div "B" | Joanne and Frank Cuonzo v.<br>GTE Directories Sales<br>Corporation |
| Mr. Richard M. Zabak, Esquire & Mr. Peter<br>Kelly, Esquire<br>Shackleford, Farrior, Stallings & Evans, P.A.<br>Tampa, Florida<br>Re: Economic Damages from Trust Dispute | 95-003761 | Nancy G. Dickson, Mark L.<br>Dickson & Carol Anne Dickson<br>v. Rena Janet Hall, Charles D.<br>Hall & Joseph Dale Hall |
| Mr. William J. Schifino, Jr., Esquire<br>Williams, Reed, Weinstein, Schifino &<br>Mangione, P.A.<br>Tampa, Florida<br>Re: Valuation of Assets, Accountant's<br>Liability | 94-1249-CIV-T-17B | SEC v. Seahawk Deep Ocean<br>Technology, Inc., John C.<br>Morris, Gregory H. Stemm &<br>Daniel S. Bagley |

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Ms. Patricia Kuhlman, Esquire<br>Maney, Damsker, Harris & Jones, P.A.<br>Tampa, Florida<br>Re: Business Valuation | Circuit Civil No.<br>94-4078-FD-22<br>Pinellas County, Florida | Korones v. Korones |
| Mr. Frank R. Jakes, Esquire<br>Johnson, Blakely, Pope, Bokor, Ruppel &<br>Burns, P.A.<br>Tampa, Florida<br>Re: Patent Infringement | 94-1252-CIV-T-24E<br>Tampa Division<br>Hillsborough County,<br>Florida | Duane H. Newville & The<br>Boden Co., Inc. d/b/a Adjust-A-<br>Brush v. Starbrite Distributors<br>Inc. and Peter Dornau, Sr. |
| Mr. Patrick Calcutt, Esquire<br>Alpert, Baker & Calcutt, P.A.<br>Tampa, Florida<br>Re: Wrongful Termination | NASDA 94-02956 | Cray, Hovis & Lewis v. Nations<br>Bank |
| 's. Marion B. Rush, Esquire<br>Salem, Saxon & Nielsen, P.A.<br>Tampa, Florida<br>Re: Asset Issues relating to Joint-Venture<br>Dissolution | 95-931-CIV-J-10 | Resolution Trust Corporation, etc.<br>v. The Dove Group, etc. |
| Mr. David J. Stefany, Esquire<br>Hogg, Allen, Norton & Blue, P.A.<br>Tampa, Florida<br>Re: Wrongful Termination | 93-1871<br>Hillsborough County<br>Court, Florida | Ikehata v. Spalding & Evenflo,<br>Spalding Sporting Goods |
| Mr. Bennett Falk, Esquire<br>Morgan, Lewis & Bockius, P.A.<br>Miami, Florida<br>Re: Wrongful Termination | NASDA Arbitration | Keith Ligori v. Merrill Lynch et<br>al. |
| Mr. Robert P. Frankel, Esquire<br>Lapidus & Frankel, P.A.<br>Miami, Florida<br>Re: Accountants Liability Issues | 95-17396-CA-03 | Scott King et al. v. Phillip H.<br>Bergman et al. |

3

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|------|-------------|-----------|
| Mr. John P. Holsonback, Esquire<br>Fuller & Holsonback, PA<br>Tampa, Florida<br>Re: Economic Damages | 95-2488 | H. Hoogewerff Junior & Co., v.<br>Robert J. Dammers |
| Mr. G. Donovan Conwell, Esquire<br>Fowler, White, Gillen, Boggs, Villareal &<br>Banker, P.A.<br>Tampa, Florida<br>Re: Economic Damages/ Lost Profits | 95-4049C120 | G.S. Tucker & Co. of Wilson,<br>Inc., Tucker Furniture Co. of<br>Rocky Mount, Inc., and G.S.<br>Tucker & Co. of Smithfield Inc.<br>v. Tyler Business Systems, Inc. |
| Mr. Buddy Ford, Esquire<br>Buddy D. Ford, P.A.<br>Tampa, Florida<br>Re: Economic Damages | 96-325-8B1<br>U.S. Bankruptcy Court<br>Middle District of FL<br>Tampa Division | Cal's Lawn Equipment, Inc. v.<br>Weaver Enterprises, Inc. |
| Mr. Jeffrey Fuller, Esquire<br>Williams, Brasfield, Wertz, Fuller, Freeman &<br>Lovell, P.A.<br>St. Petersburg, Florida<br>Re: Punitive Damages | 96-3995-CI-13<br>Pinellas County, Florida | Bruno v. Taco Bell et al |
| Mr. John Emmanuel, Esquire<br>Fowler, White, Gillen, Boggs, Villareal, &<br>Banker, P.A.<br>Tampa, Florida<br>Re: Economic Damages | 95-1432<br>Division A<br>Hillsborough County<br>Florida | Mayda Menendez et al. v.<br>Margarita Mills et al. |
| Mr. William J. Schifino, Jr., Esquire<br>Williams, Reed, Weinstein, Schifino &<br>Mangione, P.A.<br>Tampa, Florida<br>Re: Economic Damage / Personal Injury | 93-1465-CI<br>Circuit Court, 6th Judicial<br>Circuit, State of Florida,<br>Pinellas County | John Stroud v. Jonathan R.<br>Strawn, Post, Buckley, Schuh &<br>Jernigan, Inc. |
| Mr. Frank R. Jakes, Esquire<br>Johnson, Blakely, Pope, Bokor, Ruppel &<br>Burns, P.A.<br>Tampa, Florida<br>Re: Trademark / Lost Profits | 96-1635-CIV-T-25E<br>United States District<br>Court, Middle District of<br>Florida, Tampa Division | World Triathalon Corporation,<br>Inc. v. Textron, Inc d/b/a Speidel |

**STEVEN S. OSCHER**
**OSCHER CONSULTING**
**LITIGATION BACKGROUND (Continued)**

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|------|-------------|-----------|
| Mr. Scott Ilgenfritz, Esquire<br>Johnson, Blakely, Pope, Bokor, Ruppel &<br>Burns, P.A.<br>Tampa, Florida<br>Re: Contract Dispute / Proper Accounting<br>Treatment | 96-2075<br>Circuit Court, 13th Judicial<br>Circuit, State of Florida<br>Hillsborough County<br>Division C | Hayward & Associates and The<br>Polo Group, Inc. v. Golf<br>Enterprises, Inc. |
| Mr. Richard A. Hirsch, Esquire<br>Levine, Hirsch, Segall & Northcutt, P.A.<br>Tampa, Florida<br>Re: Economic Damages / Personal Injury | 96-3266-CI<br>Circuit Court, 6th Judicial<br>Circuit, State of Florida,<br>Pinellas County, Division<br>013 | Raymond J. Behar, M.D. and<br>Susan L. Behar v. United<br>Services Automobile,<br>Association |
| Mr. Arnold Levine, Esquire<br>Levine, Hirsch, Segall & Northcutt, PA<br>Tampa, Florida<br>Re: Business Valuation | 96-00044<br>Circuit Court, 13th Judicial<br>Circuit State of Florida,<br>Hillsborough County,<br>Division "S" | Barbara Mary Westrate v. David<br>Bruce Westrate |
| Mr. Charles W. Pittman, Esquire<br>Charles W. Pittman, PA<br>Tampa, Florida<br>Re: Economic Damages | United States District<br>Court, Middle District of<br>Florida, Tampa Division | Advance Leasing and<br>Development, Inc., Peter Geraci,<br>and Roy N. Geraci v.<br>Hillsborough County et al. |
| Mr. Frank Winkles, Esquire<br>Cunningham Clark & Greiwe, PA<br>Tampa, Florida<br>Re: Economic Loss | 96-5668-CI<br>Circuit Court<br>9th Judicial Circuit<br>Orange County, FL | Jim Howze Corporation v.<br>Orange County |
| Ms. Nancy Harris, Esquire<br>Nancy Harris, PA<br>Tampa, Florida<br>Re: Marital Dissolution | 96-014630, Division F<br>Circuit Court<br>Hillsborough County, FL<br>Family Law Division | Betty S. Hay v. Charles P. Hay,<br>Monica Cooper, Kenneth W.<br>Hay, et al. |
| Mr. Frank Winkles, Esquire<br>Cunningham Clark & Greiwe, PA<br>Tampa, Florida<br>Re: Personal Injury | | Dr. J. Michael Rivard v.<br>Massachusetts Mutual |



# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Mr. Noel Evans, Esquire<br>Evans & Donica, PA<br>Tampa, Florida<br>Re: Accountant's Liability | 97-1117, Division H<br>Circuit Court<br>Hillsborough County, FL. | Margaret Davis and Violet C.<br>Beasley v. William H. Durkin |
| Mr. Jonathan Alpert, Esquire<br>Alpert Barker & Rodems, PA<br>Tampa, Florida<br>Re: Wrongful Termination | NASD Arbitration<br>No. 9-04586 | Bullins et al v. NationsSecurities<br>et al. |
| Mr. Robert Rocke, Esquire<br>Annis Mitchell Edwards Cockey &<br>Roehn, PA<br>Tampa, Florida<br>Re: Contractors Dispute / Economic<br>Damages | No. 95-6659<br>Division P<br>Hillsborough County<br>Florida | Performance Office Products,<br>Inc., v. Xerox Corporation |
| Mr. James B. Murphy, Esquire<br>Shackleford Farrior Evans & Stallings, PA<br>Tampa, Florida<br>Re: Calculation of Economic Damages | 97-04986<br>Circuit Court<br>Hillsborough County<br>Florida | Ekk Will Tropical Fish Farm,<br>Inc., d/b/a Ekk Will Waterlife<br>Resources v. David W. Kitchen<br>d/b/a Terraqua |
| Mr. Ralph P. Mangione, Esquire<br>Williams Reed Weinstein Schifino &<br>Mangione, PA<br>Tampa, Florida<br>Re: Marital Dissolution / Valuation of<br>Business | 97-01683<br>Circuit Court<br>Hillsborough County, FL<br>Family Law Division | Thomas G. Middleton v.<br>Michelle H. Middleton |
| Ms. Christine Lamia, Esquire<br>Becker & Poliakoff, PA<br>Sarasota, Florida<br>Re: Economic Damages | 97-5710 CA-01<br>Circuit Court<br>Sarasota County, FL<br>Civil Division | Angie D. Hall, Inc., v. American<br>Marine Holdings, Inc. |
| Ms. Tammy Giroux, Esquire<br>Shumaker Loop & Kendrick, LLP<br>Tampa, Florida<br>Re: Economic Damages | 98-25060-BKC-AJC<br>US Bankruptcy Court<br>Sthn District of Florida<br>Chapter 11 | Richmond Health Care, Inc.,<br>d/b/a Sunrise Health and<br>Rehabilitation Center v. CMS<br>Therapies, Inc. |

