FILED

**TEAM TIRES PLUS, LTD., a**
**Minnesota corporation,**

03 APR 17 PM 4: 15

**Plaintiff,**

vs.                                                      CASE NO.: CIV-01-1124 ~WWE/~RLP

**TIRES PLUS INC., a**
**New Mexico corporation,**

**Defendant.**

---

**DEFENDANT TIRES PLUS INC.'S REPLY TO PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S DAUBERT MOTION IN LIMINE TO EXCLUDE THE TESTIMONY AND**
**REPORTS OF PLAINTIFF'S DAMAGES EXPERT**
**STEVEN S. OSCHER AND SUPPORTING MEMORANDUM**

On March 14, 2003, Defendant served upon Plaintiff its Daubert motion in limine to exclude

the testimony and reports of Plaintiff's economic expert Steven S. Oscher, asserting that Oscher used

unsupported and fictitious assumptions to arrive at his damages calculations. In its response to this

motion, Plaintiff has apparently taken the following positions: 1) Oscher's calculation of Defendant's

profits and damages to Plaintiff were not in fact calculations of these measures of damages because

Plaintiff has the burden only to prove sales; 2) the court has the power to fashion an equitable

remedy, and even though this power is purely within the discretion of the district court judge,

Oscher's calculations will assist the jury; and 3) Oscher's opinions stating that he did not have

enough information to determine the profitability of Defendant should be allowed to support

Plaintiff's unfounded contentions that Defendant's losses over the past sixteen years are doubtful,

even though Plaintiff never requested expense information in its discovery requests and did not

evaluate Defendant's expense information which had been voluntarily provided. Defendant now files this reply to Plaintiff's response.[1]

## I. Standards

Plaintiff has expended significant effort in propounding issues of trademark law, focusing not only on the Court's discretion in fashioning remedies under 15 U.S.C. § 1117, but also on the respective burdens of the parties. These are obvious exercises of misdirection, as the controlling issue for the present motion is simple: whether the methodology employed by Oscher in generating his opinions is of sufficient reliability to satisfy the standards as set forth in Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). With respect to expert testimony regarding damages, the assumptions used to arrive at specific damage figures must be scrutinized, and the expert opinions derived from these assumptions must be excluded when those assumptions are unjustified. See First Sav. Bank, F.S.B. v. U.S. Bancorp, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000). The contextual underpinnings of the suit, be it trademark or anti-trust litigation, do not affect the issue of the methodology employed by an economic expert in generating his opinions.

## II. Oscher's Initial Report

As a preliminary matter, Defendant has not asserted and is not asserting that Oscher is not an accomplished or learned accountant. While Plaintiff takes great pains to recite Oscher's accomplishments in an effort to distinguish Oscher's analysis from the economic analysis which was excluded in First Savings Bank, F.S.B. v. U.S. Bancorp, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000), Plaintiff's interpretation of that case is not accurate. Plaintiff fails to recognize that the court in that

---

[1] Plaintiff has refused to specifically address the numbered paragraphs set out as Statement of Undisputed Facts upon which Defendant relies for its Motion, electing instead to generally dispute the sum of these paragraphs as an aside in a footnote. Because Plaintiff has neither addressed any of these facts, nor provided any contradictory or additional facts, Defendant continues to rely on those facts.

case undertook a distinct and separate analysis of the substance of the expert's opinion apart from an analysis of that expert's qualifications. The crux of Defendant's motion is that Oscher relied upon unjustifiable assumptions in the rendering of his opinions, and the simple fact that Oscher is qualified as an accountant does not remit the reliability standards which are violated by Oscher's admittedly speculative opinions.

Although based on defective methodology, Oscher's Initial Report is concise (the relevant portions of which are attached to Defendant's Motion as Ex. 37).[2] In his findings, Oscher states "[t]herefore, for the period 1994 through 2001, the Defendant's calculated operating profit[3] is $560,000." (Id.) Furthermore, Oscher concluded that "Plaintiff's economic loss would range from $565,000 to $850,000." (Id.) While Plaintiff, in its response, peculiarly focuses on burden issues, the evidentiary issue to be decided for the present motion is whether the underlying facts and assumptions used by Oscher in arriving at these numbers are reliable. There are two distinct possible damages categories involved: Defendant's profits and Plaintiff's damages, and each will be dealt with separately.

## A. Defendant's Profits under 15 U.S.C. § 1117(a)(1)

An accounting of profits is not an automatic remedy even if a Defendant is found to infringe a trademark. Bishop v. Equinox Int'l Corp. 154 F. 3d 1220, 1222 (10th Cir. 1998). Moreover, a plaintiff is not entitled to profits "demonstrably not attributable to the unlawful use of [the mark]." Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206 (1942)(interpreting the language of the 1905 federal trademark Act, which is substantially identical to that under the 1946 federal Act.) Therefore, if profits are to be awarded,[4] they must be related to the profits

---

[2] Exhibits 37-42 were attached to Defendant's Motion and will be referred to here by exhibit number.