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Ms. Meredith Wester, Esquire<br>Ruden McClosky Smith Schuster<br>& Russell, PA<br>Tampa, Florida<br>Re: Economic Damages / Personal Injury | 97-08310<br>Circuit Court<br>Hillsborough County<br>Florida, Civil Division | Jennifer Smith v. Florida Health<br>Facility, LP, d/b/a Charter<br>Behavioral Health Systems of<br>Tampa Bay, Inc. |
| Mr. Ernest J. Marquart, Esquire<br>Shumaker Loop & Kendrick, LLP<br>Tampa, Florida<br>Re: Inventory Valuation | 96-2537-CIV-T-23A<br>District Court<br>Hillsborough County<br>Tampa Division | Home Shopping Network, Inc. v.<br>Central Transport, Inc. |
| Mr. Christopher S. Knopik, Esquire<br>Yerrid, Knopik & Krieger, P.A.<br>101 East Kennedy Boulevard<br>Suite 2160<br>Tampa, Florida 33602<br>Re: Personal Injury/ Wrongful Death | No. CI98-2316<br>Division 33<br>Orange County<br>Florida | Diane Manikowski v. Meredith<br>Lee Scott, M.D. |
| Mr. Richard M. Zabak, Esquire<br>Shackleford, Farrior, Stallings, & Evans<br>501 East Kennedy Boulevard<br>Suite 1400<br>Tampa, Florida 33602<br>Re: Lender liability/economic loss | No. 95-5976-CI-011<br>Circuit Court<br>Pinellas County<br>Florida | Dianne Murcin Greene v.<br>Southern Exchange Bank |
| Mr. James Kaplan, Esquire<br>Wilson, Elser, Moskowitz, Edelman, &<br>Dicker, LLP<br>3800 NationsBank Tower<br>100 S.E. Second Street<br>Miami, Florida 33131<br>Re: Accountants' Liability | No. 98-2958-CA<br>Circuit Court, Fifth<br>Judicial Court<br>Citrus County<br>Florida | Johnston v. Woodruff |
| Mr. Edward O. Savitz, Esquire<br>Mr. Edward B. Carlstedt, Esquire<br>Bush Ross Gardner Warren & Rudy, P.A.<br>220 South Franklin Street<br>Tampa, Florida 33602<br>Re: Economic damages | No. 81-3325-CA-01<br>Circuit Court<br>Twelfth Judicial District<br>Sarasota County<br>Florida | Dillin v. Bostic |



**STEVEN S. OSCHER**                              Exhibit II (cont.)
**OSCHER CONSULTING**
**LITIGATION BACKGROUND (Continued)**

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Mr. Richard Hirsch, Esquire<br>Levine, Hirsch, Segall & Brennan, P.A.<br>Tampa, Florida<br>Re: Personal Injury | 98-3413<br>Division G<br>Tampa, Florida<br>Hillsborough County | Donald R. Fickey v.<br>Cable News Network |
| Mr. Martin Hyman, Esquire<br>Golenbock, Eiseman, Assor & Bell<br>New York, New York<br>Re: Employment damages | | Bernadette Scelta v.<br>Delicatessen Support Services,<br>Inc., Boar's Head Provisions<br>Co., Inc. and Robert S. Martin |
| Mr. Robert V. Williams, Esquire<br>Williams, Reed, Weinstein, Schifino<br>and Mangione, P.A.<br>Tampa, Florida<br>Re: Wrongful death | 95-6456<br>Circuit Court<br>Ninth Judicial Circuit<br>Orange County<br>Florida | Dean Fresonke v. Prudential<br>Health Care Plan, Inc., et al |
| Ms. Deborah Gander, Esquire<br>Robles & Gonzalez, P.A.<br>Miami, Florida 33131<br>Re: Employment Damages | 98-3368-CI-11<br>Circuit Court<br>Pinellas County<br>Florida | Carl Swigart and Denise<br>Swigart v. Rebecca<br>Appelbaum and David<br>Appelbaum |
| Ms. Tammy Giroux, Esquire<br>Shumaker, Loop & Kendrick, LLP<br>101 East Kennedy Boulevard<br>Suite 2800<br>Tampa, Florida<br>Re: Contract dispute | 98-3701-CA<br>Circuit Court<br>Sixth Judicial Circuit<br>Pasco County<br>Florida | John L. Jennings, III v.<br>DeLite Outdoor Advertising,<br>LLC, et al |
| Ms. Marion Hale, Esquire<br>Johnson, Blakely, Pope, Bokor<br>911 Chestnut Street<br>Clearwater, Florida<br>Re: Damage analysis | 98-1392-T-23B<br>Middle District of Florida<br>Civil Division | Teltronics, Inc. et al. v.<br>Kevin B. Rogers, et al. |
| Ms. Gretchen R. H. Vose, Esquire<br>Vose, Blau & Hayes, P.A.<br>2705 West Fairbanks Avenue<br>Winter Park, Florida<br>Re: Contract dispute | CI 97-3575<br>Ninth Judicial Circuit<br>Orange County<br>Florida | The Strasberg Corporation<br>v. Robert Rohdie, et al |

8

## STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Robert V. Potter, Esquire<br>Johnson, Blakely, Pope, Bokor,<br>Ruppel & Burns, P.A.<br>911 Chestnut Street<br>Clearwater, Florida<br>Re: Contract dispute | 97-2866-CIV-T-17B<br>Middle District of<br>Florida<br>Civil Division | Florida Software Systems,<br>Inc. v. Columbia/HCA<br>Healthcare Corporation |
| Francis J. Carroll, Esquire<br>Boehm, Brown, Seacrest, Fischer<br>& LeFever, P.A.<br>220 South Ridgewood Avenue<br>Suite 301<br>Daytona Beach, Florida<br>Re: Economic damage analysis | 94-32172-CICl<br>Circuit Court<br>Seventh Judicial Circuit<br>Volusia County<br>Florida | Howard T. Paul and Nancy<br>A. Paul, et al v. American<br>Financial, et al |
| Christopher S. Knopik, Esquire<br>Knopik Krieger<br>406 South Morgan Street<br>Tampa, Florida<br>Re: Contract dispute | 99-1550-Civ-T-26A<br>District Court<br>Middle District of Florida<br>Tampa Division | L.C. Hicks, Jr. v. Merkert<br>American Co., Inc. |
| Melanie J. LaFond, Esquire<br>Zinober and McCrea, P.A.<br>201 East Kennedy Boulevard<br>Suite 850<br>Tampa, Florida<br>Re: Contract dispute/ fraud<br>Investigation | 98-2143-CIV-T-25E<br>District Court<br>Middle District of Florida<br>Tampa Division | America II Electronics, Inc.<br>v. Access International, et al |
| David R. Atkinson, Esquire<br>Gunster Yoakley & Stewart, P.A.<br>777 South Flagler Drive<br>Suite 500 East<br>West Palm Beach, Florida<br>Re: Accountants' Professional Conduct | 93-07804<br>7th Judicial Circuit<br>Circuit Court<br>Broward County<br>Florida | BankAtlantic v. Ernst & Young |

9

# STEVEN S. OSCHER
## OSCHER CONSULTING
### LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|------|-------------|-----------|
| Mr. Frank Winkles. Esquire<br>Swope Law Group<br>777 Harbour Island Boulevard South<br>Tampa, Florida<br>Re: Personal injury | 99-2552CIV-T-25A<br>District Court<br>Middle District of Florida<br>Tampa Division | John A. Tedesco v. The<br>Paul Revere Life<br>Insurance Company |
| Mr. Aubrey Dicus, Esquire<br>Battaglia, Ross, Dicus & Wein. P.A.<br>980 Tyrone Boulevard<br>St. Petersburg, Florida 33743<br>Re: Contract dispute | 96-6070-CI-11<br>Circuit Court<br>Sixth Judicial Circuit<br>Pinellas County<br>Florida | David S. Goldman v.<br>Acrosonic Corporation |
| Mr. A. Christopher Kasten, Esquire<br>Allen, Dell, Frank & Trinkle, P.A.<br>101 East Kennedy Boulevard, Suite 1240<br>Tampa, Florida 33602<br>Re: Contract/trade secret damages | 96-4784<br>Circuit Court<br>Thirteenth Judicial Circuit<br>Hillsborough County<br>Florida | Miami Transfer Company<br>Inc., v. Jeffrey Nutting and<br>Sunbelt Sales & Rentals, Inc. |
| Mr. Stephen Segall, Esquire<br>Levine, Hirsch, Segall & Brennan<br>100 South Ashley Drive, Suite 1600<br>Tampa, Florida 33602<br>Re: Personal Injury | 97-001935<br>Circuit Court<br>Thirteenth Judicial Circuit<br>Hillsborough County<br>Florida | Williams, et al v.<br>Zaborske and Ford Motor<br>Company, et al |
| Mr. Eric D. Cohen, Esquire<br>Welsh & Katz, Ltd.<br>120 South Riverside Plaza<br>22nd floor<br>Chicago, Illinois 60606<br>Re: Trademark | 8:00CV473-T-24F<br>District Court<br>Middle District of Florida<br>Tampa Division<br>Florida | Del Webb Corporation<br>v. Watermark<br>Communities, Inc. et al |
| Mr. Stephen J. Wein, Esquire<br>Battaglia, Ross, Dicus & Wein<br>980 Tyrone Boulevard<br>St. Petersburg, Florida 33743<br>Re: Patent Infringement | 98-2175-CIV-T-23E<br>District Court<br>Middle District of Florida<br>Tampa Division<br>Florida | TSE Industries, Inc.<br>v. Franklynn Industries, Inc. |