[3] A calculation of profit necessarily entails a review of both sales and expenses.

[4] Defendant's Second Motion for Summary Judgment Against Plaintiff's Damages Claims is still pending.

Defendant received from its use of the infringing mark. However, Plaintiff has taken the curious position that Oscher's calculation of Defendant's profits using an arbitrary and hypothetical profit percentage was actually in rebuttal to Defendant's expert's opinions, even though the reports were exchanged between the parties at the same time. In its motion, Plaintiff admits that "the profit number he generated obviously could not represent Defendant's actual profits, but was instead intended to serve only as a benchmark against which Defendant's damages expert's opinions on Defendant's profitability, or alleged lack thereof, could be examined." (Pl.'s Resp. at 6.)

> It is therefore only in calculating the total of Defendant's gross sales for the years in question . . . and offering testimony in rebuttal to Defendant's proof of elements of cost or deduction, including its damages expert's opinions on the same, that Oscher's opinions as to Defendant's profits become relevant.

(Id. at 7.) Plaintiff disregards the chronological inconsistency in asserting that Oscher's Initial Report, which explicitly states that its purpose is to calculate the damages suffered by Plaintiff, is in actuality a rebuttal report rebutting opinions which were unknown to Oscher at the time of its production. Plaintiff itself recognizes that the obvious proper subject matter for Oscher's rebuttal report was to evaluate Defendant's economic expert's opinions (Id. at 9), yet Oscher has repeatedly stated in deposition and in his reports that he has not conducted any analysis of Defendant's financial data or of Defendant's expert's opinions on damages. In lieu of conducting any rebuttal investigation, Oscher has simply substituted the arbitrary expense percentage as presented by the RMA, which has no connection to local businesses in the New Mexico area. In view of Plaintiff's admission that Oscher's opinions are not relevant to the calculation per se of Defendant's damages, Oscher's opinions regarding the same must be excluded.

It is with regard to Plaintiff's repeated complaints of its "lack of information" regarding Defendant's financial information that Defendant would like point out Plaintiff's second attempt at misdirection. If Plaintiff truly had "serious doubts as to the veracity of Defendant's position that it

4

has operated unprofitably for 14 of 16 years." one would think the most logical course of action would be to separately analyze the financial data underlying such a position. (Id. at 9.) However, the only financial documents Plaintiff has ever requested in discovery from Defendant have been the sales and revenues of Defendant. Plaintiff never requested expense information. See First Set of Interrogs. to Def. No. 10, attached as Ex. 45; First Req. for Product. of Documents and Things to Def. Nos. 30 & 31, attached as Ex. 46. Yet in Oscher's first expert report, he uses fictitious expenses in the form of the RMA information. While Plaintiff has made a significant effort to make its position known that it need only prove net sales in a trademark infringement suit when proving profits, this does not change the fact that Oscher did in fact attempt to calculate Defendant's profit. In doing so, he never once conducted a review of Defendant's actual financial information even though he admitted that this would be the best and primary source of information (Ex. 38, at 44, l. 11 - 45, l. 8.) In January of 2003, Oscher was deposed a second time and again stated that he had done no testing of either the statements of owner of Defendant or any of the substantial financial information that was voluntarily provided to Plaintiff. Second Oscher Dep., relevant portions attached as Ex. 47, at 76, ll. 3-6. In Plaintiff's response to this motion, Plaintiff has complained of lack of information citing Oscher's rebuttal report for the notion that "the information provided, even when supplemented with information subsequently provided by Defendant, is insufficient to reach a sound conclusion as to Defendant's profitability." (Pl.'s Resp. at 9.) Yet Plaintiff has never requested any information from Defendant other than sales figures, has never conducted any audit of Defendant's actual figures, and, instead, has elected to rely solely on fictitious expense figures from the RMA, a publication that has no established relationship to New Mexico, to the specific business of Defendant, or, most importantly, to the trademark at issue. These tactics by Plaintiff should not be tolerated by this Court. Defendant has provided Plaintiff with a multitude of financial documents, all