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|---|---|---|
| Ms. Gretchen R. H. Vose, Esquire<br>Vose & Blau, Attorneys at Law<br>2705 West Fairbanks Avenue<br>Winter Park, Florida 32789<br>Re: Economic Damage Analysis | 98-CI-1421<br>Circuit Court<br>Ninth Judicial Circuit<br>Osceola County<br>Florida | Cecile Resort, Ltd.,<br>Euramerican Investment<br>Consultants, Corp.<br>v. Residence Inn by Marriott<br>International, Inc. |
| Mr. Stephen L. Segall, Esquire<br>Levine, Hirsch, Segall & Brennan, P.A.<br>100 South Ashley Drive<br>Suite 1600<br>Tampa, FL 33601<br>Re:  Personal Injury | 99-919-CIV-T-17F<br>District Court<br>Middle District of Florida<br>Tampa Division<br>Florida | Simon L. Pratt and Chifton<br>M. Pratt<br>v. Ricky J. Wedig and Wel<br>Companies, Inc. |
| Ms. Jean Frances Niven, Esquire<br>Gunn Merlin, P.A.<br>601 S. Bayshore Boulevard<br>~uite 800<br>.ampa, FL 33606<br>Re: Economic Loss | 98-4392, Division J<br>Circuit Court<br>Thirteenth Judicial Circuit<br>Hillsborough County<br>Florida | Leonard Nichols, Inc.<br>v. Nationwide Mutual<br>Insurance |
| Mr. Paul Egtvedt, Esquire<br>Goldsmith & Associates, Ltd.<br>920 Midwest Plaza East<br>800 Marquette Avenue<br>Minneapolis, Minnesota 55402<br>Re: Employment matter | 99-1569-CIV-T-17B<br>District Court<br>Middle District of Florida<br>Tampa Division<br>Florida | Surget U. Doss<br>v. International Brotherhood<br>of Teamsters, etc., et al. |
| Don Greiwe, Esquire<br>Cunningham, Clark & Greiwe, P.A.<br>100 South Ashley Drive, Suite 100<br>Tampa, Florida 33602<br>Re:  Wrongful Death | 99-0920 Division I<br>Circuit Court<br>Thirteenth Judicial Circuit<br>Hillsborough County<br>Florida | Todd Anderson v. Robert<br>Rosequist, M.D., Kim Cole,<br>P.A.-C., and Family Care<br>of Land O'Lakes, P.A. |
| Edward M. Waller, Esquire<br>Fowler, White, Boggs & Banker<br>501 East Kennedy Boulevard, Suite 1700<br>Tampa, Florida 33601<br>Re: Contract damages | American Arbitration<br>Case No. 32 Y 193 0001700 | Medcenter Diagnostics, Inc.<br>vs. Lawnwood Medical<br>Center, Inc., et al |

# STEVEN S. OSCHER
## OSCHER CONSULTING
## LITIGATION BACKGROUND (Continued)

Exhibit II (cont.)

| FIRM | CASE NUMBER | CASE NAME |
|------|-------------|-----------|
| Frank Winkles, Esquire<br>Swope Law Group<br>1234 5th Avenue East<br>Tampa, Florida 33605<br>Re: Personal injury | 97-007877-CI-7<br>Circuit Court<br>Sixth Judicial Circuit<br>Pinellas County, FL<br>Civil Division | Edwin Andres and<br>Linda Andres v.<br>Buccaneer Steel Erectors<br>Inc., et al |
| Wil Florin, Esquire<br>Florin, Roebig & Walker, P.A.<br>777 Alderman Road<br>Palm Harbor, Florida 34683<br>Re: Wrongful termination | 6:00-CV-1542-ORL-158B<br>District Court<br>Middle District of Florida<br>Orlando Division | Thiruchelvam, Morillo-<br>Azcuy, Krishnan,<br>Sessoms, Joseph,<br>Thakkar, Luna, and<br>Dominguez v.<br>Metcare of Florida |
| C. Philip Campbell, Esquire<br>Shumaker, Loop & Kendrick<br>101 East Kennedy Boulevard<br>Tampa, Florida 33602<br>Re: Contract dispute | CL 00 5856 AB<br>Circuit Court<br>15th Judicial Circuit<br>Palm Beach County, Florida | Choice Restaurant<br>Acquisition, Ltd. V.<br>Whitley, Inc., et al |
| Glen Rafkin, Esquire<br>Greenspoon, Marder, Hirschfeld,<br>Rafkin, Ross & Berger, P.A.<br>100 West Cypress Creek Road, Suite 700<br>Fort Lauderdale, Florida 33309<br>Re: Contract dispute | 8:98-Civ-1150-T-MAP<br>Middle District of Florida<br>Tampa Division | Vacation Break U.S.A, Inc.<br>v. Marketing Response Group &<br>Laser Company, Inc. |

STEVEN OSCHER, 9/27/02

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NEW MEXICO
              NO. CIV-01 1124 GWE/RLP
 3
 4   TEAM TIRES PLUS, LTD., a
     Minnesota corporation,
 5
              Plaintiff,
 6
       vs.
 7
     TIRES PLUS, INC., a
 8   New Mexico corporation,
 9            Defendant.
10
11
12
13         DEPOSITION OF STEVEN S. OSCHER
14             September 27th, 2002
                   9:15 a.m.
15       201 Third Street, Northwest, Suite 2800
          Albuquerque, New Mexico 87102
16
17
18          PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:
19
20
21   TAKEN BY:   MR. TRAVIS R. COLLIER
                 ATTORNEY FOR DEFENDANT
22
23
24   REPORTED BY:  MICHELE TRUJILLO, CCR No. 116
                   Kathy Townsend Court Reporters
25                 110 Twelfth Street, Northwest
                   Albuquerque, New Mexico  87102
```

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3      SHUMAKER, LOOP & KENDRICK, L.L.P.
        Attorneys at Law
 4      Bank of America Plaza, Suite 2800
        101 East Kennedy Boulevard
 5      Tampa, Florida  33602
        By:  MR. C. PHILIP CAMPBELL, JR.
 6
     For the Defendant:
 7
        RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
 8      Attorneys at Law
        201 Third Street, Northwest, Suite 2200
 9      Albuquerque, New Mexico  87102
        By:  MR. TRAVIS R. COLLIER
10           MR. MATTHEW WEHMACHER
11   Also Present:
12      Mr. Donald Leonard
        Mr. Bruce Malott
13
14
15            I N D E X
16   STEVEN S. OSCHER                       PAGE
17     Direct Examination by Mr. Collier       4
18   CERTIFICATE OF COMPLETION OF DEPOSITION  129
19   SIGNATURE/CORRECTION PAGE                131
20
21
22
23
24
25
```

```
 1            E X H I B I T S
 2   OSCHER EXHIBIT:                        MARKED
 3   72.  Notice to Take Deposition Duces Tecum   8
 4   73.  Letter dated 9/16/02 to Mr. Morgan from
 5        Mr. Tiberman                       9
 6   74.  Report done by Oscher Consulting   10
 7   75.  Two handwritten pages, beginning with
 8        "7, Tire Cost - (y)"               11
 9   76.  Group of documents produced to Mr. Oscher,
10        including financial information     31
11   77.  Team Tires Plus, Ltd., Economic Damages,
12        and Tires Plus, Inc., ("TPI"), Annual
13        Revenue, with red markings          33
14   78.  Xerox copy of yellow stickie        48
15   79.  Xerox copy of yellow stickie        48
16   80.  Copy of Exhibit 75 handwritten pages with
17        new calculations                    86
18
```

```
 1               STEVEN S. OSCHER
 2     after having been first duly sworn under oath,
 3     was questioned and testified as follows:
 4                 DIRECT EXAMINATION
 5   BY MR. COLLIER:
 6       Q.  Good morning, Mr. Oscher.  Is that a correct
 7   pronunciation of your name?
 8       A.  It is, sir.
 9       Q.  As you know, we're here for your deposition
10   this morning.  My name is Travis Collier.  I represent
11   the defendant in this case, and I'm going to try to refer
12   to both parties as just the plaintiff and the defendant,
13   for the ease of use here.
14       I take it you've given many depositions.  Is
15   that correct?
16       A.  Yes, sir.
17       Q.  And you sort of know the lay of the land, if
18   you will?
19       A.  I hope so, yes, sir.
20       Q.  If I should ask you anything you don't
21   understand, please let me know so that we make sure your
22   answers are accurate, all right?
23       A.  Yes, sir.
24       Q.  When were you first engaged in this matter?
25       A.  I'm trying to think.
```

EXHIBIT
3

STEVEN OSCHER, 9/27/02

<table>
<tr><td valign="top">

33

1   this morning, I'll mark as Exhibit 77.
2       (Oscher Exhibit 77 marked.)
3       Q.  Can you tell me what Exhibit 77 is?
4       A.  Yes, sir.  As a result of the work or the
5   analysis that I did, after I received the information
6   from Mr. Slattery, I went back and reviewed the damage
7   calculations that had been prepared in the report, in
8   Exhibit IV and Exhibit V, and I modified the numbers, the
9   percentages, for what I learned from my discussion with
10  Mr. Slattery.
11      Q.  And we'll get back into that momentarily.
12      A.  Okay.
13      Q.  Have you reviewed any franchise agreements or
14  sample franchise agreements in coming to your conclusions
15  in this case?
16      A.  I've reviewed the agreements, certainly.
17      Q.  Did you bring those with you here today?
18      A.  No, I think they were part of the packet of
19  information that I thought had been received by you.
20      Q   I have not received any franchise agreements
21  within Exhibit 73.
22      A.  No, as I was saying, they were part of -- part
23  of the original documents that were considered for my
24  report that I understood you and Mr. Timmerman had
25  discussed.

</td><td valign="top">

35

1      A.  I've never spoken with Mr. Morgan.
2      Q.  I take it you don't know Mr. Morgan?
3      A.  I don't know Mr. Morgan, no, sir.
4      Q.  Has your firm ever done any work with any of
5  Mr. Morgan's enterprises?
6      A.  Is Mr. Morgan associated with anything other
7  than tires?
8      Q.  Not that I know of.
9      A.  Then I'm not sure -- I'm not aware of any other
10  thing that I've ever done with him.
11      Q.  Let me have you turn your attention to page
12  four of your report.
13      A.  Okay.
14      Q.  This is where you list your findings.  First of
15  all, your report says that it's your understanding that
16  the defendant was informed in 1994 that it was wrongfully
17  using the service mark Tires Plus, and I take it that's
18  information someone else gave to you?
19      A.  It may have been from the complaint that I took
20  that.
21      Q.  You, yourself, haven't been asked to review the
22  trademarks or make any determination as to who is right
23  or wrong in this case from that aspect, have you?
24      A.  No, sir.
25      Q.  You've been asked to come up with some type of

</td></tr>
<tr><td valign="top">

34

1      Q.  So some of the original -- they should be
2  listed within your report, then, as having been reviewed
3  by you.  Is that what you're saying?
4      A.  I believe so, yes, sir.  Now, if they're not
5  there, they may -- I mean, if it's not specifically laid
6  out, they may have been an attachment, an exhibit
7  attachment to some other document.
8      Q.  Do you advertise your services anywhere?
9      A.  We have a website.  I don't know if you would
10  refer to that as advertising.  There's a newsletter that
11  comes out every two months, six times a year.  I don't
12  know if you call that advertising.
13      In Hillsborough County, there is a bar journal.
14  At different times, I've had an ad that you would
15  probably call advertising.
16      Q.  What bar journal is that?
17      A.  It's the county bar.
18      Q.  Hillsborough County, is that where Tampa is
19  located?
20      A.  That's correct, sir.
21      Q.  Any other advertising that you've done in the
22  last five years, say?
23      A.  Not that I can think of, no, sir.
24      Q.  Have you ever spoken with Larry Morgan about
25  this case?