5

of which Plaintiff and its expert refuse to address. Instead. Plaintiff has substituted a hypothetical and fictitious number for Defendant's profits which Plaintiff itself recognizes "could not represent Defendant's actual profits." (Pl.'s Resp. at 6.) Even though Plaintiff has stated that it is only asserting this number "to serve only as a benchmark against which Defendant's damages expert's opinions on Defendant's profitability, or alleged lack thereof could be examined." (Id.) Oscher has used this number in his Initial Report to calculate damages to which Plaintiff contends it is due. (Ex. 37, at 4.) With final reference to Oscher's calculation of Defendant's profits. Plaintiff has retreated to the position that Oscher's numbers are not a calculation of Defendant's profits, but are merely "an applicable and appropriate measure for arriving at an award of Defendant's profits in the absence of sound evidence of elements of cost or deduction by Defendant." (Pl.'s Resp. at 8.) Plaintiff essentially cites to two lines of cases in support of its response. The first line of cases only deals with the respective burdens of proof. Yet, Oscher is the person who first calculated a number for Defendant's profit. Plaintiff surely cannot be asserting that because Defendant has the burden of proving costs. the standards of Daubert and Kumho do not apply to Oscher's opinions on the same. The second line of cases cited by Plaintiff interprets the language of 15 U.S.C. § 1117 pertaining to the power of the court to enhance or limit damages according to the circumstances of the case. Plaintiff has however, overlooked two very significant details. First. in all of the cases cited by Plaintiff, this power to change the damage award is held by the judge. [5] See Maier Brewing Co. v. Fleischman Distilling Corp., 390 F. 2d 117, 121 (9th Cir. 1968) ("This language . . . apparently confers a wide scope of discretion upon the district judge in the fashioning of a remedy. . ."); Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F. 2d 903, 917 (Fed. Cir. 1984) ("Section 1117 confers a great deal of discretion on a district court in fashioning a remedy for trademark

---

[5] For a full discussion of the rationale behind providing the district judge such discretion See Stuart v. Collins. 489 F. Supp. 827, 833-834 (S.D.N.Y. 1980).

infringement.(citations omitted)"). The jury does not have the power to enhance or limit damages in that manner: the jury is bound by the statutory language of "defendant's profits" and "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a). In fact, the legislative intent for this language is that in case a jury's award is either too small or too large, then the judge can fashion a more appropriate remedy. See Trade-marks: Hearings on H.R. 4744 Before the House Comm. On Patents Subcomm. On Trade-marks, 76[th] Cong. 154 (1939); Trade-marks: Hearings on H.R. 102, H.R. 5461, and S.895 Before the House Comm. On Patents Subcomm. On Trade-marks, 77[th] Cong. 204-06 (1941)."

Daubert and Kumho require that an expert's opinion must be of assistance to the trier of fact. Oscher's opinions are not relevant to the jury's analysis, and the jury should not be privy to Plaintiff's calculations under the theory that the court may enhance a damages award. Therefore, Oscher's opinions must be excluded from evidence.

The second critical fact overlooked by Plaintiff is that unlike the cases cited by Plaintiff, Defendant's profits are subject to precise calculation. In fact, Defendant has shown that it has suffered $1,222,762 in losses over the past sixteen years. SOF No. 3. Oscher was given more than ample opportunity to investigate Defendant's financials so as to rebut the testimony of Defendant's economic expert, but failed to do so. Because Plaintiff had the opportunity to calculate Defendant's profit, but chose not to do so, Defendant cannot now be prejudiced by Plaintiff's attempt to introduce hypothetical numbers of the hypothetical profits of a hypothetical store when the actual numbers are readily available. On the one hand, Plaintiff admits that it has no information to say that Defendant's numbers were mis-recorded. Ex. 47, at 102, *ll.* 13-23. To admit this, but then attempt to introduce fictitious numbers under the guise of cross examination, and then to provide a substitute number for

---

[6] 15 U.S.C. § 1117 also states, "[t]he court in exceptional cases may award reasonable attorney's fees to the prevailing party." This language, again stating that "the court" has this power, has been widely recognized to mean that this award is within the discretion of the judge, and not to be decided by the jury. George Basch Co. Inc. v. Blue Coral, Inc. 968 F. 2d 1532, 1542-43 (2d Cir. 1992); Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc. 951 F. 2d 684, 696 (5th Cir. 1992).

profits is simply asking the jury to ignore that facts and substitute a make believe number. Moreover, the relevant standard requires damages to relate to use of the infringed trademark, and Plaintiff has not shown that the RMA numbers have any relevance to the use of the mark.

## B. Damages sustained by Plaintiff under 15 U.S.C. § 1117(a)(2)

If Defendant is found to infringe any of Plaintiff's trademarks, in order "to recover damages plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation" Brunswick Corp. v. Spinit Reel Co., 832 F. 2d 513, 525 (10th Cir. 1987)(emphasis added). "Typically, damages are 'measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement.'" First Savings Bank, F.S.B. v. U.S. Bancorp, 117 F. Supp. 2d 1078, 1087 (D. Kan. 2000) (quoting Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F. 2d 1400, 1407 (9th Cir. 1993). Plaintiff has again made multiple references to the district court's power to fashion an equitable remedy with reference to Plaintiff's damages. Defendant concedes that the district court judge does have this power, but again, as mentioned in relation to the discussion regarding Defendant's profits, the court has this power, and not the jury; therefore, the admittedly speculative numbers advanced by Oscher should not be put before the jury.