</td><td valign="top">

36

1  damage analysis, assuming the jury finds that to be the
2  case?
3      A.  That's correct, sir.
4      Q.  It states, "We have requested financial
5  statements and tax returns for TPI."  Who did you make
6  that request of?
7      A.  Mr. Timmerman.
8      Q.  When did you make that request?
9      A.  Right after we became involved, after the
10  engagement.
11      Q.  In July of 2002?
12      A.  Yes, sir.
13      Q.  What did Mr. Timmerman tell you?
14      A.  That the redacted information that I received
15  was the only thing in the way of information that had
16  been produced.
17      Q.  Then you state, "Without the Defendant's
18  specific financial information, we have utilized
19  published studies," and is that the RMA that you're
20  referring to?
21      A.  That's correct, sir.
22      Q.  Generally speaking, if you'd had the
23  defendant's specific financial information, would that
24  have been a better source for trying to determine the
25  defendant's profits?

</td></tr>
</table>

STEVEN OSCHER, 9/27/02

37

1  A. If I had had complete financial information, it
2  would certainly have allowed me to consider the
3  information more completely than I did, yes, sir.
4  Q. In fact, that would be your primary source for
5  determining the defendant's profits, would it not?
6  A. The actual financial statements?
7  Q. Yes, sir.
8  A. That would always be so.
9  Q. Did you utilize any published studies besides
10 RMA?
11 A. No, sir.
12 Q. I guess, for purposes of the record, would you
13 identify what RMA is?
14 A. Well, it used to stand for Robert Morris
15 Associates, but I think it's taken on a different -- the
16 acronym stands for something else other than Robert
17 Morris Associates today.
18 Q. Would you tell me how you determined the
19 defendant's profits?
20 A. What I tried to do was find where there might
21 have been some published information relative to a tire
22 store operation that also had a service operation, repair
23 operation, associated with it. I didn't find any
24 published studies on point to that topic.
25     What I wanted to then do was find something

38

1  that I thought could be close to the issue, and by going
2  to these published studies, I was able to take a look at
3  a tire operation, and that's why there's actually two
4  different studies here, the first being "Retail - Tires &
5  Tubes," and the other would be "General Automotive Repair
6  Shops."
7      What I did was, in taking the profit
8  information off of this study or these studies and then
9  adjusting for what I believe -- from the redacted sales
10 information that I received from Mr. Leonard's operation,
11 the defendant's operation, I determined that about 60
12 percent of his sales were tire-related and 40 percent
13 were repair-related, and I put that percentage to the
14 profit percentages from here, and that's how I came up to
15 the 3.3 percent.
16 Q. Do you have any concerns about relying on that
17 RMA information in trying to make a profit calculation?
18 A. No, I think that what -- if I could get it back
19 for a second --
20 MR. MALOTT: I'm sorry.
21 THE WITNESS: Thanks, Bruce.
22     The studies that they have done here involved,
23 at different points in time, well over 100, over 150
24 different tire stores, retail tire stores, and similarly,
25 for the auto repair shops, it was well over 300, 350

39

1  stores for the repair shops.
2      So the accumulation of data seemed to come from
3  enough different places that -- using it as a benchmark
4  was something I had done in other cases and I believed
5  that it was reasonable and appropriate.
6  Q. Are you aware of any concerns that RMA itself
7  has expressed about the use of its data?
8  A. Well, they make a statement that it is not to
9  be used because they're not giving any reliance to it.
10     The fact that RMA has put out these published
11 studies, it is commonly used in terms of just doing what
12 I'm doing and setting a benchmark. Nobody is saying that
13 this is the way it actually is. It's just trying to give
14 the user of information the ability to see what the
15 industry may or may not be doing.
16 Q. Right. It's just a general guideline, if you
17 will?
18 A. Oh, absolutely.
19 Q. It certainly is not meant to be a specific
20 accounting of what Don Leonard made or did not make in
21 his business?
22 A. No, it couldn't be that. It's just to give me,
23 as a provider of what I think is reasonable information,
24 a benchmark, and that's how I've used it.
25 Q. And you're aware that there are concerns that

40

1  the information may not be accurate because of geographic
2  considerations, size of business, a whole host of
3  factors?
4  A. Well, on size of business, they actually try to
5  help you. You're perhaps correct about geographics, but
6  the study tends to break down the size of -- and sales
7  volume of different-size operations, so that, by itself,
8  is not an issue.
9  Q. RMA believes it's an issue, don't they?
10 A. No. Otherwise, they wouldn't have -- I don't
11 believe they -- they would not have set out, you know,
12 that we're dealing with stores and sales volumes of
13 different sizes.
14 Q. Would it be fair to state that you can't take
15 the RMA data and conclude that, because another -- an
16 individual business is different, had different profit or
17 loss, that they're necessarily not reporting their profit
18 and loss accurately?
19 A. I don't know that I understand what you just
20 asked me.
21 Q. You're not saying that you can use the RMA data
22 and compare it to an individual business, such as Mr.
23 Leonard's, and come to the conclusion that the reports of
24 Mr. Leonard are inaccurate?
25     In other words, RMA might give you a conclusion

**41**

1 that there's, across the board, a three-percent profit.
2 That doesn't mean, if Mr. Leonard reports a loss, that
3 his reports are not accurate?
4    A. Your last statement is a true statement. Your
5 other question, the answer to it is: I don't know.
6       When I start an investigation, one of the first
7 barometers I look at is as to, "What do I expect?" and
8 RMA or any industry publications are the first source
9 that I go to. If things seem to tie in, then at least it
10 gives me some understanding of the business operation.
11    Q. But the primary source that you would look at
12 to determine if Mr. Leonard was profitable or not would
13 be his own financial statements?
14    A. Certainly, his financial statements are the
15 first source of information, the detail of his
16 accounting, yes, sir.
17    Q. Have you undertaken any review of his financial
18 information in determining his profits?
19    A. I have not done a study on his information, no,
20 sir.
21    Q. Have you been given a copy of Mr. Malott's
22 report and attachments?
23    A. Yes, sir.
24    Q. When did you receive that?
25    A. Probably a couple of weeks ago.

**42**

1    Q. Were you aware that Don Leonard's specific
2 information was contained as exhibits to Mr. Malott's
3 report?
4    A. It wasn't contained as specific information.
5 It was certain financial statements and tax returns.
6    Q. Right, but the specific information concerning
7 the expenses for Mr. Leonard's business were set out in
8 exhibits to Mr. Malott's report; were they not?
9    A. Well, Mr. Malott copied, or people in his
10 office copied, information that was picked up off of
11 financial statements or tax returns. I mean, that's my
12 understanding.
13    Q. Did you make any effort to try to determine
14 Mr. Leonard's profits and losses using that material?
15    A. Other than raising questions because things
16 certainly seemed out of order, I didn't do anything more
17 than that at this time, no, sir.
18    Q. But you would agree with me that that's a
19 better indication of what his profits and losses would be
20 as compared to the RMA information?
21    MR. CAMPBELL: Objection, vague.
22    A. I don't know that I -- again, I don't know what
23 I don't know, because I haven't done anything to truly
24 look at the underlying issues that relate to the expenses
25 or the sales that Mr. Leonard reported on his financial

**43**

1 records.
2    Q. But that's information that you requested
3 Mr. Timmerman to give to you at one point, right?
4    A. Yes, sir.
5    Q. But you haven't looked at that since you've
6 received it?
7    A. No. I looked at the information that was
8 contained in Mr. Malott's report. My comment spoke to
9 what the underlying information that made up those
10 numbers that were reported, either on the compiled
11 financial statements or on the tax returns, was.
12    Q. But you haven't used Mr. Leonard's numbers to
13 come up with a profit or loss number?
14    A. Well, I did use his sales numbers. It was that
15 redacted information that we initially received.
16    Q. But you didn't use his expense numbers?
17    A. I didn't have his expense numbers.
18    Q. You had them as of two or three weeks ago; is
19 that correct?
20    A. Two or three -- again, as I'm saying, when I
21 looked at the information, I didn't -- it called into
22 question the reliability of the information, and I didn't
23 see, at that point in time, the need to make any
24 modification of my numbers.
25    Q. Would you agree with me, if a jury finds that

**44**

1 Mr. Leonard's numbers are reliable, that Mr. Leonard's
2 operation would not have made a profit over the years
3 that you've looked at?
4    A. I'm hesitating, because I don't know how you're
5 defining a "profit." If you could help me with that,
6 then I'd like to answer your question.
7    Q. Well, let me ask you how you define "profit."
8    A. I define it as the appropriate business
9 expenses taken away from appropriate, properly recorded
10 business revenue.
11    Q. If you were to assume, first of all, that all
12 of Mr. Leonard's income and expenses were appropriately
13 recorded, as given to you in the Malott information,
14 would you agree with me, over the years that you've
15 looked at, that his firm has not had a profit?
16    A. If they were reasonable and appropriate --
17 again, I -- what's -- I don't know how to answer that
18 question, and I'm not trying to be evasive, but I'm just
19 simply saying that, you know, without going in and -- for
20 example, I understand that there's personal expenses that
21 Mr. Leonard has acknowledged are recorded in there.
22       I don't know whether those are meaningful or
23 not. I know Mr. Malott testified yesterday that he asked
24 the question and that he was told that they weren't, but
25 I don't know that Mr. Malott or the people in his office