Plaintiff relies on Brunswick for the proposition that evidence of the amount of damages may be circumstantial and inexact. Under that case, as stated above, Plaintiff would not even be entitled to damages without a showing of actual confusion. Brunswick, 832 F. 2d at 525. Plaintiff has repeatedly admitted that it has encountered no incidences of actual confusion. SOF No. 8. Notwithstanding this fact, the court in Brunswick pointed out that speculation may be allowed particularly when the inability to prove damages is attributable to the Defendant's wrongdoing. In the present case, the difficulty in assessing damages has nothing to do with Defendant's actions, but

8

rather has to do with the fact that Plaintiff has not suffered any damages. Nevertheless, Oscher has

opined that Plaintiff has suffered damages in the amount of $560,000 to $850,000. This number was

generated from two basic elements of damages: 1) the franchise fees Plaintiff normally collects for

the services it renders under the mark; and 2) the "inventory mark up" Plaintiff makes on its sales of

tires to franchisees. With regard to both of these measures of damages, Oscher engaged in such

conjecture and speculation as to render these opinions unreliable and extremely prejudicial to

Defendant.

Even when faced with the standard that Plaintiff must prove its damages to be those actually

caused by an infringing use of the mark according to 15 U.S.C. § 1117, Plaintiff still maintains that

Defendant's use of the mark TIRES PLUS from 1994 to the present damaged Plaintiff in the amount

of franchising fees it normally receives from franchises. This assertion requires assumptions which

defy historical fact: that, as of 1994, would Plaintiff have offered a franchise to Defendant, and

Defendant would have bought a franchise from Plaintiff. These assumptions are admitted by Oscher

to be speculative. (Ex. 40, at 92, ll. 9-13.) In rebuttal, Plaintiff asserts that whether the Plaintiff

would have offered and Defendant would have accepted a franchise in 1994 is not speculative

because in 2000, Plaintiff offered to settle this dispute with Defendant. This fact does not show that

Plaintiff was interested in the Albuquerque market, or that it is presently prepared to enter the

market, nor do the conversations with Mr. Gary Fox which took place in 2001. The fact remains that,

according to the Tires Plus website, Plaintiff is still not even offering franchises in New Mexico.[7]

The case law cited by Plaintiff in support of its assertion of entitlement to a reasonable

royalty as a means of measuring of Plaintiff's damages is equally as lacking as its factual support.

The reasonable royalty measure of damages, as stated in the three non-Tenth Circuit cases cited by

---

[7] http://www.tiresplus.com/franchise_availloc.jsp visited April 9, 2003.

9

Plaintiff, has been widely criticized and has no application to the present dispute. Sands, Taylor, & Wood v. Quaker Oats Co. (Sands II) 34 F.3d 1340 (7th Cir. 1994), the only case in which royalty payments were awarded absent a pre-existing agreement or negotiations, is inapplicable. Unlike the parties in Sands. it is uncontested that Plaintiff and Defendant have never competed in the same geographical market. The Tenth Circuit has not followed the Sands approach, and in fact, only the Seventh Circuit has allowed an award of a reasonable royalty when there is no evidence of a prior licensing relationship between the parties. See Trovan, Ltd. v. Pfizer, Inc., No. CV-98-00094 LGB MCX, 2000 WL 709149, at *16 (C.D. Cal. May 24, 2000). Other circuits have explicitly refused to follow the Sands approach. In A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 166 F. 3d 197, 208-09 (3rd Cir. 1999) the Third Circuit stated:

> A royalty is a measure of damages for past infringement, often used in patent cases and in the context of trade secrets, but its use in trademark has been atypical. . . .
>
> Even when the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated.

Even if this Circuit were to follow the Sands precedent despite the overwhelming criticism of its holding, evidence of what a reasonable royalty should be is not within the province of the jury. The Seventh Circuit in the first Sands case, Sands, Taylor, & Wood v. Quaker Oats Co. (Sands I) 978 F.2d 947, 963 (7th Cir. 1992) justified a reasonable royalty award under an unjust enrichment theory, which is equitable in nature and therefore outside the province of the jury. See Trovan 2000 WL 709149, at *17. Oscher's opinions related to a reasonable royalty should not be submitted to the jury in this case, and must be excluded from evidence.

With regard to its alleged lost margin on tires sales, Plaintiff cannot even rely on the reasonable royalty cases in order to support the assumptions made in order for Oscher to calculate this measure of damages. Plaintiff has admitted that it is speculative to assume that Plaintiff would

10

have offered and Defendant would have accepted a franchise in 1994. (Ex. 40, at 92, *ll.* 9-13.) Plaintiff has further admitted that its franchisees did not have to purchase its tires from Plaintiff. (Ex. 38, at 81, *ll.*21-23.) Regardless of these admissions, in order for Oscher's damages related to inventory mark-up to be accepted, it must be assumed that in 1994, Defendant was a franchisee of Plaintiff and that Defendant purchased 62.8% of its tires from Plaintiff. As Defendant has stated previously, this is the epitome of speculation and must not be allowed.