**Page 57**

1    Q.  Now, you stated, when you looked at Don's
2  financials, that you had some questions.  What types of
3  questions do you have?
4    A.  Well, I think the questions were the same as
5  Mr. Malott said yesterday when he testified, that it's
6  difficult to understand a business that has been
7  operating for 16 years where, in 14 of those years, there
8  are losses, continuing losses.
9    Q.  I'm not sure if Mr. Malott said that or Mr.
10  Campbell said that, but my question for you is:  Besides
11  the fact that his financials show a loss for 14 of 16
12  years, do you have any other concerns about the
13  appropriateness of his financials, as reported?
14    A.  I think everything that I may have as a concern
15  stems from that very fact that, after 16 years, he's able
16  to put money into the business only to continue to
17  generate losses.  That's not a normal business scenario
18  that I'm accustomed to seeing.
19    Q.  Have you seen that in connection with
20  family-owned businesses before, even though you don't
21  personally agree with it, that some people still hang on
22  to their family businesses?
23    A.  I was trying to think when I've seen that, and
24  listening to the testimony yesterday from Mr. Malott, I
25  can't think of a situation that I've seen like this in my

**Page 58**

1  work experience.
2    Q.  You haven't done any analysis at all to
3  determine whether or not the actual reporting is accurate
4  or not, have you, by Don Leonard?
5    A.  Well, I was waiting to hear.  That's why I came
6  to the deposition yesterday, to hear what work had been
7  done by Mr. Malott.  I have not done anything at the
8  moment.
9    Q.  So as we sit here today, you can't say one way
10  or the other that the reporting done by Mr. Leonard is
11  inappropriate or fraudulent or misrepresentative in any
12  nature?
13    A.  I can only tell you that I don't know.  It
14  appears very suspicious.  Beyond that, I don't have any
15  other comment.
16    Q.  Besides the fact that he's reported a loss, is
17  there anything else that is suspicious about it to you?
18    A.  I think everything falls under that umbrella.
19    Q.  Can you tell me what it is, besides the fact
20  that he's reported a loss, that tells you that it's a
21  suspicious reporting?
22    A.  Again, I'm sorry, I guess I'm not making myself
23  clear.
24       In looking at the fact that the businesses have
25  continued to operate and the fact that he has put over a

**Page 59**

1  million dollars back into this business to continue to
2  generate losses, as he has for 14 of 16 years, I don't
3  understand that.  It's just not something, in my
4  accounting experience, that I've seen in a retail
5  operation like this, even a small, family-owned business,
6  if you will.
7       So to pursue any additional questions, I guess
8  I just haven't really thought about it, because, at the
9  time, I was just trying to gain an understanding for what
10  all that information related to.
11    Q.  And I guess that's my question.  Besides the
12  fact that he's generated losses over a lengthy period of
13  time, you've not done any analysis or ratios or
14  calculations whatsoever to support your conclusions that
15  make you suspicious?
16    A.  I have not.
17       Again, the question that I was asked -- or that
18  I wasn't asked, but -- one of the questions that I had
19  related to the reporting of sales, for example, and how
20  they had recorded sales, as they had here, on Oscher
21  Exhibit Number 7.  The rest of the information was
22  redacted, but they gave information with regards to the
23  detail of the sales.
24       In Mr. Malott's report, while he was given more
25  financial information, information relating to sales and

**Page 60**

1  information relating to purchases, cost of sales, were
2  just given to him as a single line item that he reported.
3       I either was hoping to hear that he had more
4  information, but I didn't -- I didn't hear -- I didn't
5  see it, and so I can't answer the question.
6       That would be one of those areas, in terms of
7  trying to line up the appropriateness of the purchases,
8  the cost of sales, but I don't know where the information
9  is, sir.
10    Q.  So I take it the answer to my question is:  You
11  have not done any type of comparative analysis or any
12  accounting work whatsoever to show that these statements
13  are, indeed, inappropriate or misrepresentative or
14  fraudulent.  Is that a fair statement?
15    A.  I have not done that.  That's correct, sir.
16    Q.  And you don't have any opinion on that, then --
17    A.  I do have an opinion.
18    Q.  But -- well, let me finish my question.
19    A.  I'm sorry.
20    Q.  You don't have any opinion on it, with the
21  exception of you think it's suspicious that a business
22  would go 14 years without a profit?
23    A.  I think it's suspicious, that's correct, sir.
24    Q.  But besides the fact that he hasn't made a
25  profit, you don't have any other information to base your

61

1   suspicion upon?
2       A.  I don't know how to answer your question,
3   again, because you changed the way you asked it.
4       To the extent that I had information in a
5   redacted form for the detail of sales that subsequently
6   wasn't produced in that same format to Mr. Malott and
7   that missing from that was information relating to
8   purchases, there would certainly be a suspicion that
9   maybe there's something in there that, you know, may
10  provide some additional avenue of pursuit.
11      So there is something specific, at least from
12  my initial look at it, but have I been able to do that?
13  No, sir, I haven't.
14      Q.  Do you know under what circumstances the
15  redacted information was produced that would cause a
16  suspicion in your mind, and do you know that the
17  suspicious information was even asked for or -- in the
18  form you're talking about?
19      A.  You asked me that question earlier with regards
20  to a statement that I made in my report about requesting
21  information and receiving redacted information.  All I
22  did was ask Mr. Timmerman if additional information was
23  produced, and he said, "No, it was produced in the form
24  you saw."
25      It wasn't until I saw it a few weeks ago, or in

62

1   the last few weeks, Mr. Malott's report, where it became
2   obvious that he had more information to deal with.  He
3   just didn't have even this detail of information that had
4   been produced.
5       Q.  Did Mr. Timmerman tell you whether or not he
6   made any effort to obtain the information that you
7   requested in July of 2002 after you requested it?
8       A.  I made the request.  He said it had been asked
9   for and this is what was produced.  I have no additional
10  information beyond that, sir.
11      Q.  For how long a period of time do you think a
12  reasonable business would continue to operate at a loss
13  before they, what, shut it down or whatever?
14      A.  I don't know that I have a perspective on what
15  a reasonable time would be.
16      Q.  Well, sir, you've told me that you're
17  suspicious because Donnie operated with a loss.
18      A.  Yes.
19      Q.  So can a reasonable business operate with a
20  loss over a number of years without generating a
21  suspicion?
22      A.  Well, again, from the perspective of cash flow
23  and what cash flow may mean and how cash flow may be
24  derived, or to the extent that there are expenses being
25  used from the business or payments that may be going

63

1   other places that have no impact on the business, to keep
2   the business operating, you know -- I mean, there's,
3   frankly, no telling how long somebody may or may not
4   choose to keep the business going.
5       My response about the questions and suspicions
6   I was having merely had to do with the fact, if
7   everything is purely this business, that this just
8   doesn't seem logical, that you would continue to incur
9   these losses.
10      Q.  You can't think of a business reason for it, is
11  that what you're telling me?
12      A.  I don't know of a business reason.
13      Q.  How long would any reasonable business continue
14  to incur losses before shutting it down?
15      MR. CAMPBELL:  Objection, speculation, lack of
16  predicate, foundation.
17      MR. COLLIER:  I'll agree, it's speculative.
18      Q.  Is that your testimony, also, sir?
19      A.  What, that how long a business would continue
20  with losses is speculation?
21      Q.  Well, before they shut it down and continue to
22  -- do you have a feel for how long is too long so that a
23  suspicion is raised?
24      A.  I think there's a number of motivating factors.
25  Is there an expectation that there may be profits at some

64

1   point?
2       Q.  All right.
3       A.  I mean, there are all sorts of individual
4   factors that could possibly come into play.
5       Q.  What are some of the other factors?
6       A.  I can't think of anything else at the moment.
7       Q.  So you can't give me an exact number of years,
8   then, that a business will operate at a loss before it
9   becomes suspicious to you?
10      MR. CAMPBELL:  Objection, mischaracterizes his
11  prior response and responses.
12      Q.  I don't mean to mischaracterize anything.  Is
13  there a figure, sir?
14      A.  I don't think there's any specific figure, no.
15      Q.  Have you been asked to do any further work in
16  following up on your suspicions?
17      A.  Not at the moment.
18      Q.  Do you intend to do any, unless you're asked?
19      A.  If I'm asked, I will certainly do it.
20      Q.  And if you do additional work, I would
21  appreciate it if you would let Mr. Campbell know so he
22  can let me know.  Is that acceptable to you?
23      A.  I will gladly have Mr. Campbell inform you of
24  anything that I do.
25      Q.  In determining this first section of your

STEVEN OSCHER, 9/27/02

77

1    You're absolutely right, I would want to check
2  it out further.
3    Q.  Anything besides that?
4    A.  Well, it would probably depend on what those
5  results are before I pursued it further.
6    Q.  Would that raise a concern in your mind that
7  they shouldn't be operating those businesses any longer
8  because they've been unprofitable since 1997?
9    A.  Again, I think you're matching apples and
10 oranges as a franchisor operates, but from the
11 perspective of if there are continuing losses, then I
12 would certainly want to inquire further.
13   Q.  If you assume that their operation of their
14 same-store businesses over the years, since 1997, has
15 been unprofitable, yet their bottom line is showing a
16 profit, would it be fair to say that they're making their
17 profit off the franchise fees?
18   A.  No.  No, sir.
19   Q.  Do you have any other idea what their stream of
20 income is for the plaintiff here besides their own
21 company stores and franchise fees?
22   A.  I think they had some wholesale operations, as
23 well.
24   Q.  Do you know what percentage of their sales is
25 wholesale?

78

1    A.  Again, I haven't done anything other than look
2  at the franchisee issue.
3    Q.  What did you rely on or use those reports for
4  that are in front of you?
5    A.  What I was trying to do was utilize the
6  reports, as I think I said earlier, for three issues:  As
7  it related to tire cost, amount of tires purchased by the
8  franchisee from the franchisor, and then a margin of
9  profit that the franchisor was making on franchisee tire
10 sales, which are those three numbers that -- percentages
11 you were asking me about.
12   Q.  Let's turn to that, then, and let's look at
13 what you did to, first of all, determine the 70 percent
14 number.
15   A.  Are we finished with these?
16   Q.  Well, my assumption is you're going to need
17 them to help me with --
18   A.  Okay.
19   Q.  I guess we're on Exhibit IV of your report,
20 which deals with inventory markup.
21   A.  Do you have the revised IV or --
22   Q.  I don't have that in front of me, but --
23   A.  The exhibit that's Exhibit 77.
24   Q.  All right.  Exhibit 77.
25   A.  Okay, sir.