Finally, a plaintiff cannot be awarded profits in addition to damages if it would result in overcompensation. Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 408 F. Supp. 1219, 1241 (D Colo. 1976), aff'd in part and modified in part, 561 F. 2d 1365 (10th Cir. 1977). Overcompensation would result, in this case, because a plaintiff in a trademark case cannot recover its lost profits in addition to the defendant's profits. United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F. 3d 1219 1228 (10th Cir. 2000). Oscher himself admitted that an award of both Defendant's profits and Plaintiff's economic damages would result in double-dipping. Oscher Dep., relevant portions attached as Ex. 48, at 99, *l.* 19 – 100, *l.* 3. Thus Plaintiff should not be allowed to submit both measures of damages to the jury, regardless of the reliability of the underlying assumptions.

### III. Conclusion

The reliability of Oscher's opinions and the assumptions on which those opinions are based have nothing to do with the respective burdens of the parties. Oscher did not limit his opinions to Defendant's sales but proceeded to invent hypothetical scenarios and then calculate possible damages from these very liberal presumptions. This should not be allowed for two very basic reasons. First, as admitted by Plaintiff, at least with regard to Defendant's profits, Oscher's calculations could not possibly represent what Plaintiff would be due if it were awarded Defendant's profits. Plaintiff

11

asserts that Oscher's calculations provide a benchmark for a court to award damages in its discretion. Plaintiff has failed to mention that such an analysis is undertaken outside the presence of the jury, and should therefore be excluded from evidence. Second, Plaintiff's complaints of "lack of information" are due to Plaintiff's failure to request any documents and its willful blindness to inspect those which Defendant has provided. Plaintiff should not be allowed to speculate when actual figures have been readily available. Plaintiff cannot complain that it will be prejudiced by the exclusion of Oscher, when "the problem is one of Plaintiff's making. . . Class counsel and their expert have charted an aggressive course with respect to their damage calculations, one which under Daubert was not without foreseeable risk." In re Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1507 (D. Kan. 1995). Based on the foregoing, Defendant prays this Court to exclude any or all of Oscher's calculations regarding 1) Defendant's profits; or 2) Plaintiff's damages.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _____

Travis R. Collier
DeWitt M. Morgan
Kurt Gilbert
Matthew S. Wermager
Attorneys for Defendant Tires Plus Inc.,
Post Office Box 1888
Albuquerque, New Mexico 87103
Telephone: (505) 765-5900
FAX: (505) 768-7395

12

CERTIFICATE OF SERVICE

I hereby certify that I have caused to be served a true and correct copy of the foregoing pleading to the following counsel of record on April 16, 2003:

*Via First Class Mail*
Juan L. Flores, Esq.
Sheehan Sheehan & Stelzner
707 Broadway NE, Suite 300
Albuquerque, NM 87102

*Via First Class Mail*
J. Todd Timmerman, Esq.
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard, Suite 2800
Tampa, Florida 33602

Dated this 16th day of April, 2003.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By: _M. Wermager_

Matthew S. Wermager

# EXHIBIT 45

**(follows this page)**

INTERROGATORY NO. 10: Please state, on an annual basis, the dollar volume of your sales of products and service under the mark TIRES PLUS from your date of first use to the present.

ANSWER:

INTERROGATORY NO. 11: Please state, on an annual basis, the dollar volume expended by you in advertising products and services under the mark TIRES PLUS from your date of first use to the present.

ANSWER:

# EXHIBIT 46

**(follows this page)**

28.    All documents relating to any alteration in format (e.g. appearance or spelling) of your use of the mark TIRES PLUS made as a result of your becoming aware of Plaintiff, Plaintiff's business, or Plaintiff's use of or rights in the mark TIRES PLUS from the date of your incorporation to the present.

29.    All correspondence, memoranda, and other documents constituting or relating to any communications between you and any other person relating to any third party's use of or rights in the mark TIRES PLUS or any similar mark.

30.    *All summaries or tabulations of sales of goods and services made by you under the mark TIRES PLUS from your date of first use to the present or, if no summaries or tabulations are available, all records from which such sales can be ascertained.*

31.    All summaries or tabulations of revenues received from sales of goods and services made by you under the mark TIRES PLUS from your date of first use to the present or, if no summaries or tabulations are available, all records from which such revenues can be ascertained.