79

1    Q.  First of all, tell me -- I understand, in your
2  initial Exhibit IV, those figures were derived from what
3  Todd Zimmerman had given you, and then, since then,
4  you've revised those numbers.  Is that accurate?
5    A.  There's two columns, one that says "Total
6  Sales," and the other one says "New Tire Sales."  Which
7  column are you dealing with?
8    Q.  Well, we've covered, have we not, the left-hand
9  column?
10   A.  Yes, sir.
11   Q.  Let's go to the right-hand column.
12   A.  Okay.
13   Q.  Down at the bottom, it says "Inventory Markup."
14   A.  Yes, sir.
15   Q.  Tell me how those numbers were derived, under
16 the revised Exhibit 77.
17   A.  If I can help you, Exhibit 75, that was a
18 document that I was referring to earlier that we'll send
19 you a typed form of, but these were the steps that I used
20 in looking at these financial reports from Team Tires,
21 the documents that we've been referring to, in going
22 through them to pull out the certain costs that are the
23 original 70 percent, 85 percent and eight percent, and
24 now the revised totals that appear on Exhibit IV.
25   Q.  So let's take the first number, 76.8 percent.

80

1    A.  Okay, sir.
2        The first issue that I had had to do with tire
3  cost, and for the 1997 report.  I have some copies.  Do
4  you want yours from the exhibits?
5    Q.  I've got an extra set.  I hope, here.  If you'll
6  just tell me the Oscher page number, I think I'll be able
7  to follow you.
8    A.  All right.  If you will tell me the Oscher
9  number, because mine don't -- weren't Bates numbered.
10   Q.  Oh, all right.
11   MR. COLLIER:  Well, off the record for a
12 moment.
13   (Off-the-record discussion.)
14   Q.  Okay.  Back on the record.
15   A.  If you go to Oscher Bates number 24 -- are you
16 there, sir?
17   Q.  Yes.
18   A.  If you look at the right-hand column that says
19 "Year-To-Date" and if you take the -- in the right-hand
20 column "Year-To-Date," you take the fourth column across,
21 which is a percentage column, and then you look to the
22 bottom of the second grouping of numbers, you see a total
23 tire margin of 23.3 percent.
24   Q.  All right.
25   A.  The reciprocal of that is the 76.7 percent that

KATHY TOWNSEND COURT REPORTERS (505) 243-5018
110 TWELFTH STREET, NORTHWEST, ALBUQUERQUE, NM  67102

20

STEVEN OSCHER, 9/27/02

**81**

1 appears on -- I forget the exhibit number.
2    Q. Exhibit 75.
3    A. Yes, sir. It's this number right here, all
4 right?
5    Q. All right.
6    A. For the other internal reports, I've taken that
7 same number across to determine what their profit margin
8 is on tire sales, and that's where I've derived the 76.7.
9 the 75.6, 76.8, the 77.1 percent, to come to this
10 four-year average, which is really a three-and-a-half-
11 year, if you will, of 76.8 percent that's used in my
12 report.
13    Q. Okay. I understand that.
14    A. Good. Do you want to go to the next
15 percentage?
16    Q. I think so.
17       MR. COLLIER: Just off the record for a minute.
18       (Off-the-record discussion.)
19    Q. Let's go to the next one, Roman numeral II on
20 Exhibit 75.
21    A. Okay. The second issue was that the
22 franchisees are not required to purchase tires from the
23 franchisor, but that a significant percentage of the
24 tires that have been purchased historically are being
25 purchased from the franchisor by the franchisees, to the

**82**

1 tune of 85 percent.
2       That was the original comment that was made on
3 the original information that was given. What I then
4 needed to find out was what percentage might that be when
5 I looked at the information.
6       So the first assumption or the first thing I
7 needed to do was to find out the inventory -- well, that
8 was the objective, to find out the inventory purchased,
9 and I'm referring now to -- is that Exhibit 75?
10    Q. Yes.
11    A. Okay. Under II-A, what relationship of tire
12 sales to total sales exists within the franchise system.
13       So what I utilized was a -- if I can -- in the
14 third grouping down, you see "Total Tire/Tire Related
15 Sales" of 55 million, 55.8 million.
16    Q. For "FY Actual," this year actual?
17    A. Yes, sir. Right.
18    Q. It's on Oscher 0024; is that correct?
19    A. Yes, sir, it's the same document.
20    Q. Okay.
21    A. Under '97 on Exhibit 75, there's a cross-out.
22 but do you see the 55.9 as the numerator?
23    Q. Un-huh.
24    A. The denominator -- if you look all the way to
25 the bottom, you see total sales of 85.1 million.

**83**

1    Q. All right.
2    A. That became my denominator.
3       So for '97, my calculation was that 67.3
4 percent of their sales volume was based on tires, and
5 then I did the same calculation for '98, '99 and 2000
6 for the other documents.
7    Q. Now, how does that tell you what percentage of
8 tires that franchisees will buy?
9    A. If you allow me to go through the rest of II,
10 it -- from my standpoint, it had to work in steps, and
11 what I'm doing with, essentially, A, B and C is I'm
12 laying a predicate for my calculation.
13    Q. So the 67.3 percent represents what, again?
14 The percentage of tire sales to total sales?
15    A. That's correct, sir. Okay?
16    Q. All right. Now, let me just ask you one thing.
17 I'm sorry, but before I leave that --
18    A. Yeah.
19    Q. -- that 55 million includes not only retail new
20 tires, but wholesale tires, used tires?
21    A. It's everything.
22    Q. Would you expect used tires to be sold to
23 franchisees?
24    A. I don't know whether they were retreads, but
25 the answer is, again, for purposes of my calculation, it

**84**

1 was such an insignificant part of the tire sales that any
2 residual difference I didn't see as making a big
3 difference to my overall calculation.
4    Q. All right. Go ahead.
5    A. The second calculation was total franchisee
6 sales, and on that number, I needed to go to Oscher Bates
7 number 39.
8    Q. Okay.
9    A. I'm going to give you a specific number.
10    Q. Ask him.
11    A. Now, see, I don't know whether this is a --
12       MR. COLLIER: Off the record.
13       (Off-the-record discussion.)
14    Q. Back on the record.
15    A. The Bates-numbered document 39, on the far
16 left-hand side is a number that is 26.8 million.
17    Q. Under what column are you looking?
18    A. I'm sorry. Let me help you here.
19    Q. You're looking on the right-hand column --
20    A. Yeah.
21    Q. -- "Year-to-Date," and it says "Last Year
22 Actual."
23    A. So those are the total sales.
24    Q. This is Oscher 0035.
25    A. And I may have transposed that, because, for

STEVEN OSCHER, 9/27/02

---

**85**

1  '97, it shouldn't have been the last year. It should be
2  the slightly higher number of 29.6.
3      Q. All right. Let me just ask you this. On
4  Oscher 0039, do you have any understanding as to whether
5  or not these sales numbers are total sales of everything,
6  or just tires, or what?
7      A. It is my understanding that these are total
8  sales of everything on which the franchise fees are being
9  paid.
10     Q. Okay. Go ahead.
11     A. And that's the same for all of the stores, as
12 well.
13         The next one, item three, or C --
14     Q. Hold on just one moment.
15         (Mr. Collier confers with Mr. Malott.)
16     Q. One question on that page, OO39 --
17     A. Right.
18     Q. -- is why you didn't include the new franchise
19 stores as opposed to just the existing.
20     A. Because it was my understanding that the -- the
21 answer actually is -- and it may have been an error in my
22 calculation I did, because when I picked it up the
23 following year -- because there's a "Last Year" column.
24 The years could have slid across, and I'd have to go back
25 and make a quick recalculation.

---

**86**

1          I don't know what it's going to change in the
2  way of the numbers, but they should have included total
3  sales, tire sales.
4      Q. All right. Go ahead.
5      A. And, in fact, if I can show you for 1998 -- I
6  think it would only be '97 that would -- because, if you
7  look at 1998, the total sales from all stores for '98 are
8  the 34 million that had been recorded in total for '97.
9      Q. All right. I see what you're saying.
10     A. Okay. So it was just sliding it over a year.
11     Q. So you made the mistake? One year only, you
12 think?
13     A. Well, what it's going to do -- because it slid
14 from each year, it will affect the calculation. I don't
15 know how it will affect it in total, because when I
16 finish building the model for you, you'll see how all the
17 numbers have come together.
18     Q. All right. You're going to send me a typed
19 copy of this, then?
20     A. Yes, sir.
21         MR. COLLIER: Let's go off the record for just
22 a moment.
23         (Recess taken from 11:50 a.m. to 1:04 p.m.)
24         (Oscher Exhibit 80 marked.)
25     Q. Back on the record, Mr. Oscher.

---

**87**

1          As I understand, you've had a chance to look at
2  your numbers over the lunch period, and you've changed
3  what was previously marked as Exhibit 75 on what we'll
4  now mark as Exhibit 80. Can you tell us what you've
5  done?
6      A. Sure.
7          Prior to the break, it was -- the question was
8  raised with regard to a column for 1997, and the question
9  that was, I think, pending was why the new franchise
10 sales had not been included, and the answer was: They
11 should be.
12         I thought I had, and when I went to look at the
13 numbers, I had incorrectly put the '97 number in '98 and
14 the '98 number in '99. So I've gone back and corrected
15 that during the break.
16     Q. Okay.
17     A. The impact of that change will carry forward
18 through a couple of the other calculations that are to be
19 made.
20     Q. Before we broke, then, we were down to -- we've
21 gone through Roman numeral II-A and II-B?
22     A. That's correct.
23     Q. I think we're on Roman numeral II-C, then.
24     A. That's correct.
25     Q. If you could tell us --

---

**88**

1      A. Sure.
2      Q. -- briefly where these numbers come from.
3      A. Sure.
4          For item C, the reference point is Oscher Bates
5  number 38.
6      Q. All right.
7      A. Go ahead. If you look in the center of the
8  page, the next heading is "Franchise Operations."
9      Q. Okay.
10     A. And sales of tires and batteries is the second
11 line down. So the number that was picked up is the
12 11,583,000, and that on the schedule is 11,600,000 for
13 '97.
14     Q. Then where did you get your next number?
15     A. The 14.7?
16     Q. No, I understand that.
17     A. It's the same -- okay. Good.
18     Q. I guess it will be Roman numeral II --
19     A. D.
20     Q. -- D.
21     A. The reason for C was to understand how much the
22 -- what the tires that were being purchased from the
23 franchisor were, and that's that number.
24         So the next calculation that needed to happen
25 was to determine what the franchisee tire sales were, and

---

STEVEN OSCHER, 9/27/02

89

1  for 1997, in order to make that determination, I needed
2  to take the information from B, which was franchisee
3  sales, to that percentage which were tire sales.
4         So by multiplying II-B by II-A, it gave me the
5  calculation for '97 of 22.9 and the other calculations.
6  That's just a mathematical calculation there.
7      Q.  All right.  Did you say multiply or divide?
8      A.  I was multiplying -- in II-D, I was multiplying
9  the amount of franchisee sales, because that was total
10 sales, by that amount which were franchise sales -- or,
11 excuse me, which were tire sales.
12        If you remember, it A, we made an allocation
13 for the various stores between tires and other products.
14     Q.  Well, I might be missing something here, but B
15 is all franchisee sales.
16     A.  Right.
17     Q.  C is simply those tire purchases by
18 franchisees.
19     A.  That's right.  We'll get to C in a second, with
20 another calculation.  All I'm trying to do is put numbers
21 in in terms of coming to a percentage, which will
22 eventually be those -- the percentage of tires bought
23 from the franchisor.
24     Q.  But I don't understand why you're multiplying,
25 to tell you the truth.