# EXHIBIT 47

(follows this page)

1 specifically questioned his testimony?
2 A. No I think my report and the conclusion
3 of my report that I issued in November gave certain
4 conclusions with regards to, you know, what his
5 testimony said and what it didn't say, and I think
6 the support for that conclusion is in the pages that
7 I was just going over with you.
8 Q. All right. Are those pages highlighted in
9 yellow or some color?
10 A. That's correct, sir.
11 Q. Well, I think what I'll do is just ask -- I
12 don't need to attach it to the deposition, but I'm
13 going to ask you to just have a copy of those
14 portions copied and highlighted just like you have
15 it and have that sent to me by Mr. Campbell. Is
16 that acceptable to you?
17 A. Of course it is
18 Q. Then another portion of your file that you
19 said you brought were the documents that have been
20 given to you since your last deposition.
21 A. That's correct, sir.
22 Q. And those are all discussed or set out in
23 Exhibit 3 of your new report; is that correct?
24 A. That's almost true. There was some
25 documents that were received, I believe, in early

1 December that had not been produced by the time the
2 report was issued. And what I got was a copy of a
3 transmittal from your office to Mr. Timmerman and
4 then it was forwarded on to me and it had, I
5 believe, certain loan documents attached to it
6 primarily.
7 Q. Have you yourself done any new calculations
8 or made any new notes since we last met?
9 A. No, sir. If you didn't hear my answer, it
10 was no, sir.
11 Q. Thanks. I didn't hear that answer. So
12 then the totality of all the calculations you have
13 made, we have that already; is that correct?
14 A. That's correct, sir.
15 Q. Now, you also brought a copy of your
16 rebuttal report; is that correct?
17 A. Yes.
18 MR. COLLIER: What I'd like to do is
19 attach that as an exhibit. Phil, I don't
20 know if we are on Exhibit 81 or where we are
21 at in terms of exhibit numbers. Do you
22 know?
23 MR. CAMPBELL: I apologize, I do not
24 know, but I can find out in a few moments,
25 but off the top of my head I do not know.

1 MR. COLLIER: For purposes of today to
2 make this easier I'm just going to attach his
3 rebuttal report as Exhibit A to the
4 deposition.
5 MR. CAMPBELL: Yes, I think it works
6 fine because it's just tied to his expert
7 testimony. That's fine. And Travis, I just
8 spoke to Todd to answer your earlier question
9 about damages.
10 MR. COLLIER: Right.
11 MR. CAMPBELL: The reason that he did
12 not -- the answer is yes, we are pursuing
13 damages and you have those calculations, but
14 the reason it was not addressed in the
15 Summary Judgment Motion is because that's
16 going to be an issue of fact as to
17 entitlement and amount, so he did not include
18 that in the motion for that reason.
19 MR. COLLIER: All right. Well, we can
20 talk about that later then.
21 (EXHIBIT NO. A WAS MARKED FOR IDENTIFICATION.)
22 Q. Mr. Oscher, I'm assuming that you have not
23 changed any of your calculations from your first
24 report; is that correct?
25 A. That's correct, sir. That's correct, if

1 you did not hear me.
2 Q. All right. Thank you. In reviewing the
3 information, the conclusion in your report on Page 4
4 states, "It remains difficult to conclude that Tires
5 Plus, Inc. operated unprofitably for fourteen of the
6 prior sixteen years." Is that basically your
7 conclusion?
8 I'm sorry. I can't hear you. You're
9 breaking up
10 A I was going to ask you a question. Were
11 you paraphrasing or were you reading specific?
12 Q Well, why don't you turn to Page 4 of your
13 report.
14 A. Yes, sir, I'm there
15 Q Have you yourself done any independent
16 testing of the financial information that's been
17 provided to you?
18 A What do you mean independent testing,
19 please?
20 Q. Well, what do you mean by independent
21 testing? That's a phrase used in your report. It
22 says that Mr. Mailot has done no independent
23 testing.
24 A Well, and that was referring to what
25 Mr. Mailot had testified to, that there was nothing

1 that he did to test any of the statements that had
2 been made to him by Mr. Leonard.
3 Q Have you done anything to test either the
4 statements of Mr. Leonard or the financial
5 information that's been provided to you?
6 A. No, sir, not at this time.
7 Q. Do you have plans on doing that in the
8 future?
9 A. I've requested of counsel that they obtain
10 information from the financial institutions with
11 regards to the loan underwriting that was given --
12 or that was made on behalf of Mr. Leonard. And when
13 that information is received, sir, I expect to
14 review that.
15 Q Besides that, do you have plans on testing
16 of any sort?
17 A. Again, as a result of that information,
18 when it comes in, there may be additional things
19 that may be an outgrowth of that information that I
20 may want to look at, yes, sir.
21 Q. What specific information from the lending
22 institutions are you looking for?
23 A. I'm looking at gaining an understanding of
24 what records were given to them by Mr. Leonard, what
25 information they had in their review of their

1 underwriting as to his creditworthiness and then
2 being able to evaluate that information myself.
3 Q. As we sit here today, you have not
4 undertaken any testing of the information you have?
5 A. That's correct, sir.
6 Q. Would it be fair to say that you cannot say
7 yourself one way or the other whether or not
8 Mr. Leonard's business has been profitable or
9 unprofitable during the time frame 1994 to present?
10 A. Well, if I look at the tax returns, the tax
11 returns show that, you know, he was not profitable,
12 say, for a couple of years. If I look at the
13 general ledger and the other information that has
14 been provided, I don't have the full body of
15 knowledge because not all the information has been
16 provided. So I don't know what goes into those
17 financial statements in terms of whether or not the
18 information that's been recorded was appropriate
19 information to be recorded or appropriate amounts to
20 be recorded for the operation of the business. So
21 my answer is I don't know, but it's more because I
22 don't have information rather than from the
23 information I have.
24 Q. All right. But what you're telling me is
25 you don't have sufficient information, as we sit