90

1      A.  Okay.  I know that the ratio of tires to total
2  sales, which is what calculation A was about, was -- tire
3  sales were, in '97, 67.3 percent.
4      Q.  Oh, excuse me.
5         I got you now.  So D is B times A?
6      A.  That's right.
7      Q.  So your assumption A was tire sales to total
8  sales of the plaintiff itself?
9      A.  Right.
10     Q.  And you've assumed that that's the same
11 percentage that a franchisee would have?
12     A.  That's correct.
13     Q.  Let me ask you this question.  Going back to
14 calculation Roman numeral II-C, that figure is listed, to
15 include tires, batteries and parts, on Oscher 0038,
16     A.  Which number did you give me?
17     Q.  0038, Oscher.
18     A.  You're giving me a Bates number.
19        Yes, sir.
20     Q.  So Roman numeral II-C is not just tire
21 purchases; is that correct?
22     A.  That's correct.
23     Q.  Do you take care of that later on or something?
24     A.  Well, what I did was -- I didn't have enough
25 information, but when I reviewed the parts sales that

91

1  were made by the franchisees, there was probably less
2  than five percent that were being used from the
3  franchisee, and I just picked up the whole number.
4         But when I looked at the individual items, they
5  were not buying a lot of the parts, and when I inquired
6  about that, not unlike the tires, the franchisees had the
7  ability to purchase parts from other locations or from
8  other sources other than Team Tires.
9      Q.  So you discount that as insignificant?
10     A.  Yes, sir, discount it --
11     Q.  So let's go back to Roman numeral II-E.
12     A.  What I then needed to do was, the amounts that
13 had been calculated as far as franchisee tire sales in
14 total, I needed to make a determination as to what the
15 cost of those tires would have been, and I used the
16 percentage from I, the tire cost, and I multiplied that
17 by the franchisee cost in D, and the calculations are
18 17.6 million in '97 and then the other amounts.
19     Q.  So you used the results of D, and you
20 multiplied that against which section?
21     A.  The first -- on the first page, what the tire
22 cost calculation was.
23     Q.  The 76.8 percent?
24     A.  76.7 percent.  Well, I didn't use the four-year
25 average.  I didn't get the four-year average until

92

1  afterwards.  I used each individual year as the
2  calculation.  So I multiplied the 22.9 million --
3      Q.  Okay.
4      A.  You're okay?
5      Q.  Right.  Okay.  I see what you're saying you
6  did.
7         So you multiplied the Roman numeral I
8  calculation times Roman numeral II-D?
9      A.  Right.
10     Q.  What is calculation Roman numeral II-F?
11     A.  And then II-F finally allowed me to get to the
12 percentage of tires purchased from the franchisor.  The
13 11.6 million in item C is the amount that we just talked
14 about, and when you divide that by the calculation in
15 II-E, the 17.6, you get 65.9 percent.
16        Then, when you multiply -- I'm sorry.  Then you
17 do the same calculation, the same calculation, for the
18 other years, as well.
19     Q.  So calculation F is what divided by ??
20     A.  It is C.
21     Q.  C divided by E.
22     A.  What the tire purchases were from the
23 franchisees.
24     Q.  So your conclusion, then, is that franchisees
25 purchased, on average, 62.8 percent of their tires from

STEVEN OSCHER, 9/27/02

**Page 93**

1  the franchisor?
2  A. For the period of information we had available,
3  yes, sir.
4  Q. What's calculation Roman numeral III?
5  A. Three, if -- and let me give you -- what I took
6  is the margin from tire sales by franchise of the
7  franchisor to the franchisee.
8  Q. Excuse me. You mean item Roman numeral III?
9  A. Yes.
10  Now, we're looking at Bates number 38, but the
11  numbers, as you pointed out earlier, included tires and
12  batteries, and they were making different calculations
13  internally. What I went to was the '98 report, and I'll
14  give you a Bates number.
15  On Bates number 84, Oscher 84, if you go to the
16  Year-To-Date column or section, the second group of
17  numbers -- the third group of numbers makes reference to
18  total margin tires, and then underneath that is a
19  percentage and it says 12.72.
20  Q. I'm not seeing that.
21  A. I know, that's a tough one.
22  Is that it right there?
23  Q. Okay.
24  A. Yeah, and then --
25  MR. MAIOTT: This needs to be on the record, so

**Page 94**

1  we know.
2  Q. On Oscher 84, under the right-hand
3  "Year-To-Date" column, under "FY Actual," the very last
4  number under that first -- or, actually, the second
5  grouping is entitled "Percentage Sales," including direct
6  "something or another."
7  If you go across, there's a percentage listed
8  as 12.72. What does that represent to you?
9  A. That is the margin on sales of tires that were
10  made by the franchisor from the --
11  Q. So that's what they state that they're marking
12  the tires up to sell to their franchisees?
13  A. That's what they're saying that they were
14  making. That's my understanding, yes, sir.
15  Now, if you move over to the two columns to the
16  last Year Actual, that's where you get the percentage
17  that you see on Exhibit 80, the 11.87 percent, because,
18  unlike the '97 internal financial report, they had set
19  out the information for just tires only, and so it was
20  picked up there.
21  Q. So what this tells you is that their margin is
22  actually -- or the markup is actually 11.8 percent
23  instead of the eight percent that you were previously
24  told?
25  A. That's correct, sir.

**Page 95**

1  Q. Now, is there another document somewhere within
2  this packet for the margin as to all tire sales?
3  A. That was the 30 percent that was the margin --
4  total margin that they had on tires, which was the first
5  calculation that we looked at.
6  Q. Have you done any checking to determine if
7  these records are accurate?
8  A. The checking that I did was -- and now we go
9  into the Price Waterhouse and Coopers financial
10  statements.
11  The opening information that was given in these
12  reports was anchoring, if you will, the sales, and it's
13  essentially the first page in each of the documents,
14  where they're reporting what their income was and what
15  their total sales were.
16  I went to the audited financial statements and
17  confirmed those balances as they appeared and used that
18  as my benchmark.
19  Q. Did you double-check on the margin?
20  A. I didn't do anything with the margins. Again,
21  those are internally generated financial statements.
22  I wasn't going to go in and re-audit the books.
23  The audited financial statements stand for themselves, at
24  least in this regard, and I was concerned that I was
25  dealing with the total sales which had been set forth in

**Page 96**

1  these internal documents, which made their way up to the
2  audited financial statements.
3  Q. So does that complete how you calculated these
4  three percentage figures?
5  A. Yes, sir, it does.
6  MR. COLLIER: Okay. I will ask Matt to get
7  Donnie.
8  MR. CAMPBELL: I'll get him.
9  (Recess taken.)
10  Q. Show me, then, where you plugged these
11  percentages into your report.
12  A. Sure.
13  We were talking, on Exhibit IV -- and this is
14  my Exhibit IV. I don't know. Have you marked those?
15  Q. Your Exhibit IV, which for our record is
16  Exhibit 77.
17  A. Right. Thank you.
18  Q. Exhibit 77 is Exhibits IV and V as you redid
19  them this morning.
20  A. Yes, sir.
21  Q. And as I understand you, right now, you're
22  going to redo it one more time?
23  A. I am.
24  Q. So let's go to your Exhibit IV contained within
25  our Exhibit 77. Tell me what you've done.

STEVEN OSCHER, 9/27/02

97

1     A.  If you look to the inventory markup section at
2  the bottom of the exhibit, you can see --
3     Q.  I'll tell you what.  Why don't you go ahead and
4  make your changes in red on our exhibit to the
5  deposition.
6     A.  Good.
7          What will change is -- the inventory purchase
8  from the franchisors is no longer 78.2 percent.  It is
9  now 62.8 percent.
10     Q.  All right.
11     A.  And the number to be calculated is, when you
12  take the sales of $5,155,000 for tire sales and you
13  multiply it by these percentages, your new total is
14  $311,594, which I'm rounding down to $311,000.
15          That amount then gets carried forward to the --
16  to the next page, which is Exhibit V, so the $397,955 is
17  now the $300,110.
18          The total before incremental expense is now,
19  under the conversion as a franchisee, $629,379, and as a
20  new franchisee, it's $988,831.  The incremental expenses
21  will change, and as a conversion, it's $31,469.  As a new
22  franchisee, it's $39,442.
23          So the new totals, as a conversion, are
24  $597,910, which would be rounded to $597,500, and for a
25  new franchisee, the total is $939,389, which is rounded

98

1  to $939,000.
2     Q.  So going back to Exhibit IV, your calculation
3  on inventory markup is based on an assumption that a
4  franchisee, such as Don Leonard, would buy 62.9 percent
5  of its tires from the plaintiff?
6     A.  That's correct, sir.
7     Q.  Let's go to Exhibit V.  This is a calculation
8  that corresponds to that part of your report that
9  attempts to calculate an economic loss for the plaintiff.
10  Is that accurate?
11     A.  Yes, sir.
12     Q.  Now, is it your understanding or are you of an
13  opinion, in an indication such as this, that the
14  plaintiff would be entitled to both defendant's profits
15  and an economic damages loss, or are you proposing these
16  as alternative measures of damages?
17     A.  I think it's my understanding that they're
18  alternative measures of damages.  I don't think they're
19  additive.
20     Q.  Okay.
21     A.  But, then, I don't know what the --
22     Q.  So you're not --
23     A.  I don't know the legal side of it, I guess, is
24  my answer.
25     Q.  So you can't say?