Page 102

A. No, sir.
Q. Do you recall what categories?
A. Rent.
Q. Do you recall how many years it was that you saw that on? Was it one year or two?
A. Again, it may have been a couple of the years.
Q. Do you know?
A. It was more than one year, but like I said, it wasn't anything that I spent a lot of time on since I knew I was going to get additional information.
Q. As we sit here today, can you tell me that that discrepancy in any way changes the conclusion on the financial statements that Donnie operated at a loss?
MR. CAMPBELL: Object to the form of the question, lack of predicate and foundation.
A. The conclusion that I'm left with is that I don't have all the financial information to fully evaluate whether the financial statements as they're shown and the tax returns as they're shown have been recorded correctly for all the business expenses.
Q. But besides the one example of the rent expense, you can't tell me any other examples?

Page 103

A. Again, I may have seen the same thing for interest expense where there were differences in what was recorded in the financial or the tax return and what was recorded on his personal return. But again, it was something that I looked at, I noticed, and then was waiting for additional information to fully evaluate, you know, the differences.
Q. Can you tell me the amounts of interest that may have been recorded differently?
MR. CAMPBELL: Travis, again, I'm going to object to the question. Obviously I'm not going to suspend the deposition, but Mr. Oscher's findings and conclusions are three paragraphs on Page 4. And other than asking him about independent testing, you haven't asked one question related to his rebuttal report, so let's try to get back to the focus on the rebuttal report. Again, I'm not going to instruct him not to answer or suspend the deposition, but I'm getting close to it, so let's try to focus in on the rebuttal testimony.
MR. COLLIER: I am. I am focusing in on the information we have supplied him since the last deposition, and he's apparently not

Page 104

prepared to testify here today, even though I've got a great expense, myself and an accountant here, to ask these questions.
MR. CAMPBELL: This is a deposition based upon a rebuttal report. Unless that information was used or relied on in any fashion, this new information, in formulating his findings and conclusions as set forth in his rebuttal, you haven't even addressed that yet, okay, frankly, it's irrelevant and it's not part of this deposition.
I can appreciate the expense and I can appreciate your wanting to redepose him, but that's not what we're here for. So let's focus in on his report and findings in the form of his rebuttal report and what, if any, information he relied upon in the past or currently or later to form those findings and conclusions. which are pretty limited, like I said, three paragraphs on Page 4.
Q. All right. Mr. Oscher, let me ask you this: Is it your testimony that you have not relied on any of the information or documents that we have sent to you since your last deposition?
MR. CAMPBELL: Again, I'm going to

Page 105

object to the question because it doesn't provide a conclusion. Relied in what context?
MR. COLLIER: Relied to form an opinion that he's going to give in trial in this matter.
A. What I said was that the information that has been provided has not given the details sufficient to evaluate the operations of Mr. Leonard's company, and all I was trying to say was until I received the additional information that has been requested, to draw any further conclusion other than the fact that, you know, I simply don't know, which is the question you asked me earlier, I can't give you any other opinion at this time, sir.
Q. So is it my understanding that you are not going to put up before the jury any of the information I have given to you since the last deposition and try to point out discrepancies in amounts or categories to the jury as we sit here today; is that your testimony?
MR. CAMPBELL: At this juncture I'm going to pose a further objection that that is going to be work product if and when we go through that issue. Travis, he has already

Page 106

said that he has not reached any additional opinions or conclusions based upon anything he's been provided other than contained in his rebuttal report. Let's move on.
Q. My question to him is: Do you intend, sir, to use any of the documents that we sent to you since your last deposition to put it up in front of the jury and to point out any discrepancies to the jury?
A. I don't know.
Q. You're not prepared to testify on that today; is that your testimony?
A. I am not prepared to answer the question the way it is asked because I don't know what the additional information that I will receive, whether or not, you know, that information that I've looked at so far needs to be further evaluated.
Q. So, as we sit here today then, with the information you've been given, you cannot testify one way or the other whether or not Donnie Leonard's financials are inaccurate?
A. That's correct.
Q. And unless you get any additional information, you won't be able to give that testimony at trial; is that fair also?

Page 107

I'm sorry, I can't hear you.
A. I didn't respond. I was thinking about your question.
Q. Are you still thinking?
A. I'm still thinking, yes, sir. Can you repeat the question.
Q. As we sit here today, unless you get additional information, you will not be able to tell a jury whether or not his financials are inaccurate; is that correct?
A. That's correct.
Q. Let me read to you a statement that has been made by the Plaintiff in this case. This is an affidavit that is attached to their Motion for Summary Judgment that we received two days ago. It states that, "At the time, in the '94 to 2001 time frame, Plaintiff, Tires Plus, was located entirely in the Midwest with no company operated, affiliated or franchise tire stores in New Mexico or any state bordering New Mexico, and with no plans to expand its use of the Tires Plus marks into New Mexico."
If you were to assume that to be true, would it be fair to state that you still have and it's still the case that there's no evidence that there would have been a franchise agreement with Don

# EXHIBIT 48

**(follows this page)**

97

1    A. If you look to the inventory markup section at
2  the bottom of the exhibit, you can see --
3    Q. I'll tell you what. Why don't you go ahead and
4  make your changes in red on our exhibit to the
5  deposition.
6    A. Good.
7    What will change is -- the inventory purchase
8  from the franchisors is no longer 75.2 percent. It is
9  now 62.8 percent.
10    Q. All right.
11    A. And the number to be calculated is, when you
12  take the sales of $5,165,000 for tire sales and you
13  multiply it by these percentages, your new total is
14  $311,394, which I'm rounding down to $311,000.
15    That amount then gets carried forward to the --
16  to the next page, which is Exhibit V, so the $387,755 is
17  now the $300,110.
18    The total before incremental expense is now,
19  under the conversion as a franchisee, $629,379, and as a
20  new franchisee, it's $988,831. The incremental expenses
21  will change, and as a conversion, it's $31,469. As a new
22  franchisee, it's $39,442.
23    So the new totals, as a conversion, are
24  $597,910, which would be rounded to $597,500, and for a
25  new franchisee, the total is $939,389, which is rounded

98

1  to $939,000.
2    Q. So going back to Exhibit IV, your calculation
3  on inventory markup is based on an assumption that a
4  franchisee, such as Don Leonard, would buy 62.8 percent
5  of its tires from the plaintiff?
6    A. That's correct, sir.
7    Q. Let's go to Exhibit V. This is a calculation
8  that corresponds to that part of your report that
9  attempts to calculate an economic loss for the plaintiff.
10  Is that accurate?
11    A. Yes, sir.
12    Q. Now, is it your understanding or are you of an
13  opinion, in an indication such as this, that the
14  plaintiff would be entitled to both defendant's profits
15  and an economic damages loss, or are you proposing these
16  as alternative measures of damages?
17    A. I think it's my understanding that they're
18  alternative measures of damages. I don't think they're
19  additive.
20    Q. Okay.
21    A. But, then, I don't know what the --
22    Q. So you're not --
23    A. I don't know the legal side of it, I guess, is
24  my answer.
25    Q. So you can't say?

99

1    A. I think you've asked me for a legal conclusion.
2    Q. If Don Leonard had joined up as a franchisee
3  with the plaintiff in 1994, then you've calculated what
4  you believe he would have paid to the franchisor from
5  1994 on Exhibit V?
6    A. That's exactly correct, sir.
7    Q. And if that were the case, the franchisor would
8  also not have received Don Leonard's profits, as you've
9  calculated in the first paragraph on page four?
10    A. Again, that's my understanding, but I don't
11  know the law, so I'm just giving you my --
12    Q. Well, I'm just asking you as a function of how
13  you understand the franchise agreement worked. Isn't
14  that correct? If Don had signed up as a franchisee --
15    A. There wouldn't be any reason to go after the
16  profits.
17    Q. Exactly.
18    A. Yes, sir.
19    Q. So, in a sense, if a jury or a judge were to
20  award both defendant's profits and plaintiff's economic
21  damages, that would be double-dipping. Would you agree
22  with that?
23    A. To me, it would.
24    MR. CAMPBELL: Arguably, it calls for a legal
25  conclusion.

100

1    Q. Would you agree with that from an accounting
2  standpoint?
3    A. Yes, sir.
4    Q. Now, the economic damages that you've listed
5  here assume, as I understand it, that Don Leonard would
6  have signed up as a franchisee; is that correct?
7    A. Yes, sir.
8    Q. Are you aware of any evidence that suggests
9  that the plaintiff was even offering franchises here in
10  New Mexico in 1994?
11    A. I think there was some correspondence or
12  communication with Mr. Leonard back then.
13    Again, there's something with regards to
14  another party, and I think that's what I was referring to
15  under "Other" on page four, about a Mr. Fox who had
16  expressed an interest. So, I mean, that's been my
17  understanding from what I've seen.
18    Q. Well, if you were to assume that the plaintiff
19  had no plans to open franchises in New Mexico until the
20  year -- well, even to the present, then would you agree
21  that it's not appropriate to try to calculate damages as
22  if Don Leonard had opened a franchise?
23    MR. CAMPBELL: Objection, calls for a legal
24  conclusion.
25    A. Yeah, I would have given you that answer. I