99

1     A.  I think you've asked me for a legal conclusion.
2     Q.  If Don Leonard had joined up as a franchisee
3  with the plaintiff in 1994, then you've calculated what
4  you believe he would have paid to the franchiser from
5  1994 on Exhibit V?
6     A.  That's exactly correct, sir.
7     Q.  And if that were the case, the franchiser would
8  also not have received Don Leonard's profits, as you've
9  calculated in the first paragraph on page four?
10     A.  Again, that's my understanding, but I don't
11  know the law, so I'm just giving you my --
12     Q.  Well, I'm just asking you as a function of how
13  you understand the franchise agreement worked.  Isn't
14  that correct?  If Don had signed up as a franchisee --
15     A.  There wouldn't be any reason to go after the
16  profits.
17     Q.  Exactly.
18     A.  Yes, sir.
19     Q.  So, in a sense, if a jury or a judge were to
20  award both defendant's profits and plaintiff's economic
21  damages, that would be double-dipping.  Would you agree
22  with that?
23     A.  To me, it would.
24          MR. CAMPBELL:  Arguably, it calls for a legal
25  conclusion.

100

1     Q.  Would you agree with that from an accounting
2  standpoint?
3     A.  Yes, sir.
4     Q.  Now, the economic damages that you've listed
5  here assume, as I understand it, that Don Leonard would
6  have signed up as a franchisee; is that correct?
7     A.  Yes, sir.
8     Q.  Are you aware of any evidence that suggests
9  that the plaintiff was ever offering franchises here in
10  New Mexico in 1994?
11     A.  I think there was some correspondence or
12  communication with Mr. Leonard back then.
13          Again, there's something with regards to
14  another party, and I think that's what I was referring to
15  under "Other" on page four, about a Mr. Fox who had
16  expressed an interest.  So, I mean, that's been my
17  understanding from what I've seen.
18     Q.  Well, if you were to assume that the plaintiff
19  had no plans to open franchises in New Mexico until the
20  year -- well, even to the present, then would you agree
21  that it's not appropriate to try to calculate damages as
22  if Don Leonard had opened a franchise?
23          MR. CAMPBELL:  Objection, calls for a legal
24  conclusion.
25     A.  Yeah, I would have given you that answer   1

STEVEN OSCHER, 9/27/02

117

1  taking a look at a franchise for a day once a quarter
2  would have not been a very expensive flight. and, again,
3  within the five percent. it was discussed and felt that
4  it was covered.
5      Q.  Is Exhibit 77, then, your final calculation as
6  to economic damages for the plaintiff in this case?
7      A.  From the facts as I understand them today, yes,
8  sir.
9      Q.  Would it be fair to say that you don't have any
10 other calculations of royalties or franchise fees or any
11 other fees that you believe may be due to the plaintiff
12 as a result of any alleged trademark violation in this
13 case?
14     A.  I have not done any other calculations, no,
15 sir.
16     Q.  And you're not aware of any other valuation of
17 that that you haven't done in this case?
18     A.  I'm confused by your question.  Are you asking
19 has somebody else other than me made a calculation?
20     Q.  No.  Do you intend to do any other type of
21 valuation besides what you've given us in Exhibit 77?
22     A.  Again, I don't know.  If additional information
23 comes to light and I'm asked by Mr Campbell to do work,
24 I will.
25     Q.  All right.  And then you'll let us know about

118

1  that if you do?
2      A.  I think Mr. Campbell would.
3      Q.  Right.
4          Let me move on to your report, to the section
5  entitled "Corrective Advertising."
6      A.  Yes, sir.
7      Q.  Have you deleted that from your damages in this
8  case?
9      A.  No, I haven't deleted it.  The advertising
10 component, you asked about before.  It's there.  I don't
11 have any additional information with regards to what it
12 might take to provide corrective advertising.  I only had
13 the information that Mr. Leonard has used, historically,
14 for his stores.
15     Q.  So is it --
16     A.  So I have not done anything more than what is
17 stated on page four.
18     Q.  Is it fair to say that as we sit here today,
19 you don't have an opinion as to what amount might be
20 needed for corrective advertising?
21     A.  That's a correct statement.
22     Q.  And would it be fair to say that you're not
23 aware, as we sit here today, of any false impressions
24 that have been associated with the alleged improper use
25 of a trademark?

119

1      A.  I don't have any direct information, no, sir.
2      Q.  And you've not been given any information from
3  the plaintiffs, as you suggest in your report, about
4  that?
5      A.  I have not received any information from the
6  plaintiffs, no.
7      Q.  You've testified earlier, from a review of
8  Don's financials, as stated in his papers, that he was
9  not profitable; is that correct?
10     A.  His tax returns and his financial statements
11 return a loss, 14 of 15 years.
12     MR. CAMPBELL:  Just so the record is correct,
13 when you say "his," are you referring to the Defendant
14 Team -- excuse me, Tires Plus, Inc.?
15     THE WITNESS:  For the stores and the
16 information that was reported by Mr. Leonard. yes. sir
17     MR. CAMPBELL:  You used the pronoun "his," and
18 I wanted to make sure --
19     THE WITNESS:  Well, he asked me about Don.  I'm
20 sorry.
21     Q.  You understand that when I've been using "Don
22 Leonard," I've been referring to the defendant in this
23 case, basically?
24     A.  That's what I've assumed, yes, sir.
25     Q.  You've not done any calculations with the

120

1  assumption that Gary Fox had purchased a franchise
2  operation at any point in time?
3      A.  No, sir.
4      Q.  Have we covered all of the. first of all,
5  calculations that you've done in this case?
6      A.  Yes, sir, I believe we have.
7      Q.  Have we covered all of the opinions which
8  you've been asked to give in this matter?
9      A.  Yes, sir, I believe we have.
10     Q.  And between what you've disclosed in your
11 report as those things that you've reviewed, as well as
12 what you've brought with you here today, have we seen all
13 of those documents upon which you've relied or generated
14 in this matter?
15     A.  Yes, sir.  I don't think there's anything else.
16     Q.  Are you aware of whether or not you're going to
17 work on any rebuttal testimony in this matter?
18     A.  That's up to Mr. Campbell.  We haven't
19 discussed it.
20     Q.  As we sit here today, you haven't discussed any
21 additional work on the issue?
22     A.  There's been discussions, but I don't think
23 I've been asked to do anything additional.
24     Q.  Has there been discussions of things you are
25 considering to do?

STEVEN OSCHER, 9/27/02

121

1    A.  Not by me, or at least not at this time.
2    Q.  Do you know Mr. Campbell or Mr. Timmerman on
3  anything other than a professional basis?  In other
4  words, do you socialize with them, eat out, play golf,
5  that sort of thing?
6    A.  I think Mr. Campbell and I have gone to a
7  baseball game, a couple years ago.  I've never socialized
8  with Mr. Timmerman.
9    Q.  Are you involved in any clubs or churches or
10  those sorts of things with Mr. Campbell?
11    A.  No, sir.
12    Q.  Now, you stated that you had reviewed a
13  circular, a franchise circular; is that correct?
14    A.  Yes, sir.
15    Q.  If the plaintiff in this case had advised to
16  its prospective franchisees that the monthly rent
17  estimated to be paid would range from $6,000 to $13,000
18  per month, do you have any argument with that?
19    A.  I don't know what you're talking about here,
20  sir.
21    Q.  Well, the franchise circular is supposed to
22  advise prospective franchisees of what expenses to
23  expect; is correct?
24    A.  Sure.
25    Q.  If you'll take a look at what was previously

122

1  marked as Defendant's Exhibit 4, page TTP 05779, the
2  plaintiff in this case advises its prospective
3  franchisees that rent can be expected to be -- I believe
4  it's $6,000 to $12,000 a month.  Is that correct?
5    A.  That's what it says here, yes.
6    Q.  Do you have any argument with that being an
7  appropriate figure to expect?
8    MR. CAMPBELL:  Objection, lack of predicate,
9  foundation.
10    A.  Well, the sentence speaks for itself, and it's
11  also qualifying it by geographic location and size and
12  other economic factors.
13    Q.  Right.  But the lowest amount is $6,000 a
14  month; is that correct?
15    MR. CAMPBELL:  Objection, predicate,
16  foundation, for this witness to opine on that issue.  The
17  best evidence is contained in the document.
18    A.  Yes, sir.
19    Q.  Well, I'm just asking you, do you have any
20  evidence, sir, that -- in your knowledge that that
21  statement is not correct?
22    A.  No.  It's contained within the documents, the
23  statements.
24    Q.  Right.  And you don't argue with that from any
25  knowledge you have?

123

1    A.  Sitting here, I don't know of anything that
2  would be different, no sir.
3    Q.  Is it your understanding that a franchisor is
4  supposed to use its best efforts to inform prospective
5  franchisees of what they can expect in terms of expenses?
6    A.  I think that's a reasonable statement.
7    Q.  The franchise agreement also tells its
8  prospective franchisees that interest to be paid to them
9  would be in the amount of 10 percent and, in some
10  instances, up to 18 percent per annum on certain late
11  payments.
12    Do you have any reason to believe that that's
13  not the typical amount of interest charged on loans for
14  like franchisees?
15    A.  I don't know what you're referring to.  If I
16  could see the document --
17    Q.  Okay.
18    MR. CAMPBELL:  Let me just object to this line
19  of questioning, that the document -- whatever exhibit it
20  is --
21    MR. COLLIER:  Exhibit 4.
22    MR. CAMPBELL:  Exhibit 4 is the best evidence
23  of its content.  I don't know that Mr. Oscher is here to
24  opine on the franchise circular.  We're not offering him
25  in terms of opinions on the franchise circular.

124

1    Q.  What I'm asking you is:  As an accountant and
2  an evaluator of businesses, do you have any reason to
3  believe that interest charges in the amount of 10 percent
4  to 18 percent are out of line with what other prospective
5  businesses are charged for a loan?
6    A.  I'm trying to see the percentage that you were
7  telling me.  I only see the 18 percent, so --
8    Q.  All right.
9    A.  I don't know where your statement of 10 percent
10  -- I'm sorry.
11    Q.  Well, let me take the 18 percent.  Do you have
12  any reason to believe that that's not an interest rate
13  that franchisees or other people in the automobile tire
14  business can expect when borrowing money from
15  franchisors?
16    A.  That's a penalty rate.  That's not a normal
17  rate, sir.
18    Q.  So if someone --
19    A.  And maybe you didn't see it, because it was
20  covered up here, so -- I'm sorry.
21    Q.  So they charge their franchisees 18 percent if
22  they're late on a payment?
23    A.  I don't know the answer to that.  I think this
24  was just talking about normal fees and interest charges
25  and letting someone know that, if you don't make